UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA                     :

   - v. -                                   :        14 Cr. 741 (KMK)

IRVING RUBIN,                                :
  a/k/a "Joseph Rubin,"
YEHUDA RUBIN,                                :
  a/k/a "Yidel Rubin,"
PINCHUS GLAUBER,                             :
MARTIN KOFMAN,
JOEL KOPPEL,                                 :
  a/k/a "Yoel Koppel,"
  a/k/a "Joel Kopple,"                       :
BENZION KRAUS,
  a/k/a "Benzion Krauz,"                     :
  a/k/a "Benzion Krause,"
HERMAN MAUSKOPF,                             :
ABRAHAM RUBIN,
DESIREE RUBIN,                               :
  a/k/a "Henchy Rubin,"
JACOB RUBIN                                  :
  a/k/a "Yaakov Rubin,
JOEL RUBIN,                                  :
  a/k/a "Yoel Rubin,
RACHEL RUBIN,                                :
  a/k/a "Ruchy Rubin,"
RIFKA RUBIN,                                 :
  a/k/a "Sura Rubin,"
RIVKY RUBIN,                                 :
  a/k/a "Rivka Rubin," and
SAMUEL RUBIN,                                :
  a/k/a "Shaye Rubin,"
                                             :
                Defendants.
                                             :
------------------------------------------------------------x

# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Benjamin Allee
Kathryn Martin
Michael D. Maimin
Assistant United States Attorneys
Of Counsel

The Government respectfully submits this memorandum in response to the defendants' motions for a bill of particulars. (Docket ## 149, 152). For the reasons set forth below, the motions should be denied.

**THE INDICTMENT**

On November 13, 2014, a 32-page indictment (the "Indictment") was unsealed charging 15 defendants with one or more of the following crimes: conspiracy to commit bank fraud and wire fraud, in violation of Title 18, United States Code, Section 1349 (Count One); conspiracy to make false statements to lenders, in violation of Title 18, United States Code, Section 371 (Count Two); bank fraud, in violation of Title 18, United States Code, Sections 1344 and 2 (Counts Three through Eleven); making false statements to lenders, in violation of Title 18, United States Code, Sections 1014 and 2 (Counts Twelve through Fifteen); aggravated identity theft, in violation of Title 18, United States Code, Section 1028A (Count Sixteen); and theft of public money, in violation of Title 18, United States Code, Sections 641 and 2 (Counts Seventeen through Twenty-One).

As set forth in the Indictment, the defendants include IRVING RUBIN, a purported real estate developer; YEHUDA RUBIN, a purported mortgage broker and real estate developer and IRVING RUBIN's son; ABRAHAM RUBIN, JACOB RUBIN, SAMUEL RUBIN, JOEL RUBIN, DESIREE RUBIN, JOEL KOPPEL, BENZION KRAUS, RIFKA RUBIN, RACHEL RUBIN, and RIVKY RUBIN, each of whom is a relative or relative-in-law of IRVING RUBIN and claimed to own properties in Brooklyn, Manhattan, and Orange County, New York; MARTIN KOFMAN, a real estate lawyer; and PINCHUS GLAUBER, a real estate appraiser. (Ind. ¶¶ 1(a)-(d)).[1]

---

[1] The fifteenth defendant, HERMAN MAUSKOPF, is not charged in Count One. He is charged in Count Twenty with theft of public money. (Ind. ¶ 23).

1

The Indictment alleges that these defendants participated in a massive fraud conspiracy, in which numerous mortgage and other loans secured by properties were obtained from banks upon misrepresentations. In particular, the Indictment sets forth the following:

From at least in or about 2004 through in or about 2014, the defendants fraudulently obtained mortgage loans and other loans from banks and other lending institutions (the "lenders"). The defendants obtained the loans by providing materially false information to the lenders about the borrowers' assets and liabilities, including but not limited to false information about the borrower's employment, income, bank accounts, and primary residence. Through their scheme, the defendants fraudulently obtained more than $20 million in loan proceeds in connection with more than twenty fraudulent loans. The majority of the loans went into default, and millions of dollars in loan proceeds were not repaid. (Ind. ¶ 2).

