UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

IRVING RUBIN, et al.,

Defendants.

No. 14 Cr. 741 (KMK)

**CORRECTED DEFENSE SENTENCING MEMORANDUM
ON BEHALF OF YEHUDA RUBIN**

HAFETZ & NECHELES LLP
Susan R. Necheles
Kathleen E. Cassidy
10 East 40th Street, 48th Floor

*Attorneys for Defendant Yehuda Rubin*

November 1, 2017

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

Introduction ……………………………………………………………………1

I.  The Offense Conduct and the Plea Agreement…………………………………………2

II. History and Characteristics of Yehuda Rubin……………………………………………4

    A.  Yehuda's Childhood and Family Life……………………………………………4

    B.  Yehuda's Involvement in the Real Estate Business……………………………6

    C.  Yehuda Today……………………………………………………………10

        1.  Family Life……………………………………………………………10

        2.  Business………………………………………………………………14

        3.  Contributions to Others……………………………………………17

III. A Below Guidelines Sentence Is a Just and Reasonable Sentence for Yehuda under the 3553(a) Factors……………………………………………………………22

    A.  Yehuda's Age at the Time of the Offense Conduct is a Mitigating Factor the Court Should Take into Account……………………………………………22

    B.  The Pre-Financial Crisis Context for Yehuda's Conduct is a Mitigating Factor..27

    C.  The Guidelines Calculation Based on Yehuda's Criminal History Overstates His Culpability……………………………………………………………32

    D.  A Below Guidelines Sentence Is Sufficient but Not Greater Than Necessary to Fulfill the Aims of Punishment……………………………………………33

    E.  The Court Can Recommend That the Bureau of Prisons Designate a Halfway House as a Correctional Institute Where Yehuda Serves His Sentence………34

IV. Restitution………………………………………………………………35

    Conclusion………………………………………………………………36

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*Graham v. Florida*, 560 U.S. 48 (2010) ……………………………………………… 24

*Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006) …………………………………………35

*Miller v. Alabama*, 567 U.S. 460 (2012) …………………………………………… 23, 24

*State v. Null*, 836 N.W.2d 41 (Iowa 2013) ……………………………………………23

*State v. O'Dell*, 183 Wn.2d 680 (Wash. 2015) …………………………………22, 23

*United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013) ………………………………24

*Roper v. Simmons*, 543 U.S. 551 (2005) …………………………………………22, 23, 24, 25

**STATUTES**

18 U.S.C.

§ 371………………………………………………………………………2
§ 3553…………………………………………………………………*passim*
§ 3621………………………………………………………………………*35*

Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, 123 Stat 1617 § 4 (2009) ………28

**UNITED STATES SENTENCING GUIDELINES**

§ 2B1.1……………………………………………………………………… 3
§ 3E1.1……………………………………………………………………… 3

## Introduction

We respectfully submit this memorandum on behalf of Yehuda Rubin,[1] who is scheduled to be sentenced on November 14, 2017.

Yehuda pled guilty to one count of conspiracy to make false statements to lenders. He admitted that in 2006-2007, and again on one occasion in 2013, he made false statements to banks in connection with applications for mortgages and home equity loans related to four properties. As stipulated in the plea agreement and at the plea hearing, the loss amount to the banks as a result of the loans procured with Yehuda's false statements was between $550,000 and $1.5 million.

This was a serious offense, one that Yehuda takes full responsibility for. He lied to lenders because he thought that the properties purchased with the mortgage loans, or improved with the home equity loans, would increase in value and that he would then be able to sell them and pay off the loans at the time of the sale. He was wrong. He was unable to repay the bank loans or resell the properties at a price that would allow repayment of the loans, and the banks, as a result, lost money on three of the four properties in question.

In this Memorandum, we seek not to minimize Yehuda's serious criminal conduct, but to situate it in the context of his life experience and to show what kind of person Yehuda is apart from the actions that are the subject of this case. In particular, in reaching an appropriate and just sentence, we ask the Court to take into consideration that the bulk of Yehuda's criminal conduct – and the full scope of the criminal conduct that resulted in losses to lenders – occurred in 2006 and 2007 when he was 21 and 22 years old. Today, at age 32, Yehuda is a different

---

[1] We refer to Mr. Rubin throughout this Memorandum as Yehuda, for clarity's sake, due to the number of Rubin defendants who are before the Court in connection with this case. Yehuda also goes by the nicknames "Yidel" and "Jay," so the letters to the Court from family, friends, and co-workers also refer to him by these nicknames.

man.  He is a loving husband and a father to four children aged one-and-a-half to 12.  He is a

responsible business person with a thriving and growing company that employs 29 people.

The stipulated Guidelines range based on the loss amount is 27-33 months.  The

Probation Department, however, recommended a sentence of a year and a day, well below the

stipulated Guidelines range.  PSR p. 26-28.  Based on an application of the § 3553(a) factors, as

discussed below, we ask that the Court sentence Yehuda to Probation's recommended sentence,

although we request that the Court sentence him to one day less – a year – so that the Court can

recommend that Yehuda serve his sentence in a halfway house to allow him to continue working.

**I.      The Offense Conduct and the Plea Agreement**

Pursuant to a plea agreement, Yehuda pled guilty to one count of conspiracy to make

false statements to lenders in violation of 18 U.S.C. § 371.  Yehuda admitted in his plea that

between 2006 and 2007 and again on one occasion in 2013, he participated in a conspiracy to

obtain bank loans by making false statements in connection with four different properties.  Three

of the four properties were investment properties in Brooklyn that Yehuda or his family members

were developing in order to try to profit either by resale or by rental.  The fourth was Yehuda's

own apartment in Monroe, NY.  We identify the four properties here and describe the

circumstances regarding each at further length below.  *See infra* at pp. 6-10.

> _418 Lafayette Avenue (2006)_ – 418 Lafayette Avenue is a property on which Yehuda
> acted as the mortgage broker in 2006.  The mortgage application, as Yehuda knew when
> he signed as the broker, contained false statements about the applicant's income,
> employment, and primary residence.  The lender, Bank of America, issued a loan of
> $533,000.  The loan ultimately went into default.  The bank does not currently have clear
> title to the property, but if the bank is able to clear title, the value of the property would
> be more than enough to satisfy the outstanding debt on the property.
>
> _5 Kosnitz Drive, Unit 302 (2007)_ – The following year, Yehuda sought to purchase an
> apartment in Monroe, NY to live in with his wife, Rachel, and their baby, S███.  Acting
> under a power of attorney, Yehuda applied for a mortgage for $260,000 from Bank of
> America in Rachel's name.  On the application, Yehuda fabricated Rachel's income and

employment.  Shortly thereafter, Yehuda also took out a home equity loan from Bank of America for $136,000 on the family's apartment, again in Rachel's name, and again based on the same false information about her income and employment.  Ultimately, Yehuda could not make the loan payments and defaulted on the loan.  He resolved the outstanding loans with the bank for $90,000 after a short sale to his neighbor, who then continued renting the house to Yehuda and Rachel to live in.  Thus, the bank loss on this property was $306,000, taking into account the $90,000 paid to the bank in connection with the short sale.  The Rubin family continues to reside at 5 Kosnitz Drive.

