UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

                            :

      -v.-                     :       14 Cr. 741 (KMK)

                            :

YEHUDA RUBIN,                 :

                            :

                            :

              Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES

JOON H. KIM
Acting United States Attorney for the
Southern District of New York

BENJAMIN ALLEE
KATHRYN MARTIN
Assistant United States Attorneys
      - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :
                                    :
        -v.-                        :        14 Cr. 741 (KMK)
                                    :
YEHUDA RUBIN,                       :
                                    :
                                    :
                Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES

The Government respectfully submits this memorandum in connection with the
defendant's sentencing scheduled for November 14, 2017.   For the reasons set forth below, the
Government submits that a sentence within the applicable Sentencing Guidelines range of 27 to
33 months' imprisonment imposed on Yehuda Rubin, as well as a term of supervised release,
forfeiture, and a significant fine within the applicable range of $5,000 to $50,000, would be
sufficient but not greater than necessary to achieve the aims of sentencing.

## BACKGROUND

### I.      Offense Conduct

Over the span of approximately eight years, Yehuda Rubin stole a total of more
than $1 million from lenders by lying to them.   The outside boundaries of the circumstances
under which Yehuda Rubin saw fit to deceive lenders in order to get money for himself were
never met, at least not until he was arrested in this case.   He lied to multiple banks, to get six
different loans, on properties ranging from investments in Brooklyn to his own home in Orange
County.   He lied about himself.   He lied about (and thereby implicated) his wife.   He lied

about (and thereby implicated) his mother.   He lied about income.   He lied about employment. He submitted forged documents.   He lied so routinely and regularly, for years, that it was commonplace for him to do so.   Yehuda Rubin was a con man.

Unconstrained by a sense of obligation to truth, Yehuda Rubin made representations in financial dealings the truthfulness of which ranged from demonstrably false to unknown.   Through webs of bank accounts, coopting of family members and associates, and other means, Yehuda Rubin has made much of the truth about himself unverifiable.   That spectrum of dishonesty ran through his frauds, and continues today, as he seeks, through the submission of his counsel, to have the Court view him through a distorting lens of his own making, in order to claim that he only committed the crime for which he is to be sentenced because he was young, destitute, cornered, naïve, and well-intentioned.

But this is no loan application review.   This is no place to spin a story of financial woe, while at the same time preventing scrutiny of that story by withholding information from Probation.   (See, e.g., PSR ¶ 88 (describing the defendant's inability or unwillingness to provide information about his finances from 2007 through 2014).   This is the sentencing of Yehuda Rubin for a serious crime.   It requires a reckoning between Yehuda Rubin and the truth.

In fact, Yehuda Rubin's crime was not a youthful indiscretion; rather, it was committed through substantial, lengthy efforts over eight years through the age of 28, which then comprised nearly a third of his life and nearly the entirety of his adult life.   And his conviction for it is his second serious felony conviction.   The criminal conduct was defining of, not in spite of, Yehuda Rubin's character.

In fact, when Yehuda Rubin set out upon his years' long effort to fleece banks, he was the son and chosen heir to his father's purportedly lucrative Brooklyn real estate business, and had opportunities of the kind that few defendants who appear before your Honor ever enjoyed. Even by his own account, Yehuda Rubin has the wherewithal while on pre-trial supervision to start a legitimate, profitable business from scratch. Yehuda Rubin did not conspire to lie to banks because he had to. He did so because he could.

In fact, Yehuda Rubin is among the most savvy, and least financially naïve defendants to come through this courthouse, having figured out not only how to profit by lying to banks and then not repaying them, but how to later escape the debts and fallout that ordinarily comes with such deadbeat defaulting, and even keep ownership of the properties at issue within his circle of business associates.

And in fact, if actions speak louder than words, Yehuda Rubin's current claim that he was well-intentioned barely registers as a whisper, shouted down by his and his co-conspirators' thorough efforts to rip off the banks they dealt with, including by: (1) spending fraudulent loan proceeds on unrelated items and not on purchasing or improving the properties at issue; (2) promptly and unhesitatingly defaulting on fraudulently obtained loans; and (3) thereafter actively pursuing negotiated settlements with the banks whereby their debts were forgiven and they or their business associates retained ownership interests in the properties. Even now, when Yehuda Rubin claims monthly income of $29,080 ($13,000 of which he and his family spend on credit card debts and clothes (PSR ¶ 90)), and regularly takes personal trips, more telling than his counsel's rhetorical assertions that he meant his victims no harm is the contradictory fact that he has never paid nor set aside with the Government any funds toward

forfeiture or restitution.

418 Lafayette Street, Brooklyn

In or about May 2005, a Brooklyn man, Harvey Cooley, recorded a deed of a purported sale approximately twenty years earlier, in 1986.[1]   The purported sale was of a brownstone building, located at 418 Lafayette Avenue, Brooklyn, from a former owner of the property, who died in or about 1988, to Cooley.   The deed was a fake.   The purported transfer did not occur, and the documentation of the transfer was an anachronism: it included versions of documents that did not exist during the lifetime of the seller, but rather were first created several years after his death.   The following year after recording the fake deed, in or about November 2006, Cooley transferred ownership of the property to Yehuda Rubin's mother, Desiree Rubin.

In or about November and December 2006, with Yehuda Rubin acting as mortgage broker, Desiree Rubin fraudulently obtained a refinance loan on 418 Lafayette in the amount of approximately $533,000 from Bank of America.   The loan applications, the submission of which Yehuda Rubin participated in as broker, contained lies about Desiree Rubin's employment, income, and bank account.   (PSR ¶ 33).   For example, in the loan application it was claimed that Desiree Rubin had a bank account with $35,000 at North Fork Bank.   This was false; she had no bank account there.   It was claimed that she worked as owner of Tristate Management with a salary of $16,000/month.   Yehuda Rubin's accountant submitted a letter purporting to verify Desiree Rubin's claimed employment.   (See Dec. 6, 2006, letter,

---

[1]        The factual details set forth herein of the crime to which the defendant pleaded guilty are among what the Government would have proved at trial.   With this memorandum, the Government provides selected documentary evidence with respect to certain of the facts set forth herein.   If necessary, the Government can provide additional supporting documentation for the Court's review.

attached as Exhibit A).   This was false; Desiree Rubin had no employment or income, and
Tristate Management was a shell company that did nothing.   Yehuda Rubin's associate, co-
defendant Pinchus Glauber, submitted an appraisal.   The applications also included the
representation that the property was Desiree Rubin's primary residence, which was false.   (PSR
¶ 33).

Bank of America approved the loan.   After it closed, the loan proceeds were not
used to purchase the property, which had, after all, been obtained with a fake deed to begin with.
Rather, the loan funds ultimately were distributed to, among other people and places: a creditor
to Yehuda Rubin from another loan; the creditor for Irving Rubin and Desiree's Rubin's
mortgage; a bank account for a real estate development project of the Rubin family; accounts
controlled by co-defendant Joel Rubin; another individual, named Morris Lowy; and Cooley.
(See Summary Chart of 418 Lafayette money flow, attached as Exhibit B).

The fraudulently obtained loan was not repaid and went into default, resulting in a
loss of hundreds of thousands of dollars.

### 5 Kosnitz Drive, Monroe

In or about June 2007, Yehuda Rubin's wife, Rachel Rubin, bought a residence
located at 5 Kosnitz Drive, Unit 302, Monroe, New York, purportedly for $375,000.   Thereafter,
Yehuda Rubin, acting as power of attorney for his wife, fraudulently obtained two loans, a
mortgage and a home equity loan, totaling approximately $396,000, secured by the property.
The loan applications included misrepresentations about Rachel Rubin's employment and
income.   (PSR ¶ 34).   For example, it was claimed that Rachel Rubin was the owner/president
of Tristate Management, earning $14,000 a month.   Yehuda Rubin's accountant submitted a

letter purporting to verify this fact.   (See July 27, 2007 letter, attached as Exhibit C).   Just as it had been false when the same representation was made about Desiree Rubin for the half-million dollar loan on 418 Lafayette, this was again false; Rachel Rubin was unemployed and had no income and Tristate was not a going concern.

The loans were approved and closed.   The home equity loan proceeds were used for purposes other than improving the property.   Instead, those loan proceeds were ultimately transferred to, among other people and places: the bank accounts for other real estate development investments of the Rubin family; a credit card bill of Rachel Rubin arising from charges for personal expenses; Morris Lowy; and co-defendant Joel Rubin.   (See Summary Chart of 5 Kosnitz money flow, attached as Exhibit D).

Yehuda Rubin did not repay the bank that made the loans.   Instead, he and Rachel Rubin defaulted, then persuaded the lender to forgive the default and accept a short sale to another individual, Abraham Werzberger, resulting in a $90,000 pay off, causing the lender hundreds of thousands in losses.   Yehuda Rubin and his family continue to live in the residence at 5 Kosnitz Drive.[2]   (PSR ¶ 80).

119-121 Hart Street, Brooklyn

In or about 2007, Yehuda Rubin obtained a property located at 119-121 Hart

---

[2]     The PSR includes, among Yehuda Rubin's claimed expenses, monthly rent of $1,250 (PSR ¶ 90).   During this case it has also been claimed, in response to the Government's assertion that following the short sale Yehuda Rubin and his family lived rent free, that actually they regularly paid rent to Werzberger, and in support of this assertion a rent check was cited. The Government's analysis of bank records of Yehuda Rubin and his wife do not support this assertion, at least not for the time period following the short sale, 2011 to 2014.   During those years Yehuda Rubin and Rachel Rubin made only three identified payments to Werzberger, the total of which was significantly less than the total of a payment Werzberger made to them during the same time period.

Street, Brooklyn, a single-family residence.   Thereafter, Yehuda Rubin fraudulently obtained two loans, a mortgage and a home equity loan, totaling approximately $660,000 from Bank of America, secured by the property.   To do so, Yehuda Rubin submitted loan applications in which he falsely claimed that the property was his primary residence, and that his monthly income was $36,325 per month.   (PSR § 35; see Primary Residence form, attached as Exhibit E).   The loans were approved and closed.   Thereafter, the loan proceeds were distributed to, among other people and places: the bank account for another real estate development of the Rubin family; co-defendant Joel Rubin; and Morris Lowy.   (See Summary Chart of 119-121 Hart money flow, attached as Exhibit F).

Yehuda Rubin then promptly defaulted on the loans.   By 2008 he was submitting and causing to be submitted letters to the bank in which he complained of misfortune and sought extinguishment of his debts.   For example, he wrote: "I write this letter with the hope that I will be able to resolve the trouble I am in quickly and amicably.   I bought a few properties as business was good. Now. I am in foreclosure due to unforeseen market changes. I own a property in Harlem which was supposed to turn a good profit but is really a disaster. I put money into that property and it seems like I will lose every penny I put in there. This is why I have to give up both properties now."   (See Hardship letter, attached as Exhibit G).   He claimed to have fortuitously found a buyer (having an agent tell the bank: "Thank G-d Mr. Rubin has found a buyer quickly" (id.)), who happened to be his "dear friend and [future] business partner," Joel Lowy.   (See Def. Br., Ex. 12 (letter of J. Lowy, submitted on letterhead stating: "We believe fundamental honesty is the keystone of business")).   Not so fortuitously for the bank, Yehuda Rubin and Lowy only offered to have Lowy purchase the property at a fraction of the amount of

8

Rubin's outstanding debt.   The bank accepted the short sale, resulting in hundreds of thousands of dollars in losses.

By the fraudulent transactions, Yehuda Rubin, in sum: obtained more than $600,000 from banks by lying about his income and residence; used at least some of the loan proceeds on completely unrelated items; did not pay back the money; escaped the debt and his own default by finding in the financial crisis – which was so harmful to so many others – a helpful excuse; and in the process procured (or at least purported to procure) for his "dear friend" a deeply discounted residential property in a nice neighborhood in Brooklyn.

<u>35 Vernon Avenue, Brooklyn</u>

The property at 35 Vernon Street is a three-story home in Brooklyn, in the area of the convergence of the Williamsburg, Bedford-Stuyvesant, and Clinton Hill neighborhoods.   It was owned for decades by Idonia Johnson, and generations of her family were raised there. (<u>See</u> FBI 302 Report of Interview, attached as Exhibit H).   By in or about 2009, Johnson was incapacitated by Alzheimer's disease, and her great-granddaughter became responsible for the property as guardian.   In 2011, Yehuda Rubin offered to buy the property, and arranged for appraisals and legal work to be done to that end.   An appraiser whom Yehuda Rubin had used on other transactions appraised 35 Vernon Avenue at $200,000, and the law firm Lowenthal & Kofman was brought in to represent Johnson, and its affiliated title company was used.   On or about April 4, 2012, a court-approved transaction was completed, whereby the property was sold to Yehuda Rubin for $200,000, in a closing handled by Lowenthal & Kofman.   The sale netted Johnson's guardian nearly nothing.   (PSR ¶ 36).

In or about the following year, in August 2013, Yehuda Rubin and his brother-in-

law and co-defendant Joel Koppel obtained a loan of $487,000 from Cross County Bank on the property.   Yehuda Rubin transferred to Koppel ownership of the entity created to own the property, and in the loan application Koppel represented himself as the landlord of the property at 35 Vernon, as well as another property in Brooklyn that, in fact, Yehuda Rubin controlled and collected rent from.   In support of these misrepresentations, Yehuda Rubin and Koppel submitted purported lease agreements between Koppel and tenants of the other property.   The lessees in the purported lease agreements were real people, one of whom was a tenant and another of whom was not.   The agreements were fakes: they were not actual leases; the rents were inflated; and Koppel was not actually the landlord.   The agreements were also forgeries: the purported lessees did not sign them or otherwise agree to them, and but for this investigation would never have known of their existence.

## II.      Procedural History

On November 13, 2014, a grand jury in this District returned an indictment

charging Yehuda Rubin and fourteen other defendants in several counts (the "Indictment").   On

November 18, 2014, the defendants were arrested and the Indictment was unsealed, and the case

was assigned to your Honor.   Yehuda Rubin was permitted release on bail terms, including

restrictions on his travel.[3]

On February 13, 2017, Yehuda Rubin pleaded guilty to Count Two of the

Indictment, charging him with conspiracy to make false statements to lenders, before Judge

McCarthy.   He pleaded guilty pursuant to a plea agreement, pursuant to which he admitted that,

as part of the conspiracy, he participated in obtaining the fraudulently obtained loans on the four

properties described above.   He also agreed to forfeit $1,219,000, representing the amount of

proceeds traceable to the offense.[4]   The Guidelines stipulation in the plea agreement results in a

Guidelines range of 27 to 33 months' imprisonment, and a fine of $5,000 to $50,000.   The

---

[3]      During the pendency of the case, Yehuda Rubin sought and was granted
approximately ten exceptions to his bail terms for purposes of traveling, including for seven trips
that were partly or entirely personal.   This included a trip for business and vacation with his
wife and co-defendant Rachel Rubin to Southern California from August 2 to 6, 2015 (docket #
132); a trip for business to Las Vegas for a trade show from January 20 to 22, 2016 (docket #
191); a trip for business to Los Angeles and Las Vegas from May 22 to 25, 2016 (docket # 232);
an international trip for a wedding with his wife and family to Montreal from July 5 to 10, 2016
(docket ## 245, 247); a trip for vacation with his wife and family to Hershey, Pennsylvania, from
August 31 to September 1, 2016 (docket # 277); a trip with his wife to Las Vegas for a
conference from January 17 to 20, 2017 (docket # 303); a trip to Miami for business from March
19 to 21, 2017 (docket # 329); a trip to Puerto Rico with his wife for religious purposes,
including a stop in Miami for business, from May 7 to 12, 2017 (docket ## 207, 362, 370); an
international trip with his wife to Montreal for a bar mitzvah from July 24 to 25, 2017 (docket #
394); and a trip with his wife to Miami for vacation from August 25 to 28, 2017 (docket # 425).

[4]      Yehuda Rubin has not made or set aside with the Government any payments
toward forfeiture, nor reimbursed or attempted to reimburse his victims.

Guidelines range results from: (1) a base offense level 6, pursuant to U.S.S.G. § 2B1.1(a)(2); (2) a fourteen-level increase because the loss was more than $550,000, but not more than $1,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H); (3) a three-level reduction because the defendant timely pleaded guilty, pursuant to U.S.S.G. §§ 3E1.1(a) and (b); and (4) a criminal history category of II, resulting from the defendant's 2011 conviction for grand larceny in Orange County, and his committing the instant offense while on a term of supervision for that prior conviction.

The United States Probation Office, in its Presentence Investigation Memorandum, reaches the same conclusion, that the applicable Guidelines range is 27 to 33 months.   Regarding Yehuda Rubin's prior conviction, the Probation Office describes that, "between August 1, 2009 and November 18, 2010, the defendant issued 31 checks drawn on his personal checking account . . . knowing that he did not have sufficient funds in his account at that time and/or that the account was closed.   The total of the checks was $27,141.37.   Full restitution in the amount of $8,657 was paid."   (PSR ¶ 67).   Yehuda Rubin pleaded to grand larceny in the third degree, a felony, and was sentenced to a conditional discharge and court fees. (Id.)

In its PSR, the Probation Office notes that Yehuda Rubin was unable or unwilling to provide any accounting, let alone a full accounting, of the sources and amounts of his prior income for eight years.   In a section of the PSR on Yehuda Rubin's employment record, the Probation Office notes: "Rubin reported that from 2007 through 2014, he was self-employed in the real estate business, buying and selling properties. . . . Rubin stated that he could not determine how much he earned and added that he is in the process of re-filing his tax returns and

12

will provide this information."   (PSR ¶ 88).   It does not appear, however, that Yehuda Rubin

ever provided this information to Probation.

       The Probation Office recommends a sentence of 12 months and 1 day in prison.

This sentence would be barely one-third of the top of the Guidelines range and less than half of

the bottom of the Guidelines range.   The entirety of the Probation Office's stated reasoning for

this recommendation is as follows: "[W]e believe that a variance from the guideline range is

warranted based on the defendant's minimal criminal history."   (PSR, at 27).   Elsewhere in its

recommendation the Probation Office's analysis is contrary to its own conclusion.   It notes, for

example:

> During the presentence interview, although the defendant accepted full
> responsibility for his criminal actions, he did not provide a statement
> regarding his motivation to commit the offense.   It appears that Rubin
> committed the offense due to greed.
>
> It appears that Rubin has a disregard for the law.
>
> It is difficult to assess the defendant's risk of recidivism. . . . The instant
> offense occurred over a 10-year period and only ceased as a result of the
> Government's investigation.   The offense was a crime of opportunity, and
> it cannot be determined if the defendant will reoffend if the opportunity
> presents itself again.

(PSR, at 26-27).

## DISCUSSION

The Government respectfully submits that a sentence within the Guidelines range of 27 to 33 months' imprisonment, as well as a term of supervised release, forfeiture, and a significant fine, would be sufficient, but not greater than necessary, to achieve the aims of sentencing outlined in Title 18, United States Code, Section 3553(a).

### I.      The 3553(a) Factors

#### A.  The Nature and Circumstances of the Offense

The criminal conduct for which Yehuda Rubin is to be sentenced is extraordinarily serious.   Yehuda Rubin stole more than $1 million from banks by lying to them. He did so over the course of eight years, and six loans.   He did so with others, including family members.   He did so as part of a conspiracy in which repeatedly one member of the conspiracy obtained a claim of ownership of a property; another member sought a loan secured by that property; the loan was obtained by lying to the lender; and, because the loan proceeds were not all owed to a seller, the fraudulently obtained loan proceeds were used instead to further other business and personal interests of Yehuda Rubin and other members of the conspiracy.   Often the loan proceeds were not repaid to the bank, which ultimately was persuaded by Yehuda Rubin and others to write off substantial debts rather than go through the prolonged process of trying to recover the losses Yehuda Rubin caused them.

Several aspects of Yehuda Rubin's crime, therefore, are particularly egregious. First, the defendant engaged in regular, brazen deception in his dealings with banks.   The lies in which he participated were not trivial, were not mere exaggerations of the truth, and were not isolated to a unique set of circumstances.   They were important, were fabrications, and were

14

routinized.   For example, in obtaining loans on his own home, the defendant's
misrepresentations included a completely made up job for his wife, with a made up title and
salary, which the defendant backed with a letter from an accountant purporting to verify this
fiction.   For further example, in obtaining a loan on the investment property at 35 Vernon, the
defendant submitted <u>forgeries</u> to the bank.   The lies gave the banks false assurances that the
borrower would be able to repay the loans, and thereby deceived the banks into approving and
issuing the loans.

   The defendant argues that this aspect of his crime is mitigated because all but one
of the fraudulent loans was issued before 2008, when lenders gave less scrutiny to
representations by borrowers ("Yehuda saw that lenders appeared indifferent"), and conduct like
his was "widespread" ("Yehuda also saw that, as a result, what was written on loan applications
was often false or exaggerated").   (Def. Br., at 6, 7, 27-32).   This argument substantially misses
the point of this proceeding – which is to hold Yehuda Rubin accountable for his criminal
conduct – in at least two ways.   (1) Regardless whether banks gave insufficient scrutiny to loans
in some instances, such as with the notorious "low-doc" and "no-doc" loans referred to by the
defense, here Yehuda Rubin and his co-conspirators were required by banks to provide
information and documents, and they affirmatively made up false verifications and forgeries.
(2) In any event, it is neither a defense nor mitigating for an opportunistic criminal to point out
that his victim left itself vulnerable to an opportunistic criminal.   <u>See</u> <u>United States v. Thomas</u>,
377 F.3d 232 (2d Cir. 2004) (victim negligence is irrelevant).   Yehuda Rubin is no more worthy
of leniency than a burglar who found his victim's home unlocked.   Here, the lenders' conduct
may explain how a criminal, like Yehuda Rubin, got away with the crime, but in no way does it

excuse it.

   <u>Second</u>, the defendant told and otherwise participated in submitting those lies in order to get money for himself and his family.   Proceeds of the fraudulently obtained loans went to, among other people and places: bank accounts of other Rubin family real estate developments; Yehuda Rubin's family members and associates; credit card bills of Yehuda Rubin and his wife and others; and to pay off other real estate loans.

   The defendant's alternate narrative, that "He lied to lenders because he thought that the properties purchased with the mortgage loans or improved with the home equity loans, would increase in value and that he would be able to sell them and pay off the loans at the time of the sale," is simply false.   (Def. Br., at 1; <u>see</u> <u>also</u> <u>id.</u>, at 7 ("In his mind . . . no one would be hurt.").   For at least four of the fraudulent loans, the fraudulent loan funds were used entirely or nearly entirely on unrelated items, and <u>not</u> to purchase the property or to improve the homes.   In addition, any notion that Yehuda Rubin was well-intentioned about paying off the lenders is belied by his and the other borrowers' prompt and unhesitating defaults on the majority of the loans.

   Yehuda Rubin's claim that he meant to pay off the loans is further betrayed by the fact that he and his co-conspirators pushed for settlements of the loan debts at deep discounts, even at times when he enjoyed great cash flow.   For example, in connection with Yehuda Rubin's efforts to elude the defaulted debt on 5 Kosnitz Drive, Bank of America received a letter from his wife, Rachel Rubin, dated May 19, 2011, in which they claimed:

     I am going through a very difficult financial stage now: In the past year I am unemployed with no luck finding a job in addition, my husband used to support me, but like everyone due to economic crises.   So is my husband being a victim of it.   He can not support me any more. . . . [T]he value of

> my house has been decreased 50% and I can not afford to pay my debt.   I am drowned which led me to the only option of settling this account to the amount of $18,000 . . . .   Please help me get this burden off my head and get it approved.

(May 19, 2011 letter, attached as Exhibit I).

Bank and credit card records belie the claims in this letter, showing instead that Yehuda and Rachel Rubin were then receiving substantial amounts of cash and other funds in their bank account, and spending a substantial amount of funds on personal expenses.   In 2011, for example, approximately $372,000 was deposited into Rachel Rubin's personal bank account, a substantial portion of which was spent from the account on personal expenditures.   In just one month, March 2011, for example, Yehuda and Rachel Rubin received in Rachel Rubin's personal bank account approximately $7,475 in cash, and spent approximately $7,255, much of it on personal expenses.   In another month, June 2011, for further example, they took in approximately $30,420 in cash and wire transfers into their account, much of which they again spent on personal items.

As for the remainder of the defendant's representation about his claimed good intentions – that he thought the properties that he used as vehicles to rip off banks would increase in value and "no one would be hurt" – it is an unverifiable counterfactual.   (Def. Br., at 7). Given that the result of the scheme was that Yehuda Rubin or an associate of his typically kept control of the property, and the banks were still not made whole, it is likely false.   And in any case even were it true that Yehuda Rubin hoped "no one would be hurt," this would have been no more than a criminal's rationalization.   It is to bank fraud what the excuse – "I hoped that when I swindled investors, and spent most of the funds on myself, the small fraction of the funds I actually invested would pay off big and no one would get hurt" – is to securities fraud.

<u>Third</u>, the defendant did not commit an isolated fraud, but committed a series of repeated frauds, which themselves were part of a near decade-long conspiracy to swindle banks and use those loan proceeds for the benefit of co-conspirators, including by distributing those proceeds to bank accounts of other Brooklyn real estate developments of the Rubin family.   As part of the conspiracy, the defendant worked with others repeatedly to carry out the scheme, including the same lawyer, the same appraiser, and the same accountant.   He also brought in his own family members.   He had his wife take out two of the loans at issue, which included her signing numerous loan documents and making false representations in order to receive hundreds of thousands of dollars.   He and his wife opened numerous bank accounts, on which she was signatory, into which fraudulently obtained loan proceeds and other relevant funds went.   He also brokered a fraudulently obtained loan with his mother as borrower, which included brazen falsehoods in the application.   And he submitted forgeries for a fraudulent loan obtained by his brother-in-law.

<u>Fourth</u>, the crime the defendant committed was an integral part of his daily life, which involved his employment, his investments, his own home, and, as noted, many people close to him.   The defendant was not pulled into some scheme in his spare time to get some extra money to make ends meet, and otherwise putting in an honest day's work for an honest day's pay.   His crime required creating numerous entities, documents, and bank accounts, transferring money between accounts on a regular basis, and working with accomplices, all to the end of misdirection, elusiveness, and ultimately, to thwart accountability.   In the world of financial representations Yehuda Rubin made and joined in, there are no solid pillars.   Rather, companies that seem like real, going concerns, turn out to be merely paperwork; bank account

balances are verified, but it turns out big deposits and withdrawals are made before and after

verification; deeds are transferred among co-conspirators and their shell companies and others

for no apparent business purpose; borrowers and those who would be accountable upon default

are purported to be presidents, landlords, and otherwise good-for the loan they are seeking, but

actually they are judgment-proof nominees; and short sales and other purportedly fortuitous

transactions are actually inside jobs between confidantes, not made at arm's length.

There is hardly a better way to summarize the completely thorough elusiveness of

the financial world Yehuda Rubin created during the conspiracy than the contrast between, on

the one hand, the extensive purported recitation of Yehuda Rubin's history and characteristics

submitted in support of his request for leniency (Def. Br., at 4-21), and, on the other hand, his

inability or unwillingness to give the Probation Office for purposes of the PSR <u>any information</u>

<u>about his employment and income for the eight years during the conspiracy</u>.   (PSR ¶ 88).   To

Yehuda Rubin, if it can't be disproved, it's true enough.

### B.  The History and Characteristics of the Defendant

Yehuda Rubin's history and characteristics likewise support a Guidelines

sentence.

<u>Yehuda Rubin's Criminal History</u>

The instant offense is Yehuda Rubin's second felony conviction.   For more than

a year, from August 1, 2009, through November 18, 2010, Yehuda Rubin issued 31 checks

drawn on his personal checking account, knowing that he did not have sufficient funds in his

account at that time and/or that the account was closed.   The total of the checks was $27,141.37.

Full restitution in the amount of $8,657.   He was convicted in Orange County Court of grand

larceny in the third degree, and sentenced to a conditional discharge.   (PSR ¶ 67).

19

Yehuda Rubin argues that his Criminal History Category of II, which results from this conviction and the fact that he committed the instant offense while being supervised for this prior conviction, overstates his culpability.   (Def. Br., at 32).   He claims that at the time he bounced the checks, he was "struggling financially."   He claims that he bounced checks as a result of bad timing: he would be expecting money from friends or family, but it did not arrive in time for a check he issued to clear.   And he claims that his guilty plea to the offense was the result of "bad legal advice."   (Def. Br., at 32-33).

Since receiving the defense's sentencing submission and seeing these claims, the Government has looked further into Yehuda Rubin's prior conviction and reviewed some of the records from that case.   They are inconsistent with Yehuda Rubin's extraordinarily minimized version of his own prior conviction.   According to the records, Rubin's attempt to defraud the local bank, Walden Savings, included checks he wrote to cash, and to the high-end department store Neiman Marcus.   They included checks issued from a closed bank account.   After he bounced checks, the bank repeatedly attempted to contact him to try to work the matter out, calling him weekly, and Yehuda Rubin repeatedly hung up on them.   He was represented in the case by Kenneth Gribbetz, Esq., with whom Yehuda Rubin expressed no prior dissatisfaction and who continued to thereafter represent him during the investigation in this instant case (until being replaced by current counsel).   Presumably prior counsel would be surprised to learn of the allegation that he gave bad legal advice and is to blame for Yehuda Rubin's Criminal History category, given that he got the defendant a conditional discharge for his readily provable attempt to steal nearly $30,000 from a local bank over the course of a year.   Indeed, had Yehuda Rubin served 60 days' imprisonment or more for that conviction – a not unreasonable outcome – he

would today be in Criminal History Category III, facing a higher Guidelines range of 30-37 months.

The Probation Office, in recommending a sentence well below the Guidelines, strangely cites Rubin's criminal history in support of that recommendation.   It does so notwithstanding its noting, otherwise, "It appears that Rubin has a disregard for the law," and, "The offense was a crime of opportunity, and it cannot be determined if the defendant will re-offend if the opportunity presents itself again."   (PSR, at 27).   Indeed, the only reason given by Probation for its recommendation is the defendant's "minimal criminal history."   (PSR, at 27).

In the Government's view, a white-collar defendant who has previously been convicted of grand larceny does not have "minimal criminal history."   Nor does a defendant who chooses to commit the instant offense while on a term of supervision for a prior felony. Probation's characterization is even less explicable for a defendant who, like Yehuda Rubin, now stands convicted of a second felony that encompasses eight years of fraudulent conduct representing the majority of the defendant's adult life, for which he was not previously caught and sentenced.   In short, Yehuda Rubin's criminal history is no basis at all to impose a lenient sentence on him, let alone the extraordinarily lenient, outlier sentence for which he advocates and which Probation unaccountably recommends.

The absence of other reasons given by Probation for its recommendation is telling.   There are none.   Indeed, the applicability of the Guidelines range of 27 to 33 months is arguably fortuitous for Yehuda Rubin, because the driver for purposes of the Guidelines is loss amount, and his criminal conduct could have resulted in greater losses and a higher Guidelines range.   Had, for example, his designs for 35 Vernon, which he obtained from Idonia Johnson's

heir for $200,000 and then leveraged with his brother-in-law into a $487,000 loan that they

obtained upon lies and forgeries, ended like his prior investment schemes, he would now be

responsible for greater losses.

<u>Yehuda Rubin's Age</u>

Yehuda Rubin committed the crime for which he is to be sentenced from the ages

of 21 to 28.   The particular ages at which he pursued the efforts in furtherance of the fraudulent

loans described above are 21 (brokering the fraudulent loan on 418 Lafayette); 22 (obtaining the

fraudulent loans on 5 Kosnitz and 119-121 Hart); 23 (pursuing short sale of 119-121 Hart to his

friend and business associate Joel Lowy); 24-25 (pursuing short sale of 5 Kosnitz); and 27-28

(obtaining and fraudulently borrowing on 35 Vernon).   He argues that this is grounds for

leniency.

Yehuda Rubin's age offers him no excuse.   As the defense notes, the defendant

continued in the crime until he was 28.   The defense's response to this detail is that "this later

conduct was far less serious [than] his prior behavior."   (Def. Br., at 25).   This is wrong.   It is

arguably more serious, as the 35 Vernon loan was obtained by inventing a landlord, Yehuda

Rubin's brother in law, and then forging lease agreements between him and purported tenants.

One of the forgeries was for a person who had nothing to do with the building at which he was a

claimed tenant.

The defense also cites to selected social science about juveniles, and to the

recently created diversion program in this District for young people.   These citations are

inapplicable.   There is no evidence that Yehuda Rubin committed a lengthy and repeated

financial fraud because he was suffering from an undeveloped or immature brain.   Indeed, the

defense elsewhere in the same submission characterizes Yehuda Rubin's criminal conduct as making a lot of sense.   It resulted from rational decision-making and a sense of valor or responsibility, that followed from his realization that he had to provide for his family and there were opportunities to do so in the real estate business with all its "widespread" indifference to fraud.   In any event, selection of other social science supports a different conclusion, that Yehuda Rubin's age at the time of the offense, combined with his prior criminal history, make him a high risk of recidivism.   See United States Sentencing Commission, Recidivism Among Federal Offenders, A Comprehensive Overview, at 5, 19, 23 (March 2016) (offenders in their 20s with criminal history more likely to reoffend).

### Yehuda Rubin's Financial Circumstances

The defense describes Yehuda Rubin as, at times, suffering financial struggles. He claims to have entered the real estate business with several deficiencies: he "lacked start-up capital"; "21-years-old and only a year or two out of school with barely any income, Yehuda determined that he would be unable to obtain loans from banks to enter the real estate business unless he lied"; "[w]ith almost no experience in financial affairs, and very limited exposure to the world outside his insular religious community, Yehuda failed to grasp the gravity or the potential consequences of his conduct in making false representations to lenders."   (Def. Br., at 7).

Yehuda Rubin's claimed financial hardship, however, is contradicted by contemporaneous documents from the time.   In 2005, about the same time that Yehuda Rubin purportedly suffered these financial and experiential handicaps, his father, co-defendant Irving Rubin, was, by his own account, a thriving real estate developer, and was bringing Yehuda into

the family business.   In a loan application to Builders Bank, Irving Rubin submitted a "resume,"

in which he described, a "12 project development phase most all of which is pre-sold and nearing

completion.   The profits receivable on these projects which contain a total of 136 units are

approximately $28,270,000," half of which "belongs to Mr. Rubin."   The resume continued:

"Mr. Yehuda Rubin is also being trained and will be involved in working on these projects."   It

concluded, "G-d willing Irving Rubin foresees continued success for these projects, his family

and real estate endeavors."   (Resume, attached as Exhibit J).   The ensuing years bore out Irving

Rubin's representation that Yehuda Rubin enjoyed the benefit of being brought into the family

real estate business.   Connected to the Builders Bank loan were multiple real estate

developments, for which particular bank accounts were created, some of which were handled by

Yehuda Rubin.   Fraudulent loan proceeds obtained by the loans described above were

distributed, in some instances, into these bank accounts, controlled by Yehuda Rubin.

Yehuda Rubin's claimed experiential hardship is even less compelling, not the

least of which because he continued in the conspiracy for which he stands convicted after he was

charged, prosecuted, convicted, and sentenced for grand larceny.   In any event, he stands

convicted for lying, repeatedly and for years, to get money.   Appreciating that that is wrong, and

that doing so has serious consequences, requires no experience in financial affairs, and no

particular worldly experience.   Yehuda Rubin, like the rest of us in our society, had sufficient

experience to know that you don't lie, and you don't steal, and if you do you go to jail for a term

sufficiently commensurate with seriousness of your crime.

## II.     The Court Should Also Impose Financial Penalties

The Court should also impose a significant fine within the applicable fine Guidelines range, and forfeiture as part of the sentence.   The applicable fine range to Yehuda Rubin in the Guidelines is $5,000 to $50,000.   (PSR ¶ 103); see U.S.S.G. § 5E1.2(c)(3) (2014) (Because the offense was committed prior to November 1, 2015, pursuant to U.S.S.G. § 5E1.2(h)(1), the applicable Guidelines manual for purposes of the fine range is the November 1, 2014 manual).   A fine is appropriate because the defendant is able to pay.   U.S.S.G. § 5E1.2(a) ("The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.").   He claims monthly income of nearly $30,000, and assets with a claimed value in excess of $1 million.   (PSR ¶¶ 90, 93). Imposition of the fine, along with a sentence of incarceration within the Guidelines range of 27 to 33 months, would result in a combined sentence that would serve the aims of sentencing, for all the reasons set forth above.   See U.S.S.G. § 5E1.2(d) ("In determining the amount of the fine, the court shall consider the need for the combined sentence to reflect the seriousness of the offense . . . , to promote respect for the law, to provide just punishment and to afford adequate deterrence.").

In addition, the Court should impose forfeiture, in the amount $1,219,000, on which the parties agree.

The Government is still determining whether and what restitution is appropriate, and will update the Court regarding restitution at sentencing.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should impose on Yehuda Rubin a sentence of imprisonment within the Guidelines range of 27 to 33 months, forfeiture, and a significant fine.


Dated: November 9, 2017
         White Plains, New York

                              Respectfully submitted,
                              Joon H. Kim
                              Acting United States Attorney

                         By: ____/s_____
                              Benjamin Allee / Kathryn Martin
                              Assistant United States Attorneys
                              (914) 993-1962 / (914) 993-1963