UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

IRVING RUBIN, et al.,

Defendants.

No. 14 Cr. 741 (KMK)

**DEFENDANT YEHUDA RUBIN'S CORRECTED REPLY SENTENCING
MEMORANDUM**

HAFETZ & NECHELES LLP
Susan R. Necheles
Kathleen E. Cassidy
10 East 40th Street, 48th Floor

*Attorneys for Defendant Yehuda Rubin*

November 24, 2017

**Introduction**

We submit this reply memorandum in response to the Government's Sentencing Memorandum.

Yehuda Rubin pleaded guilty and admitted that (a) he lied on loan applications for three properties which he purchased, and (b) that as a mortgage broker he assisted another person obtain a mortgage loan when he knew that person's application contained false statements. We stressed in our initial sentencing memorandum that Yehuda recognizes and admits that his criminal conduct "was a serious offense, one that Yehuda takes full responsibility for" and that our arguments for a sentence lower than the guidelines were not meant "to minimize Yehuda's serious criminal conduct, but to situate it in the context of his life experience…" (Deft. Sent. Mem., p. 1).

The Government's Sentencing Memorandum ignores these statements. It reads more like a rebuttal summation than a discussion of the appropriate sentence in a case where a defendant has pleaded guilty and accepted responsibility for his wrongdoing. Full of rhetorical flourishes, the government's sentencing memorandum repeatedly asserts that Yehuda lied and defrauded banks, and condemns Yehuda as a "con man," asserting there is "a spectrum of dishonesty [that] ran through his frauds, and continues today…." Gov. Sent. Mem., p. 3.

The Government's attempt to portray Yehuda as a full-time fraudster, engaged in expansive criminal conduct over a ten year time period, is wrong and relies on baseless insinuations of criminality. In order to provide clarity about what Mr. Rubin did wrong and the timing of his acts we first set out a chronology of the wrongdoing that Yehuda has admitted, and we then address the specific incorrect allegations of other wrongdoing contained in the Government's Sentencing Memorandum.

## I.    Timeline

The following timeline contains the false loan applications to which Yehuda pleaded

guilty, his prior criminal conviction, the defaults on his property, and the highlights of the

financial crisis which was occurring simultaneously.

| Date | Property | Loan Application |
|------|----------|------------------|
| November and December 2006 | 418 Lafayette Street, Brooklyn | Application for a loan for $533,000 for Desiree Rubin (Yehuda Rubin's mother).  Yehuda submitted the loan application to a bank and in doing so he assisted his mother to obtain a loan based on what he knew were false statements to the bank.  The majority of proceeds from this loan went to Yehuda's mother and father and approximately 10% went to Yehuda, to repay a loan. (Exhibit B to Govt. Sent. Mem.)   Yehuda did not fill out the false loan application and did not create the false letter from Mrs. Rubin's accountant for the loan application.[1] |
| August 1, 2007 | 5 Kosnitz Drive, Monroe, NY | Yehuda obtained a mortgage loan in the name of his wife, Rachel Rubin, in the amount of $260,000.  The application contained false statements concerning Rachel's income and employment and was supported by a false document by the accountant Strauhs. |
| September 17, 2007 | Same | Yehuda applied for and obtained a home equity loan in the amount of $136,000 on the property, again in Rachel's name and again based on the same false information about her income and employment.  There was no representation in this loan that the money would be used for any specific purpose, such as improving the property. |
| September 25, 2007 | 119-121 Hart Street, Brooklyn | Yehuda purchased this property, which was located in a then very poor neighborhood in Brooklyn, Bedford Stuyvesant, in his own name in order to try to earn rental income.  He paid $660,000 and took out a mortgage of $512,000. |
| | | |

[1] The Government refers to this person as "Yehuda Rubin's accountant."  However, as the Government is aware, Mr. Strauhs worked as an accountant for Yehuda's father long before he started working as an accountant for Yehuda.  Mr. Strauhs, who we understand to be a cooperating witness for the government, is much older and more experienced than Yehuda.  It seems unlikely that Yehuda taught Mr. Strauhs how to create false documents.  Indeed, we submit that the opposite is what occurred.  Mr. Strauhs suggested to Yehuda that this was the way to obtain bank mortgages, by submitting false statements, and that Mr. Strauhs could help in this.  As a consequence, in the loan obtained by Yehuda's wife, at 5 Kosnitz Drive, Mr. Strauhs submitted a letter falsely documenting Rachel's salary and employment.

| | | |
|---|---|---|
| October 15, 2007 | Same | Yehuda obtained a home equity loan in the amount of $148,000 on this property.  The home equity loan did not contain any restrictions requiring the money to be used for a specific purpose, such as improving the property.  The total amount borrowed on this property was $660,000, which is the price Yehuda paid to purchase the property. |
| March 2008 | | Bear Sterns collapsed.  The housing market begins to decline. |
| September 7, 2008 | | Government announced takeover of Fannie Mae and Freddie Mac. |
| September 14, 2008 | | Lehman Brothers collapsed. |
| September 19, 2008 | | The Dow plummeted 3,600 points in the next three weeks, from an intraday high of 11,483 on September 19 to an intraday low of 7,882 on October 10, 2008. |
| September 19, 2008 | 119-121 Hart Street, Brooklyn | Yehuda wrote a letter to Bank of America, Short Sale Division, stating that he was having difficulty making mortgage payments and maintaining the property and that "in consultation with a licensed real estate appraiser, Mr. Rubin was advised to sell the property as soon as possible because of declining values in that particular area" and that "Mr. Rubin has found a buyer quickly" and the buyer "is a cash buyer so no mortgage contingency period is needed." |
| September 2008-October 2008 | | The world experienced a collapse of the global financial markets, the beginning of the Great Recession.  In early September, Goldman Sachs and Morgan Stanley, the last two major investment banks still standing, converted to bank holding companies in order to gain bailout funding.  On September 25, after a 10 day bank run, the FDIC seized Washington Mutual and its assets were transferred to JPMorgan Chase.  On September 29, the Dow declined 774 points (6.98%), the largest point drop in history.  On October 6, the Dow closed below 10,000 for the first time since 2004.  On October 22, President Bush announced that he would host an international conference of financial leaders on November 15, 2008. |

| | | A federal government commission called "the National Commission on the Causes of the Financial and Economic Crisis in the United States,"[2] later concluded that the collapse of the global economy was attributable to government policies and to U.S. banks and Wall Street executives who invented and pushed risky mortgage loans, knowing that the risk of these loans defaulting could be pushed off on other, less sophisticated investors.  This government report discusses how banks and other mortgage originators trained young, inexperienced mortgage brokers, such as Yehuda Rubin, how to place risky loans, teaching them that they should not be concerned about the quality of the loan or the veracity of the information in the loan documents.[3] |
|---|---|---|
| December 2008 | 119-121 Hart Street, Brooklyn | Bank of America approved the short sale on 119-121 Hart Street and gave Yehuda a satisfaction of mortgage, which was filed. |
| August - October, 2009 | | Yehuda bounced 31 checks in his bank account.<br><br>The majority of these checks were for small amounts of money and were written to individuals and companies to whom Yehuda and Rachel owed money.  They were written to third parties at a time that Yehuda was aware that he had no money in his bank account.  A few, for small amounts of money, were covered by overdraft protection but the bank refused to cash most of these |

---

[2] This Commission was established in May 2009 as part of the Fraud Enforcement and Recovery Act and was tasked with conducting an examination of the collapse of major financial institutions.  The Commission interviewed over 700 witnesses, examined thousands of documents, and finally issued a report which is over 500 pages long, entitled, "The Financial Crisis Inquiry Report." https://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

[3] "More loan sales meant higher profits for everyone in the chain.  Business boomed for Christopher Cruise, a Maryland-based corporate educator who trained loan officers for companies that were expanding mortgage originations.  He crisscrossed the nation, coaching about loan originators a year in auditoriums and classrooms.  His clients included many of the largest lenders—Countrywide, Ameriquest, and Ditech among them.  Most of their new hires were young, with no mortgage experience, fresh out of school and with previous jobs 'flipping burgers,' he told the FCIC.  Given the right training, however, the best of them could 'easily' earn millions.  'I was a sales and marketing trainer in terms of helping people to know how to sell these products to, in some cases, frankly unsophisticated and unsuspecting borrowers,' he said.  He taught them the new playbook: 'You had no incentive whatsoever to be concerned about the quality of the loan, whether it was suitable for the borrower or whether the loan performed.  In fact, you were in a way encouraged not to worry about those macro issues.'  He added, 'I knew that the risk was being shunted off.  I knew that we could be writing crap.  But in the end it was like a game of musical chairs.  Volume might go down but we were not going to be hurt.' https://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf, pp. 7-8.

| | | |
|---|---|---|
| | | checks and returned the uncashed checks to the presenter.

In mid-August Yehuda deposited a check he had received from his brother and then paid bills for $5,800 and $210.

The check which Yehuda had deposited was returned from the third party's account, leaving him owing $7,188 to Walden Federal Bank, which grew to $7,657.82 because of bank fees in October 2009, when Walden Federal Bank closed Yehuda's account.

Yehuda did not have the money to pay back the amount he owed to the bank and did not answer bank requests for repayment. |
| November 30, 2010 | | Yehuda surrendered to State authorities and was charged with misdemeanors for issuing a check without funds, and felonies for grand larceny and possession of stolen property. |
| May 2011 | 5 Kosnitz Drive, Monroe, NY | Yehuda caused his wife to submit a letter to the bank in support of his application for a short sale on the property, stating that Rachel was not working, her husband had been a victim of the economic crisis, and the value of the house has decreased by 50%.  Rachel and Yehuda's 2011 tax returns, recently filed, show that they were in fact in financial distress and earned only $40,421 that year, well below the median national household income for that year (which was $50,502).  *See* Exhibit 1 (first page of 2011 Tax Return); https://www.census.gov/newsroom/releases/ archives/american_community_survey_acs/cb12-r01.html. |
| July 8, 2011 | | Yehuda pleaded guilty to Grand Larceny in the Third Degree.  Prior to pleading guilty he made restitution to the bank in the amount of $8,657, which included the amount he wrongly obtained from the bank plus bank fees for returned checks, overdraft protection, and insufficient funds. |
| April 2012 | 35 Vernon Avenue, Brooklyn | Yehuda purchased this property in a court-approved transaction for $200,000.   The property was extremely dilapidated.  He invested approximately $250,000 in the property in a gut renovation. |
| April 2013 | Same | Yehuda transferred the property to his brother-in-law, Joel Koppel, because Koppel had better credit than Yehuda, who applied for and obtained a mortgage loan of $487,000 from Cross County Bank.  Koppel signed for and was |

| | | responsible for the loan and the loan was fully collateralized by the property.  In support of the mortgage application, Yehuda submitted lease agreements for two apartments on another property which overstated the amount of rent on that other apartment by approximately $2,000 per month.  This false lease was based on a prediction of what the rent would be once the existing non-rent-paying tenant left the premises and a new lease was entered.  In fact, when the new lease was signed several months later the amount of rent was virtually the same as the prediction in the application – just $250 less per month. This property is still a performing loan and there was no loss to the bank. |
|---|---|---|

## II.    The Government's Claims of Wrongdoing

### A.  The Government's Claim That Yehuda Continues to Lie and to "Con" the Court by Withholding Financial Information from Probation

The Government alleges on pages 3, 12-13, and then again on page 19 of the

Government's Sentencing Memorandum that Yehuda withheld information from Probation about

his finances from 2007 through 2014.  The Government makes the following hyperbolic claims:

> This is no place to spin a story of financial woe, while at the same time preventing scrutiny of that story by withholding information from Probation.  (See, e.g., PSR ¶88 (describing the defendant's inability or unwillingness to provide information about his finances from 2007 through 2014).  (Gov. Sent. Mem., p. 3)
>                                    . . .
> There is hardly a better way to summarize the completely thorough elusiveness of the financial world Yehuda Rubin created during the conspiracy than the contrast between, on the one hand, the extensive purported recitation of Yehuda Rubin's history and characteristics submitted in support of his request for leniency (Def. Br., at 4-21), and, on the other hand, his inability or unwillingness to give the Probation Office for purposes of the PSR any information about his employment and income for the eight years during the conspiracy.  (Gov. Sent. Mem., p. 19) (emphasis in original).

The Government's claim is based on one paragraph of the PSR – paragraph 88 – which

states "Rubin reported that from 2007 through 2014, he was self-employed in the real estate

business, buying and selling properties.  The defendant added that the instant offense is related to

this employment.  Rubin stated that he could not determine how much he earned and added that he is in the process of re-filing his tax returns and will provide this information."

Contrary to the Government's repeated statement, Yehuda did not refuse to provide the requested information to Probation.  Instead, based on the advice of his counsel he declined to *guess* at a probation interview how much money he had made 3-10 years earlier[4] and instead told the Probation Officer that he would provide whatever tax returns the Probation Officer wanted as soon as they were completed by his accountant.  The Probation Officer then asked for the last five years of Yehuda's tax returns and Yehuda provided exactly what was requested – his tax returns for 2012, 2013, 2014, 2015 and 2016.[5]

So, contrary to the Government's claim that Yehuda was "unwilling" to provide financial information to the Probation Officer, Yehuda gave the Probation Officer every financial document requested by the Probation Officer.[6]

---

[4] Imagine if Yehuda had guessed what his income was in 2012, his guess had been reported in the PSR, and that guess turned out to have been inaccurate.  The prosecutor would now be telling the Court that Yehuda had lied in his probation interview, and had sought to deceive the Court.  But because Yehuda waited until his tax returns were completed, and provided the completed tax returns to Probation, somehow the prosecutor claims that Yehuda was "evasive."

[5] Counsel told the Probation Officer that Yehuda was in the process of preparing his tax returns and filing tax returns back to 2011.  This took longer than expected, in part because his preparer's supervisor had a stroke and was incapacitated for a time period.

[6] The government was aware that Yehuda was working on filing his tax returns for the purpose of providing this information to the Probation Officer.  We specifically requested an adjournment of sentencing because Yehuda's accountant had had a stroke, and we wanted to finalize and file the tax returns, and provide them to Probation, prior to sentencing.  *See* Dkt. No. 411.  On November 1, 2017 we provided tax returns for the past 5 years to the Probation Officer, as requested.  Yehuda also filed a tax return for 2011, which was not requested by the Probation Officer.  However, we attach the first page of that tax return hereto as Exhibit 1, because the government has raised issues about Yehuda's income in 2011, which we address below.

**B.  The Government's Sentencing Memorandum Repeatedly Refers To Criminal Wrongdoing In Which Yehuda Had No Involvement.**

The Government's Sentencing Memorandum repeatedly refers to criminal activity that had nothing to do with Yehuda Rubin, implying or directly alleging that Yehuda was engaged in criminal conduct to which he has not pleaded guilty and which he did not commit.

The following wrongdoing described in the Government's Sentencing Memorandum was not part of Yehuda's guilty plea, and the evidence does not establish that Yehuda was involved in this wrongdoing – accordingly the allegations concerning this wrongdoing should be disregarded by the Court:

### 1.  False Deed at 418 Lafayette Street

Yehuda Rubin pleaded guilty to acting as a mortgage broker and submitting an application for a loan for Desiree Rubin (Yehuda's mother) which Yehuda knew contained false information.  This loan was not for the purchase of the property.  The property was purchased by Yehuda's father, Irving Rubin, prior to the date when Yehuda's mother obtained the loan.  The Government alleges that the deed for the property was false and that a man named Harvey Cooley had recorded a fake deed and then sold that fake deed to Desiree Rubin in 2005.  Whether or not this is true, it has nothing to do with Yehuda Rubin.  The Government does not claim that Yehuda had any involvement in this fake deed or was in any way involved in Desiree's purchase of this fake deed.

These allegations about a fake deed should therefore be disregarded by the Court.

### 2.  Purchase of 35 Vernon Street

The Government also describes in its Sentencing Memorandum Idonia Johnson, who owned 35 Vernon Avenue "for decades," raised "generations" of her family there, but by 2009 had Alzheimer's and her great-granddaughter, Juanita Johnson, became her guardian.  The

Government implies that Yehuda defrauded the Johnsons out of 35 Vernon Avenue, paying only $200,000 in 2012 – property for which he was able to obtain a mortgage in 2013 for $487,000. *See* Gov. Sent. Mem., p. 10.  The Government emphasizes that Juanita Johnson ended up receiving virtually no money from this sale.[7]

This is another irrelevant distraction.  There was nothing improper about Yehuda's behavior or about this transaction.  35 Vernon was appraised by two independent appraisers, one of which was approved by the Court and not known to Yehuda prior to this transaction.  The Court-approved appraiser described the property as completely dilapidated and uninhabitable: "The subject property is old and in extremely poor condition.  There have not been any updates or improvements since the subject was built.  Interior is all original.  There is mold, water leaks, unsafe flooring, evidence of rodents.  Based on the appraiser's professional opinion the subject is not livable and unsafe."  Ex. 2 (Appraisal of 35 Vernon Avenue by Joseph A. Martino, dated 2011).  The other appraiser wrote similar things about the property. Based on these appraisals and an affidavit signed by Juanita Johnson and her mother Regina Johnson asking for approval of the sale of the property, the court ordered the property sold.

After purchasing the property, Yehuda spent 2012 fixing it up so that he could rent out apartments.  He spent over $250,000 rehabilitating the property and only then obtained a mortgage for $487,000.  We attach as Exhibit 3 pictures of the renovated apartment on the second floor to show the vast amount of work which was done.

---

[7] The government neglects to mention that Idonia Johnson and her grandchild and great-grandchild had been living in this dilapidated building and not paying the mortgage or any bills like electricity.  The home was in imminent danger of foreclosure at the time that Yehuda got involved.  The Johnsons petitioned the Court to approve the sale so that money in excess of the mortgage could be used to pay for Idonia Johnson's expenses.  This is what in fact occurred.

Thus, the suggestion that somehow Yehuda defrauded or cheated the Johnson family out of valuable property is untrue and unsupported by any evidence and should be disregarded by the Court.

> 3. *Short Sales on 5 Kosnitz Drive, Monroe and 119-121 Hart Street, Brooklyn*
>
>    a. *5 Koznitz Drive*

Yehuda Rubin pleaded guilty to obtaining a mortgage and a home equity loan, totaling approximately $396,000, on 5 Kotznitz Drive, Unit 302, in Monroe, NY.  He obtained these loans in 2007.  Yehuda purchased this property for $375,000 and spent approximately $75,000, including closing costs and renovation, for a total cost of $450,000.  In 2011, Yehuda, with the approval of the bank, arranged a short sale to a neighbor named Abraham Werzberger.  As a result of this purchase and short sale, Yehuda lost approximately $54,000.

The Government claims that the short sale was a fraud.  The Government's argument is based on three errors.

First, the Government asserts that Rachel Rubin's letter to the bank stating that she was "going through financial difficulties" was false because in fact $30,000 went through Rachel Rubin's account the following month and in that same year "$372,000 was deposited into Rachel Rubin's personal bank account, a substantial portion of which was spent from the account on personal expenditures."  Govt. Sent. Mem., p. 17.  However, at that time Yehuda was borrowing money from others, including hard money lenders, community loan organizations, and family members, in an effort to stay afloat and pay debts.  An analysis of the payments made out of this account, set forth in the footnote, shows that the expenditures in June 2011 which the government claimed were for personal items were in fact for repayment of debt.[8]  And Yehuda

---

[8] Contrary to the Government's claim, approximately $25,000 went into Rachel's account from May 26, 2011 through June 23, 2011 (the Government counts a check for $5,000 that bounced and that was

and Rachel's 2011 tax return shows that for the year 2011 they earned an adjusted gross income of $40,421, to support a family of five.  Exhibit 1 is the first page of the 2011 tax return.  This was well below the median income for a household at that time and shows clear financial distress for a family of five.  Thus, the Government's assertion that in 2011 Yehuda was living lavishly and obtained the short sale on Kosnitz Drive by false pretenses of financial difficulties is wrong.

Second, the Government implies that further evidence that the sale of the Kosnitz Drive property was a sham is that Yehuda and his family continued to live in the apartment and never paid rent to the purchaser, Abraham Werzberger.  In support of this argument the Government asserts that there are very few checks from Yehuda deposited into Werzberger's account, and there is a wire transfer from Werzberger to Yehuda for a greater amount of money than the deposited checks.

Again, the Government's conclusion, based on guesses rather than evidence, is wrong.  Mr. Werzberger has written to the Court and states that he receives rent on a monthly basis from Yehuda, the rent is paid primarily in cash,[9] and Mr. Werzberger declares this rent on his tax return.  Exhibit 4.  Additionally, the Government has confused two Werzbergers.  The check to

_____

returned as if it were a deposit) and all but approximately $5,000 of that was paid out to repay loans or to pay bank charges, such as the following (this includes some of the larger, but not all of, the loan repayments made during this time period):

- o  5/27:  $3,700 payment to Jacob Goldenberg to repay a loan
- o  6/1:  $500 payment to Flushing Savings Bank to repay a loan
- o  6/1:  $382 payment to PRA Inc. Portfolio Recovery – Settlement on Debt
- o  6/3:  $7,683 payment for American Express debt
- o  6/3:  $5,000 payment to Bank of America Collection
- o  6/3:  $500 loan repayment to Congregation Mosdos Toldos for a loan
- o  6/6:  $500 payment to Sun for loan repayment
- o  6/8:  $500 payment to Mendlowitz, Leisure Pro LTD to repay a loan
- o  6/8:  $1,400 payment to Attorney Friedman Saks to repay debt
- o  6/16:  $3,000 payment to Yisrael Leshkowitz to repay a loan
- o  6/16:  $526 payment to O&R Utilities Bills to pay debt
- o  5/26-6/23: $240 bank fees

[9] We remind the Court that Yehuda had a history of bouncing checks.  It is not surprising that someone who deals with him would want to be paid in cash.

Yehuda was not from the Werzberger who purchased 5 Koznitz Drive and who is Yehuda's landlord, it was from a different individual who lives in Brooklyn.  There was no reimbursement by Yehuda's landlord to Yehuda of any money paid for rent.

Accordingly, the Government's assertion that the short sale involving 5 Koznitz Drive was fraudulent lacks evidentiary support and should be disregarded by the Court.

### b. 119-121 Hart Street

Yehuda also pleaded guilty to obtaining a mortgage and a home equity loan on 119-121 Hart Street, Brooklyn in September and October, 2007.  Yehuda purchased this property for $660,000 and then obtained a mortgage loan and a home equity loan in the amount of $660,000. In September 2008, Yehuda asked the bank to allow him to do a short sale on this property, and in February 2008 the bank released him from the mortgage based on a short sale to Joel Lowy.

In asking for this short sale, Yehuda did not misrepresent his financial position.  He told the bank that he was having difficulty making mortgage payments and that a licensed real estate appraiser had advised him to sell the property as soon as possible because of declining values in that area.  Based on this, the bank agreed to a short sale.   Exhibit G to Govt. Sent. Mem.

The Government insinuates that this short sale was a sham because the property ended up being purchased by Yehuda's friend and later business partner, Joel Lowy.  What the Government fails to recognize is that this short sale took place at the height of the market panic. The market had frozen – banks were not approving loans and as a result housing prices had fallen steeply.  *See http://furmancenter.org/files/publications/HMDA_2009_databrief_FINAL.pdf.*  (The number of mortgage loans made by banks in 2009 in New York City had fallen 60% from the peak in 2004).  Often, especially in neighborhoods like Bedford Stuyvesant, which was in early stages of

gentrification in 2009, a buyer needed to be able to do an all cash transaction since mortgages were impossible to obtain.  Thus, a report on real estate prices from a Brooklyn real estate website reported that in 2010 home sales were virtually non-existent in Bed Stuy.  "There are more short sales than regular sales taking place in central Brooklyn, which shows that homeowners continue to default on their mortgages.  Residents are desperate and choose to short sell as an alternative to foreclosing.  Meanwhile, the sharp drop in home values that began in Jan. 2008 continues in this area of Brooklyn."  *http://brooklynink.org/2010/11/02/17901-housing-in-brooklyn-is-all-about-location/.*

It is highly likely, given the financial meltdown that was occurring at that point and the collapse in the real estate market in Bed Stuy, that absent Yehuda's friend, who was able and willing to purchase the property, no sale would have occurred for years and the bank might have been forced to sell the property in foreclosure, a notoriously bad way for a bank to attempt to recover its money.[10]

Accordingly, the Government's insinuation that the sale of this property to Joel Lowy (who sold it just a few years thereafter to a third party for only a small profit), was a sham transaction has no evidentiary basis and should be disregarded by the Court.

> 4. *The Government's Claim That Yehuda Did Not Spend Money Obtained From HELOC Loans To Improve The Properties Is Wrong.*

The Government repeatedly alleges that Yehuda did not use the money that he received from the home equity loans to fix up his properties.  In support of this allegation, the

---

[10] Indeed, many borrowers simply held on to the property even when they could not afford to pay the mortgages, and litigated against the banks in foreclosure, all while not making mortgage payments but still collecting rental income.  In Brooklyn this type of litigation could continue for years, at great risk to the banks.  *See, http://www.nytimes.com/2009/08/31/nyregion/31judge.html.*  Thus, a borrower who sought to negotiate with the bank and resolve a bad debt and who brought a buyer to the table was welcomed by banks.

Government has submitted charts purporting to show how the money from the HELOC loans was spent.

It is important to realize that there was no requirement in the home equity loans that the proceeds be used to fix up the properties.  Nor was there any statement in any application for a home equity loan that the money would be used to fix up the properties. Thus, even if the money had not gone to fix up the properties, that would not establish any wrongdoing by Yehuda.

But in fact much of the money did get reinvested in properties owned by Yehuda, who at the time was attempting to build a real estate rental business.  Contrary to the Government's suggestion that Yehuda just took the money from the bank loans and used it to live large, Yehuda invested hundreds of thousands of dollars into the properties he purchased.  Indeed, an examination of the flow of the money from just the 119 Hart Street HELOC loan establishes this. Thus, Exhibit F to the Government's Sentencing Memorandum shows the following payments out of funds obtained from a home equity loan on 119 Hart Street:

- Payments of over $83,000 to repay loans from Morris Lowy, who was a hard money lender who had lent money to Yehuda to purchase and renovate properties.
- Payments of approximately $10,000 to Y&R Capital, Yehuda's company which managed the properties he invested in.
- Payments of $83,000 to Devoe Properties, a company owned by Joel Rubin (Yehuda's brother) who had lent money on prior occasions to Yehuda for use in operating properties.
- Payments totaling approximately $25,000 to contractors who had done work on properties Yehuda owned.

The Government's repeated suggestion that Yehuda did not use the money from the home equity loans to fix up the properties is incorrect and should be disregarded by the Court.

     *5.   The Government's Allegation That Yehuda Took Loans, Kept The Money, and "Promptly" Defaulted On The Loans Is Not Correct.*

The Government asserts that Yehuda never intended to repay any loans, and that this is evidenced by the fact that he "promptly" defaulted on the loans. *See, e.g.,* Govt. Sent. Mem., pp. 4, 16. Two facts show that the Government's allegation is wrong.

First, Yehuda invested substantial sums of money in Kosnitz Drive and Vernon Avenue. As set forth above, on Kosnitz Drive Yehuda invested $54,000 of his own funds, and on Vernon Avenue he invested approximately $250,000. Thus, when he defaulted on Kosnitz Yehuda lost over $50,000 and had to start paying rent. It makes no sense to have made these investments of his own funds in the properties if he had just intended to default on the loans and "fleece" the banks, as the Government alleges.

With respect to 119-121 Hart, the amount taken in mortgages equaled the amount Yehuda paid for the property. At the end of the day Yehuda lost this property. Thus, while the bank lost much of the money it loaned to Yehuda, this money did not end up in Yehuda's pocket. Yehuda lost any ownership in this property and any money or time he put into the property.

Second, the Government's argument seeks to ignore what was happening in the world at the time that Yehuda defaulted on these loans. The greatest financial crisis of our generation was occurring and it was centered on real estate. Given this worldwide financial meltdown, the fact that Yehuda was unable to repay his loans on buildings that he bought at the height of the real estate bubble is not surprising and has nothing to do with any attempt by Yehuda to "fleece" the banks.

### III.    Yehuda's Prior Conviction

The Government's Sentencing Memorandum argues that checks which Yehuda bounced were attempts to "defraud the local bank, Walden Savings" and represent an attempt "to steal nearly $30,000 from a local bank over the course of a year."  Gov. Sent. Mem., p. 20.

These statements are inaccurate.

Over a two month period – during August 2009 and September 2009, ending on October 2, 2009[11] – Yehuda wrote approximately 30 checks at a time when he did not have any money in his bank account.  The checks were mainly for small amounts of money and were written to creditors.  Yehuda knew the bank would not pay out money on these checks when the checks were presented by the third parties – banks do not pay checks that are presented to them when there is no money in the account.  He nonetheless gave these checks to creditors because he owed money to credit card companies and other creditors and he had no money to pay.  He was stalling for time.  He is not proud of what he did – he was young, stupid and thought this was a bright idea to gain himself some time.  However, this was not a scheme to steal $30,000, as the Government claims.  The strongest evidence of this is the fact that the bank did indeed refuse to pay out any money on virtually every one of these checks.

In late August 2009 Yehuda deposited a check for $6,900 and wrote two checks against it, to pay bills.  The check which was deposited was returned for insufficient funds.

Yehuda did not have the money to repay the bank.  Throughout September he continued to bounce checks and to ignore the bank's request for repayment of the money owed to the bank. Finally, in early October 2009 the bank closed the account.

---

[11] The Government states that Yehuda bounced checks for one year.  The checks and the bank account statements prove that the Government is wrong and that this conduct was limited to August and September of 2009.

Thus, there is no question that Yehuda gave people checks when he had no money in the bank. This is a misdemeanor under state law but this was not an attempt to defraud the bank or steal money from the bank – he knew the bank would not cash these checks.

With respect to the two payments made by the bank based on a check that had been deposited and later returned for insufficient funds, these payments led to the state criminal charge against Yehuda of grand larceny and criminal possession of stolen property. Even if cashing these two checks and failing to reimburse the bank constitutes larceny (and we submit there is an issue with respect to intent to permanently deprive the bank of money), this was Yehuda's first offense, the amount of money was minimal, and Yehuda paid the money back as soon as he was arrested. Given these mitigating factors, it is surprising that the attorney who represented Yehuda in this state case (who was *not* Kenneth Gribitz, contrary to the Government's claim) did not negotiate a plea to a misdemeanor.

In any case, we submit that this prior criminal conduct – obtaining and failing to pay back the $6,900 and issuing checks with the knowledge that they would not clear the bank – was in fact a relatively minor crime, and not one which ordinarily results in a felony conviction for a first time offender. But the fact that the Government in this case believes that it would have been reasonable for Yehuda to have served a 60 day jail sentence for bouncing checks and wrongly obtaining $6,900 from the bank[12] – conduct which can fairly be described as the act of a person who was desperately trying to make ends meet in the short term – is perhaps the best illustration we could think of to show that the Government's judgment with respect to Yehuda Rubin appears to be unreasonably harsh and should not be relied upon by Your Honor in this case.

---

[12] The Government states on page 20 of its Sentencing Memorandum that a 60 day jail sentence for Yehuda Rubin on his state conviction would not have been an "unreasonable outcome." We disagree. We believe that sentencing a person to jail for 60 days for theft of $6,900 is excessive.

IV.    **The Government's Claims About Yehuda's Wealth**

The Government's Sentencing Memorandum argues that Yehuda comes from a wealthy family, committed his crimes in order to continue to live a wealthy lifestyle, involving fancy trips and shopping in fancy stores,[13] and that notwithstanding this wealth he has not even tried to arrange for repayment of any loans.  This is all inaccurate.

First, the Government argues that "when Yehuda Rubin set out upon his years' long effort to fleece banks, he was the son and chosen heir to his father's purportedly lucrative Brooklyn real estate business, and had opportunities of the kind that few defendants who appear before your Honor ever enjoyed."  Gov. Sent. Mem., p. 4.   In support of this claim the Government attaches as Exhibit J to its sentencing memorandum a "Resume" of Irving Rubin, Yehuda's father, in which Irving claims to have bought and sold properties worth tens of millions of dollars and states that "Mr. Yehuda Rubin is also being trained and will be involved in working on these projects."

We have no idea where this "resume" comes from or whether it was ever to be used for anything.  The document is dated August 3, 2005.  Yehuda was 19-years-old at that time.  The statement in it that Yehuda Rubin was "being trained" to work with his father on enormous real estate projects was false.  Yehuda Rubin never worked for his father.

Wherever this "resume" came from, it is disingenuous for the Government to argue based on this "resume" that Irving Rubin was rich or that Yehuda Rubin grew up rich and was to be the "heir" to a real estate fortune.

---

[13] The Government repeatedly refers to credit card bills which show that Mrs. Rubin sometimes shops in expensive stores.  Although referred to often, these bills appear to be relatively small.  *See, e.g.,* Gov. Sent. Mem., pp. 4, 17.  Moreover, we note that Hassidic women do not shop online and pride themselves on spending a lot of time shopping for clothing and finding "bargains" on that clothing.  Charges at high-end stores, thus, do not necessarily indicate extravagance but instead likely reflect purchases of clothing for the family at sales.

Irving Rubin is a co-defendant in this case and has pleaded guilty to bank fraud and is awaiting sentencing.  The Government alleged in this case that Irving lied about his financial well-being in order to obtain a mortgage.  Based on the exhaustive investigation conducted by the Government, the Government is aware that Irving Rubin was not the wealthy real estate magnate that this "resume" claims he was.  We do not understand why the Government would ask Your Honor to rely on a document that the Government must know is likely false to argue that Yehuda grew up wealthy and involved in real estate transactions.[14]

Finally, the claim that Yehuda has made no attempts to arrange for repayment of the victims or for payment of the forfeiture order appear to be based on the Government failing to remember conversations during plea negotiations.

Throughout plea negotiations counsel for Yehuda attempted to reach an agreement with the Government on the amount to be paid back to victims and the amount of forfeiture, as part of the plea agreement.  Counsel for Yehuda argued that if a number could be reached, and if it was possible to do so, she would attempt to have this amount repaid before sentencing.  Counsel for the Government, however, stated that he was not interested in negotiating this number, even if this could mean repayment of the amounts before sentencing, and that collection of this money was a matter handled by other people in his office.

---

[14] The Government also argues as evidence of Yehuda's supposedly fancy life that he "regularly takes personal trips," citing the ten trips that he requested permission to take during his three years on bail. Gov. Sent. Mem., p. 4, and fn. 3.

In fact, of the ten trips requested, Yehuda only went on seven.  Three were for business.  Two were one-day trips to Canada for family weddings where he and his wife drove there and back the same day, not even staying overnight.  One was a one-day trip to Hershey PA to visit an amusement park with his children.  Only one of these trips was a vacation/religious trip he took with his wife, the trip to Puerto Rico.

Thus, the claim that Yehuda "regularly takes personal trips" is, like so many of the claims in the Government's submission, a gross overstatement of the truth.

Given these statements, counsel for defense made no further attempts to try to arrange any plan to repay forfeiture or restitution amounts.  Nor did counsel for the Government ever give any indication that it had changed its mind and was willing to work with defense counsel to come to a resolution on the amount owed in forfeiture or restitution.

Nonetheless, we agree that an appropriate condition of sentencing would be that Yehuda pay 10% of his income toward his forfeiture judgment/restitution order.  This, we submit, is one further reason that Yehuda should be sentenced to a halfway house and allowed to continue to work.

## V.      The Mitigating Factors for a Downward Departure

After sorting through all of the Government's claims of wrongdoing, the only claims which have any validity are those Yehuda admitted in his plea allocution and in his initial sentencing memorandum:  Yehuda (1) acted as a mortgage broker in 2005 to assist his mother obtain a loan for 418 Lafayette Street, based on a mortgage application which he knew to contain false statements, (2) submitted loan applications containing false statements for Kosnitz Drive and Hart Ave., in 2006 and 2007, and (3) submitted false lease agreements which overstated the amount of rent received on a property by $2,000 per month in a loan application for the Vernon Street property in 2013.

As we set forth in our initial Sentencing Memorandum, most of this behavior occurred when Yehuda was young, between the ages of 20 and 22 years old.  It was done at a time when the banks were clearly encouraging and soliciting this kind of wrongdoing.  We do not offer this as an excuse or a defense for Yehuda's wrongdoing.  But we submit that the wrongdoing of the banks, which have been well documented by investigative agencies such as the Financial Crisis

Inquiry Commission, contributed to the wrongdoing of young men like Yehuda Rubin and is a mitigating factor.

Finally, the Government's Sentencing Memorandum does not even mention what we submit is the most significant factor favoring a downward variance from the sentencing guidelines in this case – the collateral harm to innocent third parties which would result from a sentence of imprisonment.

As set forth in our initial Sentencing Memorandum, Yehuda Rubin, working with Joel Lowy, has built a substantial business which employs approximately 40 people with an annual payroll of approximately $2 million.  The Government questions how Yehuda was able to accomplish this.  He accomplished it by hard work.  Joel Lowy invested the initial capital and Yehuda put in sweat equity – leaving his home early every morning and not returning until late every night to try to find customers, build a business, hire employees, run an office, and do everything that needed to be done to succeed in a new line of work.  Due to his hard work, Yehuda has indeed created a successful business.

Indeed, the Government does not dispute what we asserted in our initial Sentencing Memorandum: If Yehuda is sentenced to jail in this case there is a substantial risk that this business will fail and all of the approximately 40 employees will lose their jobs.  Based on this, we ask the Court to sentence Mr. Rubin to a sentence of one year in a halfway house.

**<u>CONCLUSION</u>**

For the reasons set forth in our initial Sentencing Memorandum and above we respectfully request that Yehuda Rubin be sentenced to one year in a halfway house and be required to pay 10% of his annual income toward the forfeiture judgment/restitution order.

Respectfully submitted,
Hafetz & Necheles LLP

Dated: November 24, 2017
　　　New York, NY

By:　Susan R. Necheles
　　　Kathleen E. Cassidy
　　　10 East 40th Street, 48th Floor
　　　New York, NY 10016
　　　(212) 997-7400

　　　*Attorneys for Defendant Yehuda Rubin*