As part of the scheme to defraud, the defendants used the fraudulent loan proceeds to personally enrich themselves and their families. Fraudulently obtained loan proceeds were used toward, among other things, (i) credit card debts for personal expenses of defendants, (ii) personal home mortgage payments of defendants, (iii) other real estate development projects including projects from which the defendants and others earned rental income, and (iv) debts arising from other fraudulently obtained loans, to conceal the fraudulent nature of these loans. (Ind. ¶ 3).

As part of the scheme to defraud, the defendants and others known and unknown also engaged in extensive efforts to perpetuate and conceal the fraudulent scheme. These efforts included, but were not limited to:

    a. numerous members of the conspiracy acting as the borrowers for different loans, falsely claiming that the purpose of the loans was to purchase or refinance their primary

residence, when, in fact the property was not their primary residence, and the loan proceeds were later distributed to other members of the conspiracy and to entities they controlled;

   b. the common claim by multiple co-conspirators acting as borrowers of sole ownership or control of assets or bank accounts, to give the false appearance of creditworthiness, when in fact the assets and/or bank accounts were non-existent or were owned and controlled by other members of the conspiracy, and the borrower either had joint or no ownership of them;

   c. sham transfers of ownership of properties from one member of the conspiracy to another, or to other trusted individuals, thereby confounding attempts by lenders to recover on defaulted loans and facilitating further fraudulent borrowing against the properties; and

   d. following default on a fraudulently obtained loan, coordinated efforts to deceive the lender into granting a satisfaction of the debt at a significant loss, such as by proposing short sales of properties that, unbeknownst to the lender, were not arm's-length transactions.

(Ind. ¶ 4).

 In furtherance of the scheme to defraud, members of the conspiracy participated in fraudulently obtaining loans in several ways, including but not limited to the following:

   a. YEHUDA RUBIN, the defendant, was an organizer of the fraudulent scheme. YEHUDA RUBIN personally participated in at least ten of the particular fraudulent loans, in various roles, including as borrower, borrower's power of attorney, mortgage broker, distributor of fraudulent loan proceeds, and arranger of short sales.

   b. IRVING RUBIN, DESIREE RUBIN, ABRAHAM RUBIN, JACOB RUBIN, SAMUEL RUBIN, JOEL RUBIN, RIVKY RUBIN, RACHEL RUBIN, JOEL

3

KOPPEL, RIFKA RUBIN, and BENZION KRAUSE, the defendants, were borrowers who fraudulently obtained loans from banks and other lenders. Working in concert with co-conspirators, they obtained loans upon false representations and pretenses. IRVING RUBIN, ABRAHAM RUBIN, JACOB RUBIN, SAMUEL RUBIN, and JOEL RUBIN, among others, also participated in the scheme by, among other things, (i) obtaining ownership of properties, (ii) assisting other borrowers in making false representations, (iii) receiving fraudulent loan proceeds, (iv) obtaining and distributing rental income on the properties, and (v) assisting in efforts to prevent or dissuade a lender from collecting on a defaulted loan.

        c.       MARTIN KOFMAN, the defendant, acted as real estate attorney on numerous transactions associated with the fraudulent loans, including closings. KOFMAN, through his law firm's trust account, distributed fraudulent loan proceeds between and among members of the conspiracy. KOFMAN also provided false information to lenders, including "show checks," to deceive a bank into believing that the borrower had made a down payment toward the purchase of a property, when in fact the borrower made no such payment and the checks were ultimately deposited back into the law firm's trust account.

        d.       PINCHUS GLAUBER, the defendant, completed multiple appraisals of properties in connection with particular fraudulent loans. GLAUBER included false information in the appraisals, including about the detail with which he had inspected the properties he appraised. The estimated value of certain properties appraised by GLAUBER was false and inflated.

(Ind. ¶ 5).

At the same time that the defendants were representing to banks that they had substantial income and assets, they were also representing to state and local agencies that they had little or

4

no income and assets and were entitled to receive various forms of public assistance, including Medicaid, Food Stamps, and Home Energy Assistance Program ("HEAP") benefits. For example:

  a. YEHUDA RUBIN and RACHEL RUBIN, the defendants, received Medicaid and Food Stamps at various times during the conspiracy. To receive benefits, they claimed, among other things, that their only income was $180 per month, and later $360 bi-weekly, from RACHEL RUBIN's employment. To receive loans totaling more than $1 million, on the other hand, YEHUDA RUBIN claimed that he was employed, earning more than $17,000 per month in employment and rental income, and RACHEL RUBIN claimed that she was employed, earning $14,000 per month.

  b. JOEL RUBIN and RIVKY RUBIN, the defendants, received Medicaid and Food Stamps at various times during the conspiracy. To receive benefits, they claimed, among other things, that they were homeless, and later that their only income was $130 per week and $180 per week. To receive loans totaling more than $1 million, on the other hand, they claimed that RIVKY RUBIN was employed and had an income of $12,000 per month.

  c. SAMUEL RUBIN, the defendant, received Medicaid and Food Stamps at various times during the conspiracy. To receive benefits, SAMUEL RUBIN claimed, among other things, an income of $200 per week and $0 in financial resources. To receive loans in excess of $7 million, however, SAMUEL RUBIN claimed an income of more than $350,000 per year and a net worth of more than $10 million.

  d. IRVING RUBIN and DESIREE RUBIN, the defendants, received Medicaid at various times during the conspiracy. To receive benefits, IRVING RUBIN and DESIREE RUBIN claimed, among other things, that their only income was $1,200 per week,

from IRVING RUBIN's employment at Tristate Management. To receive a loan in excess of $500,000, on the other hand, IRVING RUBIN and DESIREE RUBIN claimed, among other things, that DESIREE RUBIN was employed at Tristate Management with a monthly income of $16,000. (Ind. ¶ 6).

As part of the scheme to defraud, the defendants defrauded financial institutions, as that term is defined under Title 18, United States Code, Section 20. The defendants also used and caused to be used interstate wire communications in furtherance of the scheme to defraud. (Ind. ¶ 7).

In furtherance of the conspiracy and to effect the illegal objects thereof, the defendants, and others known and unknown, fraudulently obtained mortgage loans and other loans in connection with numerous properties, including but not limited to the properties described below, making misrepresentations concerning, among other subjects, the subjects below:

| Property | BORROWER | APPROX-IMATE LOAN AMOUNT | LOAN YEAR | Subjects of False and Fraudulent Misrepresentations |
|---|---|---|---|---|
| 5 Kosnitz Drive, Monroe | RACHEL RUBIN | $260,000 | 2007 | employment, income, bank account |
| | RACHEL RUBIN | $136,000 | 2007 | employment, income |
| 53 West 119th St., Manhattan | YEHUDA RUBIN | $1,050,000 | 2006 | primary residence, employment, income |
| | YEHUDA RUBIN | $350,000 | 2007 | primary residence, employment, income |
| 418 Lafayette Ave., Brooklyn | DESIREE RUBIN | $533,000 | 2006 | primary residence, employment, income, bank account |
| 63 South 4th St., Brooklyn | RIVKY RUBIN | $1,000,000 | 2006 | primary residence, employment, income |
| 103-105 Skillman St. Unit 7R, Brooklyn | YEHUDA RUBIN - as power of attorney | $370,000 | 2007 | primary residence, employment |
| 115 Hart St., Brooklyn | JOEL KOPPEL | $487,000 | 2012 | rent and tenant information |
| 119-121 Hart. St., Brooklyn | YEHUDA RUBIN | $512,000 | 2007 | primary residence, income, employment |
| | YEHUDA RUBIN | $148,000 | 2007 | primary residence |
| 863 Hancock St., Brooklyn | SAMUEL RUBIN | $700,000 | 2010 | rent and tenant information |
| 872 Bedford Ave., Unit 2, Brooklyn | RACHEL RUBIN | $225,000 | 2006 | primary residence, employment, income |
| | IRVING RUBIN | $292,000 | 2005 | primary residence |
| 872 Bedford Ave., Unit 3, | BENZION KRAUS | $285,000 | 2007 | bank account, purchase price |

| | | | | |
|---|---|---|---|---|
| Brooklyn | | | | |
| 860 Bedford Ave., Unit 1, Brooklyn | RIFKA RUBIN | $536,000 | 2005 | employment, income, bank account |
| 860 Bedford Ave., Unit 2, Brooklyn | RIFKA RUBIN | $216,000 | 2006 | employment, income, bank account |
| 874 Bedford Ave., Unit 3, Brooklyn | ABRAHAM RUBIN | $250,000 | 2006 | primary residence, income |
| | ABRAHAM RUBIN | $250,000 | 2006 | primary residence, income |
| | ABRAHAM RUBIN | $250,000 | 2006 | primary residence, income |
| 268 Wallabout St., Unit 1, Brooklyn | RIVKY RUBIN | $440,000 | 2006 | income, employment |
| | RIVKY RUBIN | $300,000 | 2007 | income, employment |
| 366 South 5th St., Brooklyn | SAMUEL RUBIN | $2,600,000 | 2013 | assets, net worth, rent information |
| 374 South 5th St., Brooklyn | SAMUEL RUBIN | $2,500,000 | 2013 | assets, net worth, rent information |
| 35 Vernon St., Brooklyn | JOEL KOPPEL | $487,000 | 2013 | rent and tenant information |
| 9720 Kings Hwy., Brooklyn | SAMUEL RUBIN | $7,200,000 | 2009 | down payment, assets, net worth |

The Indictment also sets forth in Count Two, in which the defendants are charged with conspiracy to make false statements to lenders, fourteen overt acts, each of which describes an act and/or representation by a defendant in furtherance of the charged conspiracy. (Ind. ¶ 15) (E.g. "a. "On or about December 23, 2005, RIFKA RUBIN, the defendant, in connection with a loan associated with 860 Bedford Ave., Unit 1, Brooklyn, New York, signed a loan application stating that she had a bank account at Apple Bank.").

8

The Indictment also sets forth in Counts Three through Eleven, in which certain defendants are charged with bank fraud, another chart listing, for each count, the defendant, the lender, the loan and property, the loan year, and the subject of the false and fraudulent misrepresentation(s). (Ind. ¶ 17).

The Indictment also sets forth in Counts Twelve through Fifteen, in which certain defendants are charged with making false statements to lenders, another chart listing, for each count, the defendant, the lender, the loan and property, the date, and the false statement(s). (Ind. ¶ 19).

The Indictment also sets forth in Count Sixteen, in which Joel Koppel is charged with aggravated identity theft, that KOPPEL "submitted or caused to be submitted fake lease agreements using the real names and purported signatures of purported tenants without their knowledge or consent, in connection with an application by KOPPEL to obtain a loan, during and in relation to the conspiracy to commit bank and wire fraud charged in Count One of this Indictment." (Ind. ¶ 21). As set forth above, Count One of the Indictment specifies that Koppel is the alleged borrower for two loans, on 115 Hart St. and 35 Vernon St. (Ind. ¶ 8).

The Indictment also sets forth in Counts Seventeen through Twenty-One, in which certain defendants are charged with theft of public money, that the defendants "falsely reported and omitted information about their income, assets, and or other financial information to obtain Medicaid and Food Stamps benefits to which they were not entitled," and includes another chart listing, for each count, the defendant, the type of benefit, the dates, and the approximate amount of public money received. (Ind. ¶ 23).

# ARGUMENT

The defendants move for a bill of particulars. The defendants seek extensive and detailed information about the scope and specifics of the Government's direct case as to each defendant were the case to proceed to trial. As to Count One, in which the defendants are charged with conspiracy to commit bank and wire fraud, the defendants ask the Court to order the Government: (1) to identify each property for which a fraudulent loan was obtained, the misrepresentations as to each loan, and the co-conspirators who allegedly participated in each fraudulent loan; (2) to provide additional information about sham transfers of property, as alleged in paragraph 4(c) of the Indictment; and (3) to provide additional information about the coordinated efforts to deceive lenders into granting satisfaction of debts, as alleged in paragraph 4(d) of the Indictment. (Def. Br., at 5-6). As to Count Two, in which the defendants are charged with conspiracy to make false statements to lenders, the defendants seek identification of each allegedly false statement and each co-conspirator involved in the making of the false statement. (Def. Br., at 6). As to Counts Three through Fifteen, in which certain defendants are charged with bank fraud and making false statements to lenders, the defendants seek identification of each alleged misrepresentation and false statement and any document where they appeared. (Def. Br., at 6). As to Count Sixteen, in which Joel Koppel is charged with aggravated identity theft, the defendants seek specification of the allegedly fake lease agreements and identification of the signatures and loan applications at issue. (Def. Br., at 6). As to Counts Seventeen through Twenty-One, in which certain defendants are charged with theft of public money, the defendants seek details about the alleged misrepresentations made in order to steal the public benefits as alleged. (Def. Br., at 6.)

Additionally, in a separate brief, defendant Martin Kofman requests further particulars, such as information specifying, among other things: (1) when Kofman is alleged to have joined

10

the conspiracy and how long he remained a member; (2) all representations made by Kofman that were false, knowingly false, and material; (3) identification of documents in which Kofman made false representations; and (4) any other alleged conduct in which Kofman engaged knowingly and intentionally that aided and abetted the scheme to defraud. (Kofman Br., at 3-4).

For the reasons below, the defendants' motions should be denied. The Indictment, with its extensive discussion of the means and methods of the fraud conspiracy including specific discussion of aspects of the scheme, more than satisfies the purposes of an indictment, which are to put the defendants on notice of the charges and to enable them to assert a claim of double jeopardy at a later date. The defendants' requests amount to attempts to obtain a preview of the Government's direct case, to learn by way of interrogatory the details of the Government's proof at trial as to each defendant. The requests should be rejected, as the defendants are properly charged and on fair and substantial notice of the charges against them.

**I.     Applicable Law**

A bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." United States v. Kazarian, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *24-26 (S.D.N.Y. May 18, 2012); United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995). Rather, a bill of particulars is required only where the indictment is so general that it does not advise the defendant of the specific acts of which he is accused. United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (citations omitted); United States v. Gibson, 2001 WL 460935, at *3 (S.D.N.Y. May 1, 2001) ("[A] bill of particulars is not a matter of right."). A motion for a bill of particulars should be granted only where necessary (1) to inform the accused of the charge against him with sufficient precision to enable him to prepare his defense and avoid surprise; and (2) to enable the

accused to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. See Wong Tai v. United States, 273 U.S. 77, 82 (1927); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).

"It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case." United States v. Payden, 613 F. Supp. 800, 816 (S.D.N.Y. 1985). Further, supplying evidentiary detail is not the function of the bill of particulars. See Torres, 901 F.2d at 234. It is not the function of a bill of particulars to allow defendants to preview the evidence or theory of the Government's case. United States v. Taylor, 707 F. Supp. 696, 699 (S.D.N.Y. 1989) (citations omitted); United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985).

Nor is it the purpose of an Indictment or bill of particulars to provide detailed information about the conspiracy, such as how and when the conspiracy was formed, or when each participant entered it. United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989); see also United States v. Tymes, 1999 WL 34971, at *2 (N.D.N.Y. 1999). Where the indictment "describes in careful detail the nature and goals of the charged conspiracy," and it "discloses sufficient information to inform the defendants adequately of the charges against them," a bill of particulars is not warranted. United States v. Ferrarini, 9 F. Supp. 2d 284, 299 (S.D.N.Y. 1998) (denying request for particularity of defendant's specific role and the actions taken by the defendant); see United States v. Zemlyansky, 945 F. Supp. 2d 438, 484-85 (S.D.N.Y. 2013) (denying request for "specification of the false and fraudulent representations . . . and the respect to which the statement is false"); Kazarian, 2012 WL 1810214, at *26 (denying request for particulars about "the dates and locations of acts and

conduct [the defendant] is alleged to have performed, and his alleged role in the charged conspiracies," because "[t]he Government need not disclose the date a defendant is alleged to have joined the conspiracy, the identities of all co-conspirators, the precise dates and locations when and where the defendant assisted the conspiracy, and the means by which defendants furthered the conspiracy."); United States v. Samsonov, 07 Cr. 1198 (CM), 2009 WL 176721, at *2-4 (S.D.N.Y. Jan. 23, 2009) (bill of particulars should not be "misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches"); United States v. Bin Laden, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have almost uniformly been denied."); Feola, 651 F. Supp. at 1132 ("Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial.").

In addition, if the information sought by a defendant is provided in the indictment or through some other means, a bill of particulars is not necessary. See Bortnovsky, 820 F.2d at 574; see, e.g., United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984) (noting production of relevant insurance files in fraud case); Kazarian, 2012 WL 1810214 (noting the "enormous amount of discovery material," which "provide[s the defendant] with much of the information sought in the request for a bill of particulars").

## II. Discussion

There is no basis for a bill of particulars in this case. The defendants are charged in a detailed Indictment that sets forth with more than usual detail the criminal conspiracy with which they are charged. The Indictment describes at length and in detail the scheme to defraud, specifying, among other things, the nature of the fraud conspiracy, the manner by which the co-

13

conspirators defrauded the lenders, the time period of the fraud conspiracy, and the efforts undertaken by co-conspirators in furtherance of the conspiracy. (Ind. ¶¶ 2-4). The Indictment describes, for example, specific aspects of the fraud conspiracy, including the defendants' efforts to falsely claim properties as their primary residence, to falsely claim assets of others or non-existent bank accounts as theirs; to engage in sham transfers of ownership of properties from one member of the conspiracy to another; and to coordinate efforts to obtain loan reductions and forgiveness from banks after defaulting. (Ind. ¶ 4(a)-(d)). The Indictment describes ways in which each defendant participated in the fraud scheme. (E.g., Ind. ¶¶ 5(a)-(d), 8, 15(a)-(n), 17, 19, 21). And the Indictment lists, in chart form, twenty-five loans regarding eighteen properties, specifying not only the property, borrower, loan amount, and date, but also the subject matter of misrepresentations on the loans. (Ind. ¶ 8; see also ¶¶ 17, 19 (charts listing more information about loans and misrepresentations). The Indictment more than satisfies pleading standards and sufficiently puts the defendants on notice of the charges against them and enables them to assert a defense of double jeopardy later if necessary.

In addition, the Government has produced voluminous discovery relating to the allegations in the Indictment, by which the defendants are on further notice of the charges. See Bortnovsky, 820 F.2d at 574; Panza, 750 F.2d at 1148; Kazarian, 2012 WL 1810214, at *25. The discovery includes loan files, additional bank records, public records regarding properties at issue, credit card records, welfare files and additional charts regarding receipt of welfare funds, and other documents. In addition, the Government produced in discovery a disc containing 23 pdf files assembling documents related to mortgage and other loans in this case, including documents regarding transfers of ownership of the properties that were the subjects of the loans, loan applications, closing information, bank records, correspondence regarding attempts to

modify or extinguish the loans, and other records. These compilations were related to loans on the properties listed in the Indictment (but for 374 South 5th St.), as well as additional properties: 95-99 Skillman St. and 858 Bedford Ave., in Brooklyn. These files further put the defendants on notice of the nature of the charges against them.

The defendants claim that a bill of particulars is necessary in order for them to know the Government's view as to each defendant's specific role in the scheme, including the Government's view as to which loans each defendant directly participated in, and the transactions and misrepresentations in which each defendant directly participated. (Def. Br., at 8, 10; Kofman Br., at 3-4). These are not proper bases, however, for a bill of particulars. See Ferrarini, 9 F. Supp. 2d at 299 (S.D.N.Y. 1998) (denying request for particularity of defendant's specific role and the actions taken by the defendant); Zemlyansky, 945 F. Supp. 2d at 484-85 (denying request for "specification of the false and fraudulent representations . . . and the respect to which the statement is false"); Kazarian, 2012 WL 1810214, at *26 (denying request for particulars about "the dates and locations of acts and conduct [the defendant] is alleged to have performed, and his alleged role in the charged conspiracies," because "[t]he Government need not disclose the date a defendant is alleged to have joined the conspiracy, the identities of all co-conspirators, the precise dates and locations when and where the defendant assisted the conspiracy, and the means by which defendants furthered the conspiracy."); United States v. Bin Laden, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have almost uniformly been denied."); Feola, 651 F. Supp. at 1132 ("Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial.").

15

The defendants also claim that the discovery is too voluminous and unwieldy to apprise them of the nature of the charges. (Def. Br., at 10-11). The Government agrees that the discovery is voluminous. Moreover it is continuing, as are efforts to make previously disclosed discovery more user-friendly. But these are not bases for ordering a bill of particulars. The reason that the discovery is extensive is that it is a reflection of the scale and duration of the fraud conspiracy. Within the discovery, and within the disc containing the compilations of certain property-specific documents discussed above, is more information apprising the defendants of the nature of the charges and enabling the defense to prepare for trial.

The defendants also claim that a bill of particulars is required because the Indictment is "non-exhaustive," that is, the lists of properties and loans and types of misrepresentations specified in the Indictment do not include all of the properties and fraudulent loans and misrepresentations that were part of the fraud conspiracy. (Def. Br., at 9). The defendants are correct that the lists set forth in the Indictment are non-exhaustive. For example, at trial the Government may prove up fraudulent loans of which it is aware in addition to those included in the lists in paragraphs 8, 17, and 19, including loans referred to elsewhere in the Indictment and loans for which it has produced discovery such as loans related to the properties at 95-99 Skillman Street, 858 Bedford Avenue (referred to supra), 128 Heyward Avenue 1st Floor, 656 Metropolitan Avenue, each in Brooklyn, New York (see Ind. ¶¶ 24(v), (w)), and other properties. There is no requirement, however, that an indictment be exhaustive in its detail, and the provision of a non-exhaustive list is no basis for ordering a bill of particulars, "which would confine the Government's proof to particulars furnished and restrict unduly the Government's ability to present its case." United States v. Mahaffy, 446 F. Supp. 2d 115, 119-20 (E.D.N.Y. 2006); Samsonov, 07 Cr. 1198 (CM), 2009 WL 176721, at *2-4 (S.D.N.Y. Jan. 23, 2009) (bill of

16

particulars should not be "misused . . . to foreclose the Government from using proof it may develop as the trial approaches").

The defendants also claim that there are aspects of this case that unusually require a bill of particulars, such as that it charges a fraud scheme spanning ten years, it includes defendants who may have had other business transactions with each other than the allegedly criminal transactions, and it is a case with "complexity." (Def. Br., at 10; Kofman Br., at 3). Again, however, these are not circumstances that justify the ordering of a bill of particulars, unless, as in any case, they result in the defendants being unaware of what they are charged with or unable to assert double jeopardy. Such requests for bills of particulars in large, multi-defendant, complex fraud cases are regularly denied when the Indictment meets the required standards. See, e.g., Kazarian, 2012 WL 1810214, at *26 (denying request in twenty-plus defendant fraud case involving dozens of fraudulent medical clinics with which only certain defendants were involved).

This is not a case, as defendants argue, like Bortnovsky, where portions of the Government's trial proof were "shrouded in mystery" to such extent that the burden of proof essentially shifted to the defense to disprove burglaries that were ultimately beside the point. 820 F.2d at 574-75. Rather, the Indictment is detailed and specific. The discovery is extensive, and also includes compilations of some of the particularly relevant documents. Moreover, the Government has and will continue to meet with defense counsel at their request to discuss the case, including the charges and the Government's theory and certain of the anticipated trial proof. In addition, the Government anticipates that, consistent with this Court's prior practice, trial exhibits will be marked and disclosed several weeks in advance of trial, and as a result of

this and other pre-trial disclosures trial in this case will have none of the unfair mystery that haunted Bortnovsky.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the defendants' motions for a bill of particulars should be denied.

Dated: White Plains, New York
November 13, 2015

    Respectfully submitted,

    PREET BHARARA
    United States Attorney

By:   /s/ Benjamin Allee
    Benjamin Allee/Kathryn Martin/Michael Maimin
    Assistant United States Attorneys
    (914) 993-1962/1963/1952