*119-121 Hart Street (2007)* – With respect to 119-121 Hart Street, Yehuda took out a mortgage and a home equity loan on this property in his own name in 2007.  He lied to the lender, Bank of America, about his primary residence, income, and employment.  In total, the loans were for $660,000.  Once Yehuda became unable to make the loan payments, he arranged a short sale in which the bank was repaid for $370,000 of the original loan amount.  Thus, the loss amount attributable to this property was $290,000.

*35 Vernon Avenue (2013)* – In 2013, Yehuda, acting through an LLC with a friend agreeing to act as the named borrower, took out a mortgage on 35 Vernon Avenue, a multi-family residential property Yehuda had purchased in 2012.  The false statement on this mortgage application pertained to the amount of rental income for a different mortgaged property, which was listed under the borrower's assets.  The rent on the other property was overstated by approximately $2,000 per month.  There was no loss to the bank in connection with the 35 Vernon loan, as the mortgage is still a performing loan.

The plea agreement, based on Yehuda's admission to having made the above-described false statements to the banks, arrives at a stipulated loss amount of more than $550,000 but less than $1.5 million.  Pursuant to the November 2016 Guidelines Manual, the Guidelines calculation is as follows:

- The base offense level is 6. U.S.S.G. § 2B1.1(a)(2).

- The loss amount of $550,000 to $1.5 million adds 14 points. § 2B1.1(b)(1)(H).

- Yehuda's timely acceptance of responsibility subtracts 3 points. § 3E1.1(a) and (b).

- The total Guidelines offense level is 17.

Yehuda's Criminal History Category is II.  He has one prior NY state offense, a count of Grand Larceny in the 3rd Degree from 2011 related to bouncing checks in his bank account, for

which he was sentenced to a term of conditional discharge of three years.[2]  However, because the criminal conduct with respect to the Vernon Avenue property occurred while Yehuda was on conditional discharge for the state offense, two criminal history points are added.  Yehuda thus has a total of three criminal history points, putting him in Category II.

The resulting sentencing range for an offense level of 17 in Category II is 27-33 months' imprisonment.  In addition, the applicable fine range is $5,000 to $50,000 based on the November 1, 2014 manual.  The PSR reaches the same conclusion as to Yehuda's Guidelines recommended sentence.  PSR ¶ 13.

## II.      History and Characteristics of Yehuda Rubin

### A.  Yehuda's Childhood and Family Life

Born in 1985, Yehuda was raised in Williamsburg, Brooklyn in a Hasidic family affiliated with the Satmar sect of ultra-orthodox Hasidic Jews.  Yehuda was one of 13 siblings, the fourth child born to Irving and Desiree Rubin.  His family was close-knit, and he had a stable upbringing marked by adherence to religious traditions, holidays, and family gatherings with close and extended family.

Yehuda's exposure to the world outside of Hasidic Williamsburg was limited.  In the summers, his family went to the Catskills with others from their community.  In his childhood home, Yehuda had neither a television nor any books or publications other than religious texts or Jewish newspapers (in Yiddish).  From age 4 until age 16, Yehuda studied at religious schools, or yeshivas, in Williamsburg, where his yeshiva education lasted from approximately 6:30 in the morning until 8:30 at night, most hours of which were dedicated to religious instruction.  Yehuda

---

[2] As we discuss, *infra*, at Section III.C., Yehuda was charged with larceny after he bounced a number of checks during a period when he was extremely short of funds and pled guilty to larceny in the third degree.

also attended Yeshiva for most of the day Sunday.  Saturdays, the Sabbath, were spent in religious study and prayer at "shul."

As is often true in the Hasidic community, Yehuda did not attend college after graduating from the United Talmudical Academy in Brooklyn but continued his religious education at two separate Yeshivas, one in Monsey and one in Kiryas Joel.  He studied for an additional three years and graduated from the United Talmudical Academy in Kiryas Joel at the age of 19, the vast majority of his lifetime education having been in religious studies.

At around the same time he was graduating from Yeshiva, he was introduced to Rachel Hirsch.  Rachel, 18 years old, was from a Satmar Hasidic family in Kiryas Joel, NY.  As Rachel writes in her letter to the Court, ███████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

██

Rachel and Yehuda were introduced by a matchmaker and their respective families.

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████ Rachel explains that she came to understand that Yehuda was "by nature a very sensitive, kind and smart young man," ██████████████████████████ *Id*. Over time, Yehuda and Rachel formed a strong and loving bond. Rachel writes, "Yehuda has given me the life and hope that I always dreamt about. He made me his partner and gave me a chance to have a wonderful home and family ███ ████████████████ *Id*. They were married in October of 2004.

After his marriage to Rachel at 19-years-old, Yehuda returned briefly to his religious studies at a Kollel, or institute for religious education. Shortly thereafter, the couple received the joyful news that Rachel was expecting a child, and Yehuda quickly had to abandon his studies and venture into the larger world to find a way to support his new wife and himself and prepare to raise a family. Yehuda had never had a job of any kind, nor any training to prepare him for a field of employment. With his wife pregnant with their first child, however, he had no choice but to find work in order to provide for his family.

### B. Yehuda's Involvement in the Real Estate Business

During these years in the mid-2000s, "real estate" was the holy grail, particularly for people from Yehuda's community who, like him, did not have a secular education or many other available career options. Yehuda saw many examples in his community, including members of his own family, who had become successful by investing or working in the real estate business. Yehuda began his career as a mortgage broker, recognizing that, in such a booming market, there was a demand for mortgage services. Through an acquaintance, Yehuda found work as a mortgage broker, and earned a commission for any customer he brought in. During his time as a broker, Yehuda saw that lenders appeared indifferent to what was written on mortgage loan applications, encouraging loans and telling borrowers that no corroboration of their finances was

6

necessary.  The loans were known as "no-doc" or "low-doc" loans, with lenders requiring

minimal or no documentation to substantiate the loan applications, and were prevalent in the

mid-2000s.  See discussion, *infra*, at Section III.B.  Yehuda also saw that, as a result, what was

written on loan applications was often false or exaggerated.

Through his work as a mortgage broker, it seemed – particularly to someone as naive as

Yehuda – that anyone with business-smarts, a good work ethic, and some start-up capital would

be able to make money in the booming real estate market of New York City.  Yehuda, however,

lacked the start-up capital.  At 21-years-old and only a year or two out of school with barely any

income, Yehuda determined that he would be unable to obtain loans from banks to enter the real

estate business unless he lied about his financial status.  In his mind, there was no way he could

lose – the loans would allow him to get started in investing in real estate, the properties would

increase in value, the loans would be repaid when he sold the properties, and no one would be

hurt.  With almost no experience in financial affairs, and very limited exposure to the world

outside his insular religious community, Yehuda failed to grasp the gravity or the potential

consequences of his conduct in making false representations to lenders.

The first instance of false statements to which Yehuda has pled guilty occurred in 2006

on the loan application for 418 Lafayette Avenue.  Yehuda's relative wanted to obtain a

mortgage on this property; however, due to his bad credit, the relative wanted to obtain the

mortgage loan in the name of his wife.  Yehuda, 21 at the time, agreed to sign off as the broker

on a Bank of America loan application in which the borrower's income and employment were

plainly false.  Although he knew it was wrong to lie to the bank, Yehuda had seen from his work

as a mortgage broker how unconcerned lenders appeared to be with an applicant's financial

information and how the banks and mortgage brokers seemed interested only in how many loans

they could write.  Confirming this impression, the only support Bank of America sought for the mortgage application was a letter from the borrower's accountant, affirming her false "self-employment and income."

In 2007, at age 22, Yehuda obtained a mortgage loan to purchase an apartment in Monroe, NY on 5 Kosnitz Drive for his family to live in.  He later obtained a home equity loan on the same apartment.  He obtained both loans in his wife Rachel's name, acting under a power of attorney that she signed without knowledge that Yehuda would falsify her financial information.  As Yehuda explained at his plea allocution, he did this in Rachel's name because she had better credit.  Plea Tr. at 28.  Yehuda admitted that he "made false statements about her income and employment on the loan application" and signed it for her as her attorney in fact.  *Id*. The lender, Bank of America, again did little to verify the statements Yehuda submitted, asking only for a letter from Rachel's accountant in support of her self-employment, which Yehuda procured, and a verification of deposit for Rachel's checking and savings account balances, also at Bank of America.

Later that same year, seeing the booming real estate market around him and feeling like he was missing out on lucrative opportunities, Yehuda took out a loan to purchase an investment property at 119-121 Hart Street.  Again, he made false statements on the mortgage and home equity loan applications, inflating his own income and lying about his employment.  The lender – once again Bank of America – issued the loans, requiring only minimal documentation to be submitted by Yehuda.

Of course, the "burst" of the real estate bubble and the ensuing global financial crisis in 2007-2008 meant that real estate investments were no longer guarantees of financial success.  In Yehuda's case, they were his financial downfall.  Able to make payments neither on his real

estate investments nor his own home, Yehuda defaulted on the loans in 2008.  In the cases of his apartment at 5 Kosnitz Drive and of the property at 119-121 Hart Street, Yehuda arranged short sales on the properties that were accepted by the bank as partial repayments of the loans.

In the aftermath, from 2009-2011, Yehuda struggled to rebuild financially, relying on loans from friends and family while trying to work out deals with the banks for properties on which he had outstanding loans.  When the market began to rebound in 2011-2012, Yehuda again started to look for opportunities in real estate.

In 2012, Yehuda purchased a property at 35 Vernon Avenue, the final property addressed in the plea agreement, for $200,000.  It was dilapidated and unlivable at the time of purchase. After investing several hundred thousand in rehabilitating the property, its value had increased enough such that Yehuda could obtain a mortgage on the property.  In 2013, Yehuda sought to obtain a mortgage loan on 35 Vernon Avenue.  Obtaining a loan in 2013 was a far different prospect than it was in 2007.  Now, banks required good credit and backup of financial representations.  To obtain the mortgage on 35 Vernon, the property was placed into an LLC, with Yehuda's friend agreeing to act as the named borrower on the property on behalf of the LLC, because Yehuda, not surprisingly, had terrible credit as a result of his earlier defaults. Unlike the other properties included in the plea agreement, the representations about the named borrower's income and employment were all true.  The sole falsehood on the application, and the reason Yehuda pled guilty to a false statement with respect to this property, was that the application asked for information about *other* properties held by the named borrower, including mortgage payments and rental income on those properties.  With respect to one other property whose mortgage was held in the name of the same borrower, the number listed for the income, i.e. the rent roll, was not accurate at the time the mortgage application on 35 Vernon was

submitted.  It overstated the monthly rent on one apartment by approximately $2,000 per month.

This was a prediction of what the rent roll *would be* once the existing non-rent-paying tenant was

evicted and a new lease was entered.  In fact, when the new lease was signed several months

later, the amount of rent was virtually the same as the prediction in the application – just $250

less per month.  Thus, while the application contained a false statement at the time it was

submitted, the falsehood was remedied within months.  The 35 Vernon mortgage is still a

performing loan, and there was no loss to the bank due to the misstatement on the loan

application.

In November 2014, Yehuda, his wife Rachel, both of his parents, and numerous other

family members were arrested and charged with participating in a scheme to obtain fraudulent

loans from banks over the course of the previous 10 years.

## C.  Yehuda Today

### 1.  *Family Life*

At the time of his arrest, Yehuda was 29-years-old and a father of three children, S█████

(born in 2005), I████ (2008), and S██ (2011).  Yehuda and Rachel's fourth child, L██, was born

in 2016 during the pendency of this case.

Yehuda is a caring and involved father.  His children look up to him as a role model and

mentor, and cannot imagine life without their father's daily presence.  Only Yehuda's oldest son

has any understanding of the legal situation his father is in.  S████ writes of his father:

> My father is my role model and I hope to follow in his footsteps. It is so hard for
> me to believe that my father has done something against the law.  I can only
> believe that what he did was truly a mistake. . . . I cannot imagine life without
> him.

Ex. 2 (S████ R████).  Yehuda is a hands-on father, and is involved in child-rearing as a partner

with his wife.  S████ writes of the activities they do together as a family:

10

> We spend Fridays and Sundays together as a family no matter what my father may have on his mind. . . . On Sundays we do special things like ice skating, roller blading, bowling and fun things like that.  On Fridays we go shopping for goodies for Shabbos.  All of us kids get to choose our favorite pastry, chocolate or candy that is our special Shabbos treat from 'Tatty.'. . . He truly is one of a kind and we so need him in order for us to continue being good kids and succeed.

*Id.*  Yehuda's family and friends speak of his active involvement with his children's lives.  Chany Wercberger, Yehuda and Rachel's neighbor, writes of Yehuda as a beloved father, without whom his family would be lost:

> When he comes home after work he is met by his children who pounce on him exuberantly.  Each one is anxious to share the specifics of their day.  I can't imagine these children coping without him especially his wife, Rachel, who relies on him for everything.

Ex. 11 (Chany Wercberger).  Yehuda's father-in-law, Barl Hirsch, expresses admiration of Yehuda's relationship with his children:

> Yehuda is a super model of a husband, understanding and sensitive.  He helps a lot around the house especially with the children who adore him.  When I visit on weekends I often see Yehuda sitting with the kids around him playing games and laughing.  I derive such pleasure seeing that since I never had the chance to be that kind of father to my own kids.

Ex. 10 (Barl Hirsch).

Yehuda's wife Rachel relies on Yehuda for love and emotional support. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

11



Ex. 1.

Yehuda is deeply remorseful for his criminal conduct and knows he is responsible for the threat it poses to his family. His sense of contrition is palpable to those who know him. Rachel writes, "Yehuda is so remorseful about what has happened. … He is not the same person he once was. He made a complete turnaround. … He feels so guilty about what his actions caused to happen to us. I know he would never take a chance like that again." Ex. 1. An administrator at Yehuda's company, Big Apple Testing, Jessica Futrell-Ryan affirms, "[Jay] knows his actions were wrong and has never once tried to defend, minimize, or explain away his activities; Jay has instead only ever shared his concern for how his family will survive without him." Ex. 13 (Jessica Futrell-Ryan). The letter to the Court from Rabbi Baruch Teitelbaum, who leads the Kiryas Joel congregation that Yehuda and his family belong to, also reflects Yehuda's primary concern with the well-being of his family: "[Yehuda] makes no excuse for his infraction. Rather, he berates himself that he allowed it to happen. … He is beside himself for the shame, pain and hardship he has brought on his beloved wife and children." Ex. 16 (Rabbi Baruch Teitelbaum).

Particularly painful for Yehuda to accept is that his actions caused Rachel to be arrested along with him. Not only did he risk his family's welfare by committing a crime; he compounded the damage to his family through his foolish decision to use Rachel's name on a

false loan application.[3]  Yehuda has had to acknowledge the fact that as a result of his own

actions, the feeling of security he had created for Rachel and their children was shattered on the

morning of November 13, 2014, when FBI agents showed up at the family's door and arrested

both Yehuda and Rachel in front of their three young children. ██████████████████████

████████████████████████████████

        Yehuda has had to work hard to regain Rachel's trust and restore safety and stability to

their household. ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

            ████████████████████████████████

            ██████████████████████████████

            ██████████████████████████████

            ████████████████████████

██████

        At age 32, Yehuda is a different person than he was at age 21, or even at age 28.  His

arrest in this case triggered a number of positive developments for Yehuda, so that in many

ways, despite the fact that he is on the precipice of getting sentenced, he is living a happier, more

stable, and more productive life than he was before he was arrested.  In the three years since his

arrest, Yehuda has had time to examine his youthful errors in judgment and his flawed approach

to business decisions, both through dealing with his legal case ██████████████████, and to

---

[3] Rachel entered into a deferred prosecution agreement with the government on July 18, 2017.  Minute
Entry dated July 18, 2017 (Entered July 20, 2017).

get his business affairs properly in order.[4]  As discussed below, for the first time, he now has a

stable and honorable career with significant growth prospects. ████████████

████████████████████████████████████

████████████████████████████████

██

### 2. *Business*

Since 2015, Yehuda has been engaged with the operation of a new company, Big Apple

Testing, with his business partner, Joel Lowy.  Big Apple Testing is a special testing company in

the construction industry.  Big Apple provides several services to builders: it performs soil

testing, conducts other special inspections required for building projects by the Department of

Buildings, and provides optical monitoring of excavations to ensure safety and stability of

adjacent structures.

Big Apple Testing has had a remarkable trajectory over the past two and a half years.

After his arrest in this case, Yehuda knew that he had to find another career – he was only 29 and

had just been arrested on serious fraud charges stemming from his conduct in the real estate

business.  He knew he needed to find something to do that was not related to the real estate

industry, ████████████████████, with a wife and several children at home,

he could not wait until the conclusion of his criminal case to try to start a new career.  Only a few

months after Yehuda's arrest, he and his close friend Joel Lowy saw an opportunity to grow a

small existing company in the construction field.  Lowy invested the capital, but Yehuda has

poured his time and energy into the company for the last two and a half years.[5]  He works

---

[4] For example, Yehuda has used the time between his plea and sentencing to get up-to-date in filing his tax returns.

[5] Lowy is a 60% owner of the company, and 40% is owned by Yehuda's wife, Rachel Rubin.

tirelessly, driving into Brooklyn early in the morning to meet customers, and answering their phone calls at any hour of the day or night. While on pre-trial supervision, with the Court's permission, Yehuda traveled several times to Las Vegas or Miami to try to cultivate clients at trade shows or through in-person meetings.

At first, business was slow, as customers in the construction industry were reluctant to hire someone who had just been charged in a federal criminal case. But, after seeing the quality and reliability of the work that Big Apple did, referrals started to increase. Together, Yehuda and Mr. Lowy have grown Big Apple from a company with one employee in 2015 to 29 employees today.

This growth is due, in large part, to the reputation for honesty and reliability that Big Apple has developed, and to Yehuda's aptitude for client relations and management of employees. Yehuda manages the sales and business development for Big Apple, while Mr. Lowy handles the banking and finances of the company. In addition to interacting with clients, Yehuda also oversees the employees and ensures that department managers are properly running their divisions. Yehuda's talent in these areas has significantly contributed to Big Apple's growth and success. According to Mr. Lowy:

> Yehuda is a business partner par excellence. His profession in sales and dealing with our customers has gotten us to where we stand today. Big Apple Testing has flourished and is expanding at a fast pace. We are constantly hiring more employees to help us operate more efficiently. He plays such an integral part in our company that I truly feel that "Big Apple Testing" will be in jeopardy in his absence. I cannot run the business without him at my side.

Ex. 12 (Joel Lowy). Any period of incarceration for Yehuda when he cannot work will be a tremendous setback for Big Apple and its employees and will jeopardize its survival, given that it is still a small and young company in which Yehuda plays a central role.

Mr. Lowy and Yehuda are very aware that the industry they operate in is a highly regulated one.  Customers depend on things being done correctly and exactly by the books.  Mr. Lowy explains the business philosophy of Big Apple:

> Big Apple Testing can only succeed if our customers can totally rely on our work – that means doing everything exactly by the book.  Yehuda and I have made it our responsibility to ensure that our whole business runs this way – exactly by the book, so we do not have any problems.  We schedule frequent meetings with our accountant, Leshkowitz and Co., to double and triple check that all is accurate.

Ex. 12.

Customers and clients, too, echo that Big Apple is a company that operates carefully and with integrity.  David Sinai of Candor Capitol, a Big Apple Testing client, recalls an instance in which, during the training of a new accounts payable manager at Candor, Yehuda called David personally to inform him that Candor had mistakenly double-paid for Big Apple's services.  Ex. 24 (David Sinai).  Park Builders Inc., another client, attests to the professionalism and "outstanding" customer relations provided by Big Apple, and Yehuda in particular.  Ex. 25 (Park Builders).  And Abraham Glanz, President of PC Payroll, Big Apple Testing's payroll company, finds Yehuda to be "a man of great character, very honest, and [a] great pleasure to deal with." Ex. 26 (Abraham Glanz).  Glanz explains that Yehuda is extraordinarily careful in ensuring that his employees are paid in accordance with the law and in checking quarterly that Big Apple's taxes have been filed properly.  *Id.*

Yehuda's ease and kindness in relating to his employees has fostered the creation of a congenial workplace, where employees feel that they can approach Yehuda with any concerns and that he cares about them as individuals, making them eager to continue working there. Yehuda often goes beyond what is expected of an employer, treating his employees more like family.  A Big Apple employee, Dave Belizaire, describes Yehuda as "the most genuinely kind person [he] knows," and explains that in the wake of Hurricane Irma's destruction of Dave's

16

family's home in Key West, Yehuda secured Dave's family a furnished rental apartment in Miami and provided Dave with a loan from the business to ship basic goods to his family.  Ex. 14 (Dave Belizaire).  Jessica Futrell-Ryan, the administrator at Big Apple, who reports directly to Yehuda, writes that Yehuda went "above and beyond" in helping her manage the death of her husband and continues to assist and encourage her in philanthropic endeavors, recently matching the money she was able to raise for hurricane relief.  Ex. 13.  Employee Shantel Williams writes of how Yehuda provided emotional support to her and secured financial assistance for her ███ ███████████████, describing Yehuda as "a real close friend holding [her] hand all along." Ex. 15 (Shantel Williams).

### 3.  Contributions to Others

Consistent with the stories relayed by his employees, many others, family and non-family members alike, have written to the Court with stories of Yehuda's assistance to them in times of need.  These stories, too numerous to describe here, demonstrate that Yehuda is the rare type of person who will help out in ways that require a substantial investment of his time or a significant imposition on his own life, not just a monetary donation or one-time favor.  Yehuda, together with his wife Rachel, takes on others' problems as his own and figures out how to best ease the burden for the individual or family in need.  As a friend of Yehuda's since childhood accurately summarized:

> Most people understand the importance of caring for others, but often times personal commitments get in the way.  Yehuda is different from most people.  I have seen him make great sacrifices to those in need.

Ex. 23 (Moshe Guttman).

A good example of this is when Yehuda's sister-in-law, Faigy Rubin, was seriously injured in a bus accident in 2012, suffering severe head trauma.  Ex. 3 (Faigy Rubin).  As soon as

he learned of the accident from his brother, Shloimy, Yehuda drove to Montreal, where Faigy

and Shloimy live, to help his brother cope with this devastating situation.  *Id.*  Yehuda provided

comfort and consolation to their young children and even brought their four-year-old daughter,

Y███, back with him to New York.  She stayed with Yehuda and Rachel for almost a year, so

that her father would be able to focus on Faigy's recovery while knowing that Yachi was well

taken care of, and so Y███ would be somewhat insulated from the trauma of her mother's injury.

Ex. 3; Ex. 4 (Shloimy Rubin); Ex. 8 (Y███ R███).  Because of Yehuda and Rachel's kindness,

Y███ remembers her time with them as an exciting visit filled with love and special treatment,

not as a devastating separation from her parents.  Y███ writes (with the help of her older sister):

> Being that I was only four years old at that time, my dear beloved aunt and uncle,
> Rachel and Yehuda Rubin, welcomed me into their home showering me with love
> and treating me like I was their only child.  They so lovingly accepted me.  I will
> never forget it.  I was their little prima Donna whom they dressed so perfectly
> matching to their other kids as if I totally belonged.  I felt like their home was my
> home. . . .
>
> I clearly remember one Sunday getting into the car with Yehuda and Rachel.
> They told me we were going shopping.  I could not believe my eyes when the car
> came to a stop and I looked out the window and saw the American Girl store!
> The place of my dreams!
>
> I felt like I was in paradise.  Rachel treated me with Molly and Samantha along
> with beds for them to sleep on and matching pajamas for all three of us.  I could
> not contain my excitement.  I jumped into the car and hugged Rachel and Yehuda
> so tight and so long not wanting to let go.  This memory will forever stay with
> me.

Ex. 8.  Throughout Faigy's miraculous recovery, Yehuda was alongside Shloimy every

step of the way and managed the logistics of Faigy's financial and medical arrangements.

Ex. 3; Ex. 4.  Faigy writes:

> Although he lives many miles away he was the one who jumped in to the car
> immediately and drove all the way to Canada to be with us every step of the way.
> Mentally, emotionally, financially …whatever it was that was needed he was the
> one to step up to the plate with his generous heart and utmost devotion. . . .
> Yehuda took my baby, Y███, then four years old, back with him to New York

18

with his wife, Rachel's consent and welcomed her ever so warmly into their loving home and treated her like one of their own.  I have to say that Y█████ was the child that was least affected by my whole ordeal.  She had warm, loving, giving people taking the best care of her.

He was the sole support to his brother, my husband who consulted with him every step of the way. . . . When I needed to be transferred from one medical facility to the other it was Yehuda that made all the technical and financial arrangements at a moment's notice without batting an eyelash. . . . It was a long journey for me.  I was in and out of the hospital, countless surgeries, rehab….and I thank god every day for his miracles of life and for sending us an angel whom to lean on . . . Yehuda Rubin.

Ex. 3.

This is characteristic of Yehuda – he is the person on whom others rely in crises, taking special interest in those with illnesses or disabilities, sheltering their family members in times of need, and wordlessly shouldering the logistical stress of arranging medical appointments.  He gives of his time with generosity, whether tending to the childcare responsibilities of a neighbor ████████████████████████████ or regularly visiting a childhood friend's widowed grandfather in an assisted care facility.  Ex. 11; Ex. 21 (Isaac Hager).  Yehuda is clear-headed in crises, able to take on the burdens of those around him and walk them through difficult yet necessary decisions and conversations.

[redacted]

[redacted]

[redacted]

[redacted]

Yehuda's caring nature comes out in small ways, too, whether it is taking the time to call Rachel's grandmother in the mornings before work to check in and bringing the children by to visit her every Sunday, or insisting on accompanying his own grandmother to Miami when she travels there for the winter, or calling regularly to check in on a friend [redacted]

█████ – these small kindnesses add up to a feeling among his friends, employees, and family members that it will be a serious loss to many if he is cut off from their lives.  *See* Ex. 17 (Rifka Rosenwasser); Ex. 18 (Zisha Rubin); Ex. 22 (█████████).

### III.    A Below-Guidelines Sentence is a Just and Reasonable Sentence for Yehuda under the 3553(a) Factors.

In imposing a sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) to arrive at a fair and reasonable sentence.  The sentencing court must impose a sentence that is "sufficient but not greater than necessary" to comply with the objectives of sentencing.  18 U.S.C. § 3553(a).  We respectfully submit that in light of the § 3553(a) factors, a sentence of a year, essentially the sentence recommended by Probation, would satisfy the objectives of sentencing and is the appropriate sentence for Yehuda's offense.  In addition, we ask that the Court recommend that the BOP designate a Residential Reentry Center (also known as a halfway house) as the correctional institute where Yehuda should serve his sentence.

### A.    Yehuda's Age at the Time of the Offense Conduct is a Mitigating Factor the Court Should Take into Account.

Scientific and sociological research indicates that adolescents, which in this context includes individuals in their early 20s,[6] do not yet have fully developed brains:  "It is

---

[6] In evaluating the consideration of youthfulness as mitigating evidence in sentencing for adults, the Washington State Supreme Court cited the *MIT Young Adult Development Project*, quoting, "'The brain isn't fully mature at … 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car.'"  *State v. O'Dell*, 183 Wn.2d 680, 692 n.5 (Wash. 2015).  In *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court repeatedly cited developmental psychologist Jeffrey Arnett's (1992) article "Reckless Behavior in Adolescence," which defined "adolescence" as "extending from puberty to the early 20s."  Jeffrey Arnett, *Reckless Behavior in Adolescence*, DEVELOPMENTAL REVIEW, 12 (1992, pp. 350, 354), *available at* https://tinyurl.com/yawe35fx.  *See also* Praveen Kambam and Christopher Thompson, *The Development of Decision-Making Capabilities in Children and Adolescents: Psychological and Neurological Perspectives and Their Implications for Juvenile Defendants*, BEHAVIOR, SCIENCE, LAW, 27 (2009, pp. 173-190) (reviewing several studies that define "youth" between ages 18-22 and document the continuation of neuroanatomical maturity into one's 20s), *available at* https://tinyurl.com/y8dczwtv.  Thus, while much of the case law discussion surrounding diminished culpability pertains to juveniles

increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." *Miller v. Alabama*, 567 U.S. 460, 472 (2012) (at footnote 5, citing the Brief from the American Psychological Association, et al.).  Psychological and neurological studies have shown that parts of the brain involved in behavior control continue to develop well into the 20s.  *State v. O'Dell*, 183 Wn.2d 680, 692 (Wash. 2015).[7]  "These studies reveal fundamental differences between adolescent and mature brains in the areas of risk and consequence assessment, impulse control, tendency toward antisocial behaviors, and susceptibility to peer pressure."  *O'Dell,* 183 Wn.2d at 692.

The incomplete development of a young person's neuroanatomical system manifests in behaviors widely considered to be "reckless."  An article entitled "Reckless Behavior in Adolescence" by Jeffrey Arnett, cited by the Supreme Court in the landmark case *Roper v. Simmons*, 543 U.S. 551 (2005) (holding the juvenile death penalty unconstitutional), discusses that adolescents (defined in Arnett's study as extending from puberty to the early 20s), exhibit a disproportionate amount of reckless behavior because of the failure of probability reasoning and increased susceptibility to peer pressure.[8]  Social scientists recognize that juveniles achieve the ability to use adult reasoning by mid-adolescence, but still "lack the ability to properly assess risks and engage in adult-style self-control."  *State v. Null*, 836 N.W.2d 41, 55 (Iowa 2013) (noting that "the human brain continues to mature into the early twenties," such that diminished decision-making capacity extends beyond age 18).

under age 18, the contemporary conversations in developmental psychology show that the scope of adolescence, and therefore diminished culpability, extends beyond 18 into at least one's early 20s.

[7] *See also* Praveen Kambam and Christopher Thompson, *The Development of Decision-Making Capabilities in Children and Adolescents: Psychological and Neurological Perspectives and Their Implications for Juvenile Defendants, supra*, at footnote 5.

[8] Jeffrey Arnett, *Reckless Behavior in Adolescence*, *supra*, at footnote 5.

Courts, including the Supreme Court, have recognized that a young person's decreased capacity for decision-making and risk-assessment translates to diminished culpability for individual offenders and thus is properly taken into account in sentencing. In *Roper*, after evaluating the scientific and sociological research, the Supreme Court described the differences between adults and juveniles:

> [A] lack of maturity and an underdeveloped sense of responsibility … often result[ing] in impetuous and ill-considered actions and decisions[;] … [greater] vulnerab[ility] or susceptib[ility] to negative influences and outside pressures, including peer pressure … explained in part by the prevailing circumstance that juveniles have less control or less experience with control, over their own environment[;] … [and the fact that] the character of a juvenile is not as well formed as that of an adult.

*Roper*, 543 U.S. at 569-70. On that basis, the Court held that it was cruel and unusual punishment to sentence juveniles to death, no matter how heinous the crime. Similarly, in *Miller* and *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court held that mandatory life sentences for juveniles and life without parole sentences for non-homicide offenders were unconstitutional. The *Graham* Court noted:

> No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence.

*Graham*, 560 U.S. at 68.

The Second Circuit has also recognized that an offender's immaturity at the time of the offense is an appropriate factor to be considered under § 3553(a). *United States v. Reingold*, 731 F.3d 204, 221 (2d Cir. 2013) ("the district court may, of course, take the defendant's immaturity into account in deciding where within the prescribed statutory range to sentence [defendant]. *See* 18 U.S.C. §§ 3553(a), 3661").

As a man in his young twenties during most of the conduct in question in this case,

24

Yehuda was vulnerable in precisely the way that the Supreme Court and other courts have described.  He was particularly susceptible to the negative influences around him – when he saw others submitting false loan applications to lenders, he was lulled into the sense that it was not especially wrong or harmful because "everyone was doing it."  He took impetuous and ill-considered actions – he did not think about the consequences of submitting false loan applications to lenders, and certainly did not understand the gravity of what he was doing.

The positive side of the immaturity and irresponsibility of young offenders is their greater capacity for rehabilitation.  Their flaws are not necessarily characterological or permanent:

> From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.  Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'

*Roper,* 543 U.S. at 570.  Yehuda is the perfect example of the rehabilitative potential of youthful offenders.  There is no indication that now, at age 32, with a large family to support and a promising career ahead of him, that Yehuda would repeat the transgressions of years ago.  To the contrary, after the shock of his and his wife's arrest, Yehuda has demonstrated his capacity to live a law-abiding life. ██████████████████████████████████████████, has worked hard to build a new career and business, and has been on pretrial supervision for three years without incident.

The government will surely point out that Yehuda's criminal behavior continued beyond his young twenties, because he made a false statement on a loan application when he was 28 (35 Vernon Avenue) in addition to when he was 21-22.  We submit that this later conduct was far less serious – it was undoubtedly wrong, but not as serious as his prior behavior.  The only falsehood on the application related to the rent roll on another property that was disclosed on the

35 Vernon application.  The rent roll was an accurate prediction of what the rent on related property *would be*, but was not accurate at the time that the application was submitted.  While this does not change the fact that there were false statements made at the time of the application, the false statements were in fact cured several months after the application was submitted, because at that point the rent roll *did* accurately reflect the revenue from the property.  We also believe that Yehuda had become inured to the behavior he had begun while he was younger, and concede that he did not fully appreciate the wrongful nature of the full scope of his conduct until he was charged in this case.  The relevant question for the Court now is, at age 32, in 2017, what sentence is sufficient but not greater than necessary to fulfill the aims of punishment.

Yehuda's life now, at age 32, bears all the hallmarks of a responsible and reformed individual who will live a law-abiding life going forward.  As previously discussed, he is one of the managers of a responsible, principled business that is thriving in large part because of his industriousness.  Big Apple Testing is in the construction industry, a heavily regulated industry, and must scrupulously follow industry standards and rules, assisting contractors in ensuring compliance with City codes relating to inspections and monitoring.  The business's survival depends upon it.   Yehuda's life outside of work, as described by many of the letter-writers, revolves around spending time with his wife Rachel and their four children, and being involved in his community.  Yehuda made mistakes – mistakes that were numerous and serious – when he was very young.  He deserves a chance to show that those mistakes flowed from immaturity, not character.

Significantly, the Southern District Board of Judges has endorsed the view that young offenders deserve special consideration, and often a second chance, by initiating the SDNY Young Adult Opportunity Program.  In 2015, the Southern District Board of Judges initiated a

pilot program intended to benefit non-violent young adults between 18- to 25-years-old who were charged with crimes in the SDNY.  (See Appendix A describing the Program).[9]  Under this program, participating defendants receive intensive supervision, assistance with employment, counseling, and treatment resources.  Participants who successfully complete the program may receive a shorter sentence, a reduction or deferral of charges, or possibly a dismissal of the charges.  Most defendants are expected to complete the program within 12-18 months.

Although Yehuda was likely ineligible to participate in the program because he was 29 at the time of his arrest, he meets the other criteria for consideration – his offenses were non-violent and the majority of his criminal conduct occurred before he was 25.  The existence of this program suggests a concerted initiative by the District Courts in the SDNY to give special consideration to individuals like Yehuda, who demonstrate a capacity to accept responsibility and move beyond their youthful offenses.  Although Yehuda has not been a program participant, he has taken the steps on his own that the Young Adult Opportunity Program seeks to accomplish with defendants in the program – he has found stable employment that he is well-suited to continue; he has stayed out of trouble for the three years since his arrest in this case; he has taken responsibility for his prior offenses; ████████████████████  We urge the Court to give Yehuda special consideration on the basis of his age at the time of the offense.

### B.  The Pre-Financial Crisis Context for Yehuda's Conduct Is A Mitigating Factor.

The stipulated Guidelines range of 27-33 months, driven by the loss amount of $550,000 to $1,500,000, is based entirely on loans Yehuda obtained in 2006-2007 that caused losses to the

---

[9] Recent cases in the SDNY indicate that the Young Adult Opportunity Program continues to provide the chance for youthful offenders to receive treatment in pursuit of rehabilitation and special consideration in the disposition of their criminal cases.  *See, e.g., United States v. Rudge, et al.*, 16-Cr-311 (KMW); *United States v. Tindley*, 16-Cr-784 (RA); *United States v. Gao*, 16-Cr-625 (SN).

banks.[10]  The conduct that Yehuda has admitted to during that time period – falsifying his income and other facts on his loan applications in order to purchase real estate – was so widespread in those years that it has been blamed as a major cause of the Great Recession of 2008.

The discussion that follows highlights the widespread nature and devastating impact on the economy of these so-called "liar's loans," and the banks' complicity in this conduct.  We emphasize that this is not  a defense to Yehuda's criminal conduct, and is not an attempt to minimize Yehuda's responsibility for his choices or to shift blame for his conduct to the banks. Rather, this discussion relates to what is arguably the most important § 3553(a) factor – the history and characteristics of the defendant.  It puts Yehuda's criminal acts in 2006-2007 into context and demonstrates how a 21-22 year old not otherwise inclined towards criminal behavior could have participated in a fraudulent scheme of the magnitude that Yehuda did – mistakenly rationalizing it as the norm, and failing to appreciate the severity of his conduct.

In the wake of the global financial crisis, Congress passed the Fraud Enforcement and Recovery Act (Public Law 111-21) in 2009, which, in part, established the Financial Crisis Inquiry Commission (FCIC) in order to examine the "collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the government."[11]  As has been well-documented by the FCIC, a significant factor that led to the housing bubble, and ultimately precipitated the Great Recession of 2008, was the failure on the part of lending institutions to perform due diligence on mortgage loan underwriting.  In a statement before the

---

[10] The false statement with respect to the Vernon Street property in 2013 caused no loss to the bank and thus had no impact on Yehuda's offense level.

[11] *About the FCIC at Stanford Law School*, ROCK CENTER FOR CORPORATE GOVERNANCE AT STANFORD LAW SCHOOL, *available at* https://fcic.law.stanford.edu/about/history.

FCIC, former Comptroller of the Currency John C. Dugan cited lax underwriting as a root cause

of the housing bubble:

> While the lack of consumer protection contributed to the record levels of
> mortgage losses, I believe there was a more fundamental problem: poor
> underwriting practices that made credit too easy.  Among the worst of these
> practices were the failure to verify borrower representations about income and
> financial assets…[12]

In January 2011, the FCIC produced a final "Financial Crisis Inquiry Report," documenting what

it found to be the causes of an avoidable crisis.  The Report found that mortgages without proper

underwriting represented a growing proportion of all outstanding mortgages in the pre-crisis

years of the millennium:

> Around 2005, however, low- and no-documentation loans took on an entirely
> different character.  Nonprime lenders now boasted they could offer borrowers the
> convenience of quicker decisions and not having to provide tons of paperwork.  In
> return, they charged a higher interest rate.  The idea caught on: from 2000 to
> 2007, low- and no-doc loans skyrocketed from less than 2% to roughly 9% of all
> outstanding loans.  Among Alt-A securitizations, 80% of loans issued in 2006 had
> limited or no documentation. As William Black, a former banking regulator,
> testified before the FCIC, the mortgage industry's own fraud specialists described
> stated income loans as 'an open 'invitation to fraud' that justified the industry
> term 'liar's loans.''[13]

Other sources have concluded that mortgages without proper underwriting accounted for 40% of

new mortgages and more than 50% of subprime mortgages in 2006-2007.[14]  By 2006, "these

---

[12] *Statement of John C. Dugan, Comptroller of the Currency before the Financial Crisis Inquiry Commission* (April 8, 2010, p. 1-3), *available at* https://tinyurl.com/yatu4t9w.

[13] *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (January 2011: pp. 110-11), *available at* https://tinyurl.com/7vqp9qe.

[14] Stephane Fitch, *No-Doc Mortgages are Back?!*, FORBES (July 2, 2010), *available at* https://tinyurl.com/y7jpyole.

low- or no-doc loans comprised 81% of near-prime, 55% of jumbo, 50% of subprime and 36% of prime securitized mortgages."[15]

Lending out large amounts of money with either zero or minimal proof of the financial status of the borrower had the consequences one might expect.  In his 2006 written testimony to the Federal Reserve Board of San Francisco, Steven Krystofiak, President of the Mortgage Brokers Association for Responsible Lending, stated that between 2004 and 2005, 90 out of 100 stated-income loans exaggerated the applicant's income and almost 60 of these loans did so by more than 50%.[16]  In evaluating how these loans became so pervasive, the FBI reported in its "Financial Crimes Report 2007:"  "80 percent of all reported [mortgage] fraud losses involve collaboration or collusion by industry insiders."[17]

Bank of America, the lender on the loans in question here, was no different than most mortgage lenders in the mid-2000s.   It "was the biggest U.S. bank in terms of assets in 2005.  It made stated income and no-doc loans until August 2007, when the bond markets froze." Kathleen C. Engel and Patricia A. McCoy, *The Subprime Virus: Reckless Credit, Regulatory Failure, and Next Steps* 170 (2011).

With respect to the three properties for which Yehuda submitted false information to Bank of America in 2006-2007, each loan required no or minimal documentation of the financial information submitted.  The most that was required was a letter from an accountant verifying the borrower's stated income and employment.  Signed applications were apparently not even required for the home equity loans.

---

[15] Danielle DiMartino and John V. Duca, *The Rise and Fall of Subprime Mortgages*, ECONOMIC LETTER: INSIGHTS FROM THE FEDERAL RESERVE BANK OF DALLAS, 2(11) (2007, pp. 1-8), *available at* https://tinyurl.com/yarg6wvl.

[16] *Written Testimony of Steven Krystofiak before the Federal Reserve Board San Francisco* (2006), *available at* https://tinyurl.com/ycslsmck.

[17] *Financial Crimes Report 2007*, FBI (2007), *available at* https://tinyurl.com/ycbtc4ml.

These types of loans issued by Bank of America, as well as those it acquired by taking

over other financial institutions, ultimately caused Bank of America to sustain heavy losses and

to require multiple rounds of bail-outs by the federal government:

> How did these loans do it? An Alt-A loan pool that Bank of America securitized
> in April 2007 gives us some idea. According to the prospectus, 72 percent of the
> loans in this securitization, known as the "Bank of American Alternative Loan
> Trust 2007-2," were low-doc or no-doc loans. Just eighteen months after the
> offering, over 15 percent of the loans in the loan pool were already delinquent, in
> foreclosure or foreclosed upon, or in bankruptcy.
>
> The bank sustained large mortgage losses that, combined with the acquisition of
> Countrywide and Merrill Lynch in 2008, left it in a weakened state. Despite an
> initial $25 billion federal capital infusion in October 2008, Bank of America
> Corporation reported a $15.31 billion net loss for the fourth quarter of 2008,
> requiring another $20 billion federal bailout in January 2009. At the same time,
> the federal government extended Bank of America protection against losses on
> $118 billion in loans and mortgage-backed securities.

Kathleen C. Engel and Patricia A. McCoy, *The Subprime Virus: Reckless Credit, Regulatory

Failure, and Next Steps* 170 (2011).

In addition to its relevance to Yehuda's history and characteristics, the widespread nature

of conduct similar to Yehuda's in those years, and the banks' encouragement of no-doc loans, is

also relevant to the Court's evaluation of several additional § 3553(a) factors, including: (1) the

nature and circumstances of the offense (3553(a)(1));  (2) the need for the sentence to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense (3553(1)(2)(A));  (3) the need to afford adequate deterrence to criminal conduct

(3553(a)(2)(B));  and (4) the need to protect the public from further crimes of the defendant

(3553(a)(2)(C)).

It will not promote respect for the law for justice to come down harshly upon a young,

naïve man, when so many others' blameworthy conduct from that era has gone unpunished. Nor

is there a need at this point, in 2017, for the Court to send a general deterrence message related to

this type of conduct – there has been a nationwide reckoning, and industry-wide changes, to prevent such behavior from becoming widespread again.  Nor is it necessary to harshly punish Yehuda to protect the public from further crimes – as demonstrated by the fact that so many others apparently engaged in similar conduct when loans were not subject to scrutiny, this was a crime of opportunity, not a deceit committed only by the pathologically-criminal.  Yehuda has learned his lesson from being prosecuted and has turned his life around since his arrest; he is not at risk of committing another crime in the future – the criminal justice system has already achieved its goal of specific deterrence with respect to Yehuda.

### C.  The Guidelines Calculation Based on Yehuda's Criminal History Category Overstates His Culpability.

The Court should take into account that the Guidelines calculation of 27-33 months relies on a Criminal History Category of II, which overstates his culpability.  While the calculation is correct, because Yehuda was still on conditional discharge from a state offense when he submitted the 35 Vernon application with false rent information, the classification of the state offense as "grand larceny" makes it sound as though the conduct was more serious than it was.

In 2010, Yehuda was charged with criminal offenses in Orange County Court as a result of bouncing a number of checks in his personal checking account.  In 2009-2010, at the time that he bounced the checks, Yehuda was struggling financially due to the collapse of the real estate market during the financial crisis and the loans he had taken out in connection with the conduct charged in this case.  He was surviving mostly on loans from friends and family, and sometimes he would be expecting an incoming loan and would write checks to pay back other loans based on this expectation.  The money would not come in and the check he had written would bounce.  For the most part, his bank did not clear the checks he had written when his account did not have sufficient funds to cover them.  On one occasion, however, he had deposited a check for

approximately $7,000 into his account.  He then wrote checks from his account assuming the

deposited check would clear in time.  It did not, however, clear.  In that instance the bank did

cover the checks written so the bank was out approximately $7,000 when the deposited check did

not clear.  When he could not immediately cover the bank's loss, he was arrested.  As the PSR

correctly notes, he fully repaid the bank the amount it was due ($8,657 including fees) after his

arrest.  PSR ¶ 67.  Notwithstanding the repayment after he was arrested on a complaint, Yehuda

was subsequently indicted. He received bad legal advice and rather than resolve the case with a

more favorable plea to a lower level offense before indictment (or afterwards), he accepted a plea

to the felony offense of Grand Larceny in the 3rd Degree and received a sentence of conditional

discharge to resolve the indictment.

Yehuda's state offense, thus, represents bad financial decision-making and his desperate

financial situation during the same period of time covered by the plea agreement, not additional

malicious conduct or a propensity to reoffend as one might think based on the crime he pleaded

to.  The fact and timing of this prior offense increases the Guidelines recommended sentence

from 24-30 to 27-33.  We note that, notwithstanding the existence of this prior state offense, the

Probation department recommends a year and a day of imprisonment, significantly below the

Guidelines recommended sentence.

### D.  A Below Guidelines Sentence Is Sufficient but Not Greater Than Necessary to Fulfill the Aims of Punishment.

Yehuda has pled guilty to serious criminal conduct.  He recognizes that his criminal

conduct was extensive and caused significant harm to others.  He also realizes the harm he

brought upon himself and his family members by choosing a dishonest course of action.  But,

since his arrest in this case, Yehuda has done nothing less than turn his life around.  He

immediately took steps to find work in a field not related to real estate development or

investment.  He has been working steadily for more than two and a half years, to build a business founded on hard work and fair dealing, not quick money.  His employees and their families depend upon him.  His own family, of course, also depends upon him financially.  They also depend heavily upon him for emotional support, particularly Rachel, ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

Yehuda is now well-positioned to be a positive role model to his children and others in his community – to demonstrate that what does *not* pay off is fraud and dishonesty, and that what *does* pay off is hard work and honesty. A long period of incarceration will not only jeopardize the emotional and financial health of his wife and children, but will be a tremendous set back in the business he has built and for the employees of that company.  The letters to Your Honor describe a uniquely kindhearted person – one who has acknowledged his mistakes, has matured beyond them, and has inspired those around him with his acts of generosity and benevolence.

What we are pleading for, on Yehuda's behalf, is a second chance – a chance to show that his crimes when he was young were not the result of his dishonest character, but were crimes born of youthful bad judgment and immaturity.

### E.  The Court Can Recommend That the Bureau of Prisons Designate a Halfway House as the Correctional Institute Where Yehuda Serves His Sentence.

The PSR recommends a sentence of one-year and a day imprisonment for Yehuda. Because this sentence would be over one year, Yehuda would serve 85% of the sentence. Eighty-five percent of 366 days would be 311 days.

We ask that instead of the recommended sentence of one year and a day that Your Honor sentence Yehuda to one year with the recommendation that he serve this sentence in a halfway

34

house.  We ask for this sentence – which would be 54 days longer than the sentence recommended in the PSR – so that Yehuda can serve his sentence in a halfway home.

A halfway house, formally known as a Residential Release Center, is a correctional institute which may be designated for the service of a prison sentence.  Title 18 U.S.C. § 3621(b) governs the Bureau of Prison's authority to designate a prisoner's place of confinement, and states that BOP may designate any available "penal or correctional facility."  A Residential Release Center, formerly known as a Community Corrections Center, is a correctional facility under the statute. *Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006).  There is no prohibition on BOP designating a prisoner to a halfway house for the entirety of his sentence.  *Id.*

Although Yehuda would be allowed to leave the facility during the day to work, conditions at halfway houses are punitive – they are not nearly as nice as the low security prison to which Yehuda likely would otherwise be sent.  The Court, of course, only has the authority to recommend to BOP where to designate prisoners. We respectfully request that the Court recommend that Yehuda serve his sentence at a halfway house so that his business does not collapse thereby hurting his employees, and so that he is able to continue to work to support his family, keeping him on the path to a functional, law-abiding life when he is finished with his sentence.

## IV.     Restitution

As of the date that the PSR was finalized, the government had not provided any information about whether it was seeking restitution.  PSR ¶ 105.  Assuming the government does seek restitution at sentencing, we request an opportunity to fully respond to the government's arguments and calculations.

## <u>CONCLUSION</u>

Accordingly, based on the § 3553(a) factors and the facts set forth above, we respectfully ask that the Court sentence Yehuda Rubin to a year in prison with the recommendation that his sentence be served in a halfway house.

Respectfully submitted,
Hafetz & Necheles LLP

_____/s/_____

By:   Susan R. Necheles
      Kathleen E. Cassidy
      10 East 40th Street, 48th Floor
      New York, NY 10016
      (212) 997-7400

*Attorneys for Defendant Yehuda Rubin*

36