1   *UNITED STATES DISTRICT COURT*

2   *SOUTHERN DISTRICT OF NEW YORK*
    -------------------------------X
3   UNITED STATES OF AMERICA,            :

4                                        :

5       *v.*                             :
                                         *14 cr 741*
6   YEHUDA RUBIN,                        :

7                   *Defendant.*         :

8   -------------------------------X

9                                   *United States Courthouse*
                                    *White Plains, New York*
10

11                                  *NOVEMBER 27, 2017*

12  *B e f o r e :*

13                  *HON. KENNETH M. KARAS*
                    *United States District Judge*
14

15  *A P P E A R A N C E S*

16  *KATHRYN MARTIN*

17  *BENJAMIN ALLEE*

18      *Assistant United States Attorneys*

19  *KATHLEEN CASSIDY*

20  *SUSAN NECHELES*

21      *Attorney for Defendant*

22

23

24

25

1              P R O C E E D I N G S

2              THE DEPUTY CLERK:  All rise.  The Honorable Kenneth

3     M. Karas presiding.  United States of America versus Yehuda

4     Rubin, 14 cr 741.

5              Counsel, please state your appearances.

6              MR. ALLEE:  Good afternoon, your Honor Benjamin Allee

7     and Kathryn Martin for the government.

8              THE COURT:  Good afternoon to you both.

9              MS. NECHELES:  Good afternoon, your Honor.

10             Susan Necheles and Kate Cassidy for Mr. Rubin who's

11    here with us, Yehuda Rubin.

12             THE COURT:  Good afternoon you all.  Please be

13    seated.  All right.  We're here for Mr. Rubin's sentence.

14    There's been quite a flurry of filings.  So I just want to make

15    sure that we're all on the same page.

16             Starting with the presentence report, the report I

17    read was last revised on August 23.  Is that the most recent

18    report you all have?

19             MR. ALLEE:  Yes, your Honor.

20             MS. NECHELES:  Yes, your Honor.

21             THE COURT:  Okay.  And then on behalf of Mr. Rubin,

22    there was the sentencing submission -- well, there was

23    October 31, and then there was the redacted corrected one on

24    November 1.  And then, of course, I've read that submission and

25    then all the exhibits.

1          And then there was a reply submission dated
2    November 22nd.  And then I also got -- and then I also had
3    exhibits and I've read those.  And I get yesterday, something
4    from the Aleph Institute, A-L-E-P-H, dated November 26.
5          Is there anything else I should have read on
6    Mr. Rubin's behalf?
7          MS. NECHELES:  Your Honor, did you get our reply?
8          THE COURT:  I mentioned that.  The reply was
9    November 22nd.
10          MS. NECHELES:  And there was the government's.  I
11    guess you didn't mention the government's?
12          THE COURT:  Well, I'm only talking about from your
13    perspective.  I wanted to make sure I've read everything from
14    Mr. Rubin's perspective.  So I haven't left anything out.
15          And then the government, I've read their sentencing
16    memorandum dated November 9 along with all the exhibits.  Is
17    there anything else I should have read on the government's
18    behalf?
19          MR. ALLEE:  No, your Honor.
20          THE COURT:  All right.  In terms of the presentence
21    report, are there any objections on Mr. Rubin's behalf?
22          MS. NECHELES:  Your Honor, I think we had submitted a
23    letter dated July 20.
24          THE COURT:  I thought that things got resolved
25    though, but you tell me --

1          MS. NECHELES:  I believe they are all resolved.

2          THE COURT:  Okay.  So you've had enough time to go

3    over the presentence report with Mr. Rubin and then there are

4    no objections currently?

5          MS. NECHELES:  Yes.

6          THE COURT:  Okay.  Did you review the report?

7          MR. ALLEE:  Yes, your Honor.

8          THE COURT:  Any objections?

9          MR. ALLEE:  No, your Honor.

10         THE COURT:  All right.  So I guess the best way to

11   start is -- I don't know who's going to speak on behalf of

12   Mr. Rubin, but is it going to be you, Ms. Necheles?

13         MS. NECHELES:  I am, your Honor.

14         THE COURT:  All right.  So then you can go first and

15   then the government and you can respond to anything they say.

16   Otherwise Mr. Rubin will have the opportunity for the last

17   word.

18         MS. NECHELES:  Thank you, your Honor.  And I know you

19   have read carefully everything that was submitted and I just

20   want to focus today on a few things.

21         THE COURT:  Okay.

22         MS. NECHELES:  And I will start as we all must start

23   with law, with 3553(a), which asks your Honor to impose a

24   sentence that is sufficient but not greater than necessary to

25   comply with the objectives of sentencing and talks about

1   factors that your Honor must consider.

2          And the first factor, and what many courts have held

3   is the most important factor, are the nature and circumstances

4   of the offense and the history and characteristics of the

5   defendant.  So I'm going to start backwards.  I'm going to talk

6   first about the history and characteristics of the defendant.

7   And then I'll talk about the nature and circumstance of the

8   offense.  And, finally, I will talk about the sentence which we

9   submit, your Honor, would be sufficient to comply with the

10  objectives of sentencing.

11         The first is who is Yehuda Rubin?  And I'll refer to

12  him as Yehuda because there's so many "Mr. Rubins" in this

13  case.  And I want to talk about his life first.  Because when

14  you sentence someone -- and I've done many sentencing as I'm

15  sure your Honor has done many sentencing.  And to me it's

16  always a day where you look at the whole person, you look at

17  who is this person.  You don't just take the criminal conduct

18  in the abstract.  It's the good and the bad, but the good also

19  that the person has done in their life should be accounted for

20  on this day.

21         And here, your Honor, you've seen many letters from

22  many people.  You see many people here who have come and many

23  of them have written letters.  And they have -- and they talk

24  about a person who really is -- a person this young really is

25  an extraordinary person, a truly good man.  And this case is

1  unusual because it's gone on for so long.  And because of the

2  length of this case, I've really gotten to know Mr. Rubin and

3  also actually to know many of his friends and colleagues who

4  are here in court today.  And they spoke to me about him and

5  I've seen what kind of a person that he is.  And I've gotten to

6  know his wife, as well, who is sitting here in the courtroom in

7  the front.

8        And I want to start with his wife because Rachel

9  Rubin wrote a remarkable letter, your Honor, which I submit is

10 raw in its honesty.  And she had talked to me about this many

11 times in the past since I've first known her from the very day

12 when she was arrested, and I saw her downstairs in the jail

13 downstairs here.  After that, we really -- she told me she --

14 after that that she was an orphan and told me about her life

15 and how she grew up.

16       And she didn't tell me at first about all of her

17 phobias and those problems.  I came to know them over time.

18 And the two of them both told me at different times about the

19 story of them getting to know each other and, you know, how

20 they had first been introduced.  And I work a lot in this

21 community, your Honor.  So I know some of the customs and I

22 know that men and women get married very young.  They don't

23 know anybody of the opposite sex up to that point.  They do not

24 socialize or communicate and it's kind of traumatic.  It's a

25 scary thing at that age to sort of get thrown in with someone

1   else.

2          THE COURT:  It's scary at any age.

3          MS. NECHELES:  And I got married at 41 and it's not

4   easy.

5          THE COURT:  It's not easy, right.

6          MS. NECHELES:  So maybe it's easier at 19.  But I

7   know it was very, very scary for Rachel.  And given, you know,

8   her history, it was hard to get to trust somebody.  And they

9   were 19 in getting married.

10         And I thought about it and I thought, you know,

11  imagine you got married at 19 or I got married at 19.  And I

12  got married to someone who had these difficulties.  And I came

13  from an extraordinarily sheltered background where I had never

14  spoken to someone of the opposite sex.  Would I be able to deal

15  with this?  I think it is a testament to who Yehuda is, that he

16  totally dealt with it.  He is a person of deep compassion and

17  deep ability to sort of pull beyond himself, to dig deep and go

18  beyond.

19         This is a community where therapy is not spoken

20  about.  Problems like that are just not talked about.  And he

21  is not like that.  He is a person -- you will see it and I saw

22  it in letter after letter who, when someone is having a

23  problem, someone is having a difficulty in their life, he

24  confronts that.  He doesn't hide from it.  He doesn't think

25  it's something to be ashamed of.  He confronts it in their

1    whole person and helps.  And that is what he did with Rachel.

2         And she tells you in her letter to your Honor -- and

3    this is the only quote I'll read, but it really struck me about

4    it.  She tells you in her long letter, she says, "That is why

5    Yehuda is my life.  I'm nothing without him.  He picked me up

6    from the dirt and helped me rise above all of my challenges.  I

7    still have many things that make me worried or anxious.  I have

8    many fears that sometimes make it hard to get through the day.

9    But I can always share these feelings with Yehuda and he knows

10   just what to say and how to support me.  He is my backbone.  He

11   is my support, my shelter, my everything.  And that is the kind

12   of man he is.

13        There are letters from so many family members telling

14   how Yehuda is the person they turn to in an emergency.  And in

15   this same -- part of the same character, he is not a person who

16   is afraid of dealing with the hard things in life.  And it also

17   goes to something else, and I think you'll see later when I'm

18   talking about the business he started.  He's very smart and

19   very competent and very much able to sort of pull things

20   together.  He's organized.  He's on top of things and he's a

21   person that you go to to get that kind of help.  And the things

22   he has done are truly remarkable.

23        His sister-in-law, Faggi, and her husband write how

24   she was in a car accident in Montreal.  He and his wife,

25   Rachel, immediately that night drove all the way up there that

1    night and immediately went to help. And they took the youngest

2    baby back with them, Yachi, who was four years old, home with

3    them to live not just for a few weeks, but for a year she lived

4    in their house.

5    Your Honor, I can't even imagine what that must have

6    been like. This child, who was -- probably must have been

7    traumatized to all of a sudden be taken to someone else. It

8    could not have been easy to take care of her for that year.

9    And this, of course, is a testament to Rachel, of course, as

10   well. But Yachi writes how they treated her just like one of

11   their own, and she writes of these joyous memories of that

12   year. That is the kind of person that Yedil and his wife are.

13   Daniel Hirsch, his brother-in-law, talked about how

14   Yedil helped when his wife was diagnosed with a brain tumor.

15   He got in touch with the community organization that helps.

16   And, your Honor, in many of these letters, you can

17   tell that these letters are truthful and they're honest letters

18   because they're corroborated by other letters. The

19   organization, in fact, also writes about working with Yedil and

20   how Yedil has helped out in different cases and given money to

21   this organization.

22   He continues to help. He helped with his family.

23   He's had the family stay in his home. They've stayed at the

24   hospital with a person very much in this community. People

25   don't stay in the hospital alone. And he has slept in the

hospital and cared and he continues today to help with this family.

Volvy Hirsch, who was a cousin of his, who is in this courtroom today here for Mr. Rubin, is a disabled young man and he's a cousin of Rachel's.  He met at -- Mr. Rubin and Volvy met after Mr. Rubin got married and they became friends and Yedil started going to his house a couple of days, three days a week to help out and help him in the home.

But what is particularly striking to me about this letter and what I see other times and it's the same thing, he didn't just see a person who was disabled.  Yedil saw someone who had a lot of potential, a lot that he could do in his life and he helped that person become what he could become.

And so Volvy writes about Yedil helping him learn to drive a car, helping him get a job in something that he really loves doing today, sending him business, staying in his life, helping him make a better life.  These are just a few of the letters and a few of the examples and when I read through them, I really was overwhelmed by them.  I thought, this is a very special young man.  He is only 32 years old today.  This is how he has led his life.

And it's not just confined to his community, your Honor.  In fact, one of his employees, David Belizaire, was an employee who works at the business he works at right now, talks about how when Hurricane Irma hit his family in Florida, Yedil

1　helped not only with money, but he helped first off -- right to

2　start off with help them get another house.  He reached out and

3　helped find them an apartment that they could move to to live.

4　　　　Your Honor, this letter actually struck me very

5　strongly because I have a lot of family who was hurt by the

6　hurricane and it was so difficult and we were so frantic here.

7　And so that kind of helped to be able to reach out to somebody

8　and come in and help.  I know I've been very appreciative and I

9　know that Mr. Belizaire is.  And since that time, he gave

10　loans, employee loans, to this employee so that the employee

11　could help further with the family.

12　　　　And then there is the anonymous charity.  And

13　Maimonides says that to give to charity, the highest form of

14　giving is to give anonymously so that other people don't know

15　rather than to stand up and talk about it in temple, but to

16　give anonymously.  And that is what Moses Goldberg talks about

17　Yehuda doing, about how there is a widow in the community, who

18　every couple of months, they get together and figure out how

19　are they going to help her pay her bills going forward.  They

20　raise money.  They give money.  They do what they need to do

21　and they do it without fanfare, without making a big deal about

22　it.  And Mr. Goldberg was careful not to put the woman's name

23　in there.

24　　　　And I'm going to ask, your Honor, if one of the

25　employees can speak, the bookkeeper from his company, Jessica

1   Futrell.  Ryan can speak in a little while and she also will

2   tell your Honor about the anonymous charity that Mr. Rubin

3   gives.  So that is who he is.

4           And so now I wanted to talk a little bit about the

5   crime that he committed and what he has admitted to, because

6   always to me, when I am standing at sentencing, I think about

7   what -- well that's who he is, but why did a person like

8   this -- why did a good person like this commit the criminal

9   conduct that he's standing before your Honor for?  And that is

10  the second part -- or the first part of the most important

11  factor I think that your Honor has to consider today.

12          I want to start with something we talked about in our

13  sentencing memorandum and that is how young he is.  And of all

14  of the defendants in this case -- and the government has talked

15  about it being a family and a conspiracy -- out of all of the

16  defendants, Yehuda was the youngest.

17          At the time that this started in 2005 when he became

18  a mortgage broker, he was 20 years old, got married at 19, his

19  wife got pregnant, he was in school.  In that community, if you

20  are wealthy, you stay in school for a couple of years even

21  after you're married, studying torah.  But he was not wealthy

22  and so he needed to get a job and it was the height of the real

23  estate boom.  And people seemed to be making a lot of money,

24  particularly in Brooklyn in real estate and particularly in the

25  Satmar community.  The Satmar community was located in a place,

1    in an area in Brooklyn in Williamsburg that got rezoned.

2              And so all of a sudden, there was all this property

3    that could be developed and at the same time, there was this

4    boom in Brooklyn.  And so you saw a lot of the Satmar

5    community, a lot of young people and a lot of people going into

6    real estate in this community.  And that's what Yehuda saw.  He

7    saw many, many, many people going into real estate.  He lived

8    in -- upstate in Monroe, but he has close connections with

9    Williamsburg.  There's a lot of family in Williamsburg.  The

10   community is in both places, in Monroe and in Williamsburg.

11             So -- and there were other people in his family.

12   It's not just the community, but he saw there were many other

13   people in his family who were in real estate.  And, in fact,

14   you can see the first loan in this case that we're discussing

15   is 118 Hart Street.  And that, your Honor, was not Mr. Rubin --

16   Lafayette.  I'm sorry 118 -- 418 Lafayette.  Sorry, your Honor.

17   That was not his property.  That property was a loan that he

18   was the real estate -- the mortgage broker on.

19             The loan was not for him, although he got some of the

20   money out of it because he had lent money previously to his

21   father and some of the money came back to him.  But you can see

22   from the government's exhibit that most of the money, the vast

23   majority of that money went to his father and other places like

24   that.  The government said that some of it went to pay off his

25   creditor.  As far as I can tell, that's like $4,000 or

1    something like that.  That was a creditor of Yehuda's, but the

2    vast majority of that money went to Yehuda's father.

3           And -- but what you see also is that in this very

4    first loan that he is handling in this case where he is the

5    mortgage broker, there are false statements in it.  And other

6    people are putting in false statements.  And it's accountant,

7    who I believe is now a government witness, this accountant who

8    was probably 30 years Yehuda's senior, he was putting in a

9    false statement on his mother's wealth.  I do not believe that

10   it is credible to suggest that Yehuda told the accountant how

11   to do this.  I think that the accountant was saying this is the

12   way it's done.

13          In any case, it is uncontested that what went on

14   there and what went on in the next couple of loans was at the

15   height of the no doc loan period.  And, your Honor, it's kind

16   of amazing when you research this a little bit and you Google.

17   I mean, there's been books and there's been movies written.

18   But the government has documented to an extent I didn't realize

19   what went on during this period.  How did this all happen?  And

20   they have documented with testimony about how the banks and the

21   mortgage companies were really encouraging this wrongdoing.

22          Now the government cites a case which they stand for,

23   United States v. Thomas, which they say stands for the

24   proposition that it is not a mitigating circumstance or

25   something to take into account at sentencing, that the victim

1   of the fraud encouraged the fraud or participated in the fraud.

2           The case doesn't say that.  The case actually says

3   it's not a defense.  And it's not a defense.  And it's not a

4   defense and we are not giving it as a defense.  And I'm not

5   saying that this justified his action in any way, and Yehuda is

6   not saying it.

7           What I'm trying to say is you need to step back to

8   this time when this is going.  How did this happen, how did

9   somebody like him end up doing something?

10          THE COURT:  So if somebody burglarizes an unlocked

11  home, that's okay?

12          MS. NECHELES:  No, your Honor.

13          THE COURT:  Is it any less serious a crime if it's

14  locked?

15          MS. NECHELES:  So what I would say, your Honor, is if

16  there is an abandoned neighborhood where all the houses are --

17  people are living in them because they're squatters, it's

18  illegal what they're doing.  But after a while, it starts to

19  look like this is what's okay and, particularly, to someone

20  who's young.

21          I'm not saying -- and I don't want to create the

22  impression that I'm saying that it's okay what he did, your

23  Honor.  It's not okay.  I'm just trying to say, how is it that

24  he got himself into this?  How is it that he was putting in

25  these totally false loan applications.  And I think it was

1    partly a product of the time.  It was kind of a shocking time.

2              I remember that, getting calls all the time

3    suggesting that we take out more mortgages on our home.  You

4    would get these calls if you had a -- if you owned property

5    saying, take out a HELOC loan.  And so would that have made it

6    okay for me to have lied?  No.  It would not have and I didn't,

7    but I was a lawyer.  I understood this is not what, you know, I

8    could do.  Yehuda was a 20-year old kid.

9              And I think that when you read the testimony from

10   this -- from this commission who studied on it, who had all

11   these witnesses, and you read how they talk about how they took

12   these kids who were mortgage brokers, essentially trained them.

13   This is, you know, don't worry about any of this.  Just get the

14   loans, get the loans, get the loans.  You see why this

15   happened.

16             And, your Honor, I've always thought, you know, I've

17   now defended a lot of case and been involved in the last ten

18   years in a lot of cases that grew out of this crisis.  And I

19   don't represent the banks.  I don't represent the top bankers.

20   I have always represented the people who took out the mortgages

21   or the mortgage brokers.  And those were the people who got

22   prosecuted and they were guilty.  They all did something wrong

23   but it was a systemic failing.

24             And I don't really understand what we gain as a

25   society by denying that part also.  It seems to me that that's

1    just part of the whole picture here.  And it is -- I think it's

2    an important part to understand how someone like him did

3    something like this or started off doing something like this.

4            Now in 2007, 2008, the market crashed and it was a

5    rude awakening.  And that is when the -- everything fell apart

6    for Yehuda.  His finances really fell apart.  I know that there

7    was a lot of money going through his accounts, but we have

8    shown that he had tremendous debts.  He was juggling things.

9    He had other property he had also purchased and he was trying

10   to keep things afloat.

11           On these two properties that he had taken false --

12   had taken loans based on false statements, he went back to the

13   banks and he did sales, short sales on them.  And in those

14   short sales, the bank lost money and that is what the losses

15   are from here, and also the loss that they made on his mother's

16   loan as well.

17           And at that time, he was bouncing checks as well,

18   your Honor.  I think that we have recovered that these were not

19   false short sales.  In fact, Yehuda lost money on this.  These

20   were not -- this was not a situation where he was putting up a

21   straw borrower and putting money into pocket.  This was a

22   situation where he was really trying to make something work.

23           I'm not saying that that makes it okay.  I'm saying I

24   think it's less bad than the people who went out and just had

25   straw borrowers and pocketed the whole mortgage money.  He

1  didn't.  He lost what he had invested in these properties,

2  including his home and since then has been renting his home.

3         Now I want to address the 2013 wrongdoing because I

4  agree with the government that that is a different time period

5  and he wasn't so young anymore and he should have known better.

6  And what I will say is this -- and I've asked him, I've spoken

7  to him about this.  He still didn't understand he had to be

8  totally careful and truthful about everything.  He thought this

9  didn't matter.  In a couple months, this will really be the

10 rent.  It was wrong.  It is the least serious of all his

11 criminal conduct.

12        The government says it is more serious.  But if you

13 did the guidelines calculation just on that loan, it would be

14 less than six points.  It is not a -- there was zero loss from

15 it.  So it would be seven points base offense level.  It

16 doesn't get up to a million dollars borrowed and you would have

17 the two points subtracted for acceptance of responsibility, it

18 would be five points.  It is something that we do not, as a

19 society or in the guidelines, consider the most serious crime.

20 It's a crime.  I'm not trying to justify it.  I'm just saying

21 it was far less serious than what he had done earlier, but

22 still wrong.

23        I would also say the bank, as far as I know, is now

24 aware of the false statements on this.  They've been

25 subpoenaed.  There have been liens placed on many of these

1　properties.　The bank is aware of this loan and they've never

2　called this loan.　They are not interested in making it into a

3　nonperforming loan, and they're fine with it continuing as it

4　is.　So, yes, this was wrong conduct, but it is not normally

5　the kind of wrong conduct that we send people to jail with.

6　　　　So I want to address finally what has occurred since

7　Yehuda's arrest because, again, it's an unusual case because of

8　the length that this case has been pending, length of time.

9　And I submit that Yehuda really has made a remarkable

10　turnaround in his life.

11　　　　One, I've never seen someone turn things around as

12　much as he has here.　After his arrest, he realized he needed

13　to start doing something entirely new and he did, in fact,

14　start a new business with his friend, Joel Lowy, who is in

15　court here today.

16　　　　And the government in its submissions says well, he

17　has the resources.　He is a very fortunate person.　He has the

18　resources to do so.　It's not true that he came from a wealthy

19　family.　He did not grow up with those kind of resources.　I am

20　surprised that the government put that résumé of his father in

21　the sentencing submission.　I believe that they will argue at

22　his father's sentencing that it was a false document and it

23　shows the falsity of what his father was saying.　He -- and I

24　believe it is not a truthful document.　Yehuda was not working

25　for his father.　In fact, at the time the document was

1  submitted, he was 19 or 20.

2         In any case, to start the new business, his friend

3  Joel Lowy had assets and was able to put up money.  But Yehuda

4  did have resources and those resources are that he's smart,

5  he's very engaging, very caring and very careful.  He is able

6  to put things together and organize things just like you've

7  seen him be able to organize help for so many people in his

8  life.  He was able to organize a very paper-intensive business

9  and a business where Yehuda had to run around, get business and

10  then make sure the jobs are where the tests are being done

11  right, everything is being done right.  And he did this, he and

12  Joel Lowy.  And they built this business up to 39 people,

13  employees I believe it is at this point.

14         And, your Honor, I think that this case raises the

15  issue and forces us to confront the issue of the question of do

16  we believe in rehabilitation.

17         THE COURT:  Can I just ask one quick factual

18  question?

19         MS. NECHELES:  Sure.

20         THE COURT:  So the government has all these charts

21  that you saw on exhibits and one of the recipients of the money

22  is somebody named Morris Lowy.  Do you know if he has any

23  relation to Joel Lowy?

24         MS. NECHELES:  I don't know.  I know that Morris Lowy

25  is, as we mention in our papers, is a hard money lender in the

1  community.  He lends money.

2          THE COURT:  All right.  I just didn't know.

3          MS. NECHELES:  I don't know.

4          THE COURT:  I don't know who knows who in this case.

5  I didn't mean to interrupt.  You can return with "do we believe

6  in rehabilitation."

7          MS. NECHELES:  Yes, do we believe in rehabilitation.

8          Can someone who has so changed their life and so done

9  something new, can they -- should they get credit for it?  Is

10 it something we should give value to and think, yes, this

11 person could be a new person.  And if we do believe in it, is

12 it right to throw everything away?  Because I submit, your

13 Honor, that a three-year sentence or the kind of -- a guideline

14 sentence here would cause the business to evaporate.

15          And, your Honor, I would ask that one of his

16 employees, the office administrator, who I've spoken to in the

17 back who wrote a letter, but who asked if she could speak at

18 court, be allowed to speak to tell you Honor a little bit about

19 this business and what she believes would happen.

20          THE COURT:  Okay.

21          Any objection from the government?

22          MR. ALLEE:  At present, no position on that, your

23 Honor.

24          THE COURT:  Okay.  It's not normally the case, but

25 I'll hear from this individual.  Thank you, Ms. Necheles.

1          JESSICA RYAN:  Good afternoon, your Honor.

2          THE COURT:  Good afternoon.

3          JESSICA RYAN:  Thank you for allowing me the

4     opportunity to speak.

5          THE COURT:  If you could just state your name for the

6     record, please.

7          JESSICA RYAN:  My name is Jessica Futrell Ryan.  I'm

8     the administrator for Big Apple Testing, which is Jay and Joe

9     Low's company.  "Jay" is what we call Yehuda Rubin in the

10    office.

11         THE COURT:  Okay.

12         JESSICA RYAN:  I began working for Big Apple Testing

13    in March of this year.  Prior to this, I've worked in an

14    administrative capacity in my whole career.

15         I lost my husband in 2015 and I took a year off from

16    work to grieve and put back the pieces of my life.  When it was

17    time to reenter the work force, it was harder than I could have

18    ever imagined.  Employers weren't interested in giving a widow

19    of 40 a shot.  It was disheartening to say the least.

20         And then I interviewed with Jay and Joel at Big

21    Apple.  They weren't just understanding; they were supportive.

22    For them, staying at home and caring for your family, taking

23    time to heal, it wasn't a deficit, it's a strength that should

24    be lauded.

25         Originally, I was hired to be the bookkeeper.  But

1  since I'm an all-in kind of person who doesn't wait for

2  instruction.  Jay and Joel quickly took notice and proceeded to

3  give me more and more responsibilities, both big and small,

4  which is much needed in a small but growing company.

5          They know they can rely on me day or night to be

6  there for them, for the company, just as I know -- just as I

7  know I can count on them to be there for the employees and

8  myself.

9          When I started in March, we had a staff of less than

10  20 employees.  We now employ over 30 people with a weekly

11  payroll of approximately $40,000 and we're still growing.  Big

12  Apple Testing is a construction special inspection firm with

13  our focus in soil testing, special inspection and monitoring.

14  This means we're involved in all the separate phases of

15  projects from design of the foundation, to DOB compliance

16  during construction and monitoring neighboring structures for

17  damage as the construction is ongoing.

18          Jay is our Chief Operating Officer.  He's the person

19  who brings in new business and keeps our current clients happy.

20  And the retention in the construction industry is very

21  important because there's so many different phases to a

22  project.  The client can always choose to hire another company.

23  And I'm very proud to say that I have yet to hear of that

24  happening at Big Apple.

25          Often clients want to speak with Jay because, much

1    like myself, they know they can depend upon him.  Jay works

2    from 6:00 in the morning to very late at night.  Before he even

3    gets in the office, he's on calls and emails.  He's stopping by

4    job sites and meeting with clients.  He's frequently in the

5    office past 7:00 p.m. when I leave.  Other evenings he's out

6    entertaining clients and building up the business, often not

7    getting home past 10:00 p.m.

8          We're very by-the-book and adhere to the DOB strict

9    guidelines.  I have to say that Jay is definitely the driving

10   force behind that.  Our main priority is safety first, always.

11   Our special inspectors are ACI certified level two, as well as

12   OSHA for safety, as are all of our field technicians.

13         Jay, along with our PE, are always first to point out

14   shortfalls to clients and if necessary will go out in the field

15   to correct any oversights.

16         Big Apple isn't just a great place to work, your

17   Honor, but we're a family.  And recently when one of our

18   employees was hospitalized for a week, it was Jay who's on the

19   phone with her every day.  It was Jay who started our yearly

20   tradition of giving turkeys to all of the employees on

21   Thanksgiving, who always encourages all our of charitable

22   efforts from raising money for hurricane relief, our camp food

23   drive that we're currently running, to the toy drives we'll

24   soon begin.  Jay never mentions it, but since I'm the

25   bookkeeper as well as his assistant, I know that he gives

1    generously of his time as well as his money to many charitable

2    causes outside of the office.

3         I asked to be able to speak today at sentencing not

4    just on behalf of Jay, whom I know to be a wonderful, caring,

5    thoughtful person who gravely regrets what he's done in the

6    past, but for the over 30 men and women we employ from all over

7    the world as far as Africa, from every race and religion.  We

8    are Christian, Muslim, Sikh, Jewish, or as they call us, the

9    rainbow coalition of the concrete industry.

10        These people need their jobs, Your Honor.  We're all

11   just working people with families to support.  And I know

12   without Jay, that would not be possible.  Not only would we not

13   be able to keep moving forward, but I would almost immediately

14   have to lay off half the staff, eventually myself included.

15        So I'm here today speaking on behalf of all of us and

16   hope you will have mercy on Jay because the man I know is

17   honest, law abiding, who does so much for others daily, not

18   just by employing us, by also being our friend.  And I beg that

19   you continue to let him do so.

20        THE COURT:  Take your time.

21        JESSICA RYAN:  Thank you.

22        On one other note, your Honor, I've also been

23   privileged to spend time with, Rachel, Jay's wife, on quite a

24   few occasions.  I had this written down but I don't know why --

25   and I know from firsthand experience how absolutely devastated

1  she will be to lose just one moment with her husband, because

2  when they look at each other they look at each other the way my

3  husband and I did.

4          Thank you for your time.

5          THE COURT:  All right.  Thank you.  That was a

6  well-done speech.

7          JESSICA RYAN:  Thank you.

8          MS. NECHELES:  So, your Honor, the sentence that we

9  have asked and that we propose is a sentence that would --

10  Yehuda would be sentenced to a halfway house.  That is

11  incarceration, your Honor.  And I've spoken to people who have

12  been there and it is not a nice place to be, it's not as nice a

13  place as a camp.  It's not a easy place to be.  But it would

14  allow him to work and be out of the house.  And we ask for a

15  sentence of a year, and we do so knowing that probation asked

16  for a lesser -- or suggested, recommended a sentence of a year

17  and a day.  And this would be 50 percent more than a year and a

18  day because he would not get credit off because you don't get

19  credit.

20          And we also have proposed some community service.

21  And that proposal is the proposal that came from Olive, the

22  Olive organization.  The Olive organization is an organization

23  that I have worked with for over 30 years, Your Honor.  It is

24  an organization that as you can see in the submission that they

25  put -- that many many judges have recognized.  I've worked with

1  them often in the eastern district with many different judges,

2  Judge Weinstein, Judge Trager.  Many of the judges there have

3  recognized Olive.

4          I know that the other day, they were meeting with the

5  chief judge in the eastern district who was excited with

6  working with them.  They have often supervised and suggested

7  community service-types of programs and helps me to craft those

8  programs for people.  That's not their main focus.  Their main

9  focus is they work in the prisons.  They work with helping

10 people through the process.  They work with families and they

11 work on education of people in the Hasidic communities to try

12 to help people understand that lying is cheating and you cannot

13 do it.  And I think they've been very successful in the

14 communities that they've worked with and in helping people

15 through this process.

16         One of the Rabbis is here today in court, should your

17 Honor have any questions of him, and would also be willing to

18 speak with your Honor about their proposals involving the work

19 that they have done in the past.

20         Your Honor, I believe that there is a stark question

21 before Your Honor and that is, does it make sense at this point

22 to send Mr. Rubin to jail?  Does it make sense to destroy this

23 company in which -- it would be him destroying it.  He's the

24 one who committed the crime and who did this stuff, and I

25 understand that and he understands that.

1     But I also understand that in a very real sense it

2   will hurt many, many, many other people.  The collateral

3   consequences will continue to spread.  And I believe, knowing

4   Yehuda Rubin, that when he -- if he were sent to jail and for a

5   guideline sentence, when he gets out, he will pick up the

6   pieces and he will rebuild because that is who he is.  I've

7   seen him do it.  And he was able to do it.  But I don't know

8   that these 39 other people will have such an easy time of it.

9   I don't know that they will be able to so quickly pick up the

10  pieces from their destroyed jobs and from their loss place.

11  And does it make sense here to make these people lose their

12  jobs?  Do we believe in rehabilitation?  Do we think that

13  someone who has been slapped down in the way that Yehuda was,

14  do we think that they can learn from their mistakes?

15          THE COURT:  What happens to the business if Mr. Rubin

16  is in a halfway house?

17          MS. NECHELES:  He will be able to work during the

18  daytime, your Honor, and will be able to continue -- the main

19  thing is, can they continue to get clients.  The jobs end and

20  they -- he will be able to go out during the day and work at

21  the business and he will spend the evenings and weekends at the

22  halfway house.

23          THE COURT:  Okay.

24          MS. NECHELES:  Your Honor, so we ask for a sentence

25  that would be a sentence that would contain the punishment of a

1  halfway house incarceration, restitution, order of restitution.

2  If there is restitution, I haven't seen any numbers proposed

3  here of what the restitution are for.

4      We -- your Honor, I would say one more thing with

5  respect to the restitution and forfeiture.  I tried to discuss

6  this a number of times before with Mr. Allee and was

7  unsuccessful.

8      We also tried, actually, trying to figure out how to

9  get the deeds.  There are a couple of deeds, all of which I

10  think are forged, on the property which his mother took out

11  the -- or bought and then took out a mortgage on.  And so we

12  met with some people trying to figure out could we buy up some

13  of these deeds and then be able to have the bank settle it, you

14  know, because the bank -- actually, there is property that is

15  worth more than the actual amount of the loan.  The bank at the

16  end of the day will be satisfied.  They have to do the

17  litigation and I don't know why they haven't done the

18  litigation in the 12 years that have passed.

19      They have to sue the people.  There's two different

20  deeds.  They have to sue the people with the deeds and get

21  those deeds settled.  We were hoping we would be able to do it.

22  We knew who owns the other deed.  We were unable to bring them

23  to the table.  It's going to take litigation.

24      So we have given some effort to this, you know, and

25  we don't even know what banks hold the paper at this point in

1  order to be able to do any restitution until there is a

2  restitution order here.  Because the banks were all selling

3  the -- you know, would sell the loans and I don't know who at

4  this point is responsible for the loans to be able to do a

5  restitution.

6           But Yehuda understands this is his responsibility and

7  he will have to be paying back restitution and whatever

8  forfeiture there is.  And we have proposed a community -- some

9  sort of community service part of this as well.

10          Thank you, your Honor.

11          THE COURT:  Thank you very much, Ms. Necheles.

12          And for you, Ms. Cassidy, I want to thank you for a

13  very helpful and thorough and frankly very well put together

14  sentencing memorandum with all the exhibits.  I know how much

15  work goes into a product like that and so I thank you both for

16  your efforts.

17          MS. NECHELES:  Thank you.

18          THE COURT:  Mr. Allee?

19          MR. ALLEE:  Thank you, your Honor.  This is a

20  sentencing of the defendant, Yehuda Rubin, for a serious

21  federal crime.  He's pleaded guilty to conspiring with others

22  to make false statements to lenders, to lie to lenders in order

23  to get money for themselves.

24          As with any other sentencing before your Honor, your

25  Honor, Ms.~Necheles pointed out in some many sentencings, that

1    means this is a somber choice for the Court.  As we see it, the

2    choice for the Court is not whether to send Yehuda Rubin to

3    prison, the choice is for how long to send Yehuda Rubin to

4    prison in order to impose a sentence that's sufficient but not

5    greater than necessary to achieve the aims of sentencing.

6         The defense argues for a sentence of one year in a

7    halfway house.  That would be an insufficient sentence.  Our

8    position is a sentence within the guidelines range, which here

9    is 27 months to 33 months, would be sufficient but not greater

10   than necessary to achieve the aims of sentencing.

11        The first factor for your Honor to consider, of

12   course, is the nature and the circumstances of the offense.

13   That's the first aim of sentencing, is to impose a sentence

14   that meets those -- meets the nature and circumstances of the

15   offense and is commensurate with that.

16        The defendant pleaded guilty to, in particular,

17   fraudulently obtained loans on four properties.  The properties

18   were in Brooklyn.  Three of them were in Brooklyn and one was

19   the defendant's home, which is in Orange County.  The lies that

20   were made to obtain the loans connected to those properties had

21   to do with employment, with income, with primary residency and

22   with tenancy with tenants.

23        The first of the properties, the first of the loan --

24   the property connected to the first of the loans was 418

25   Lafayette.  That's in Brooklyn.  The borrower there was the

1    defendant's mother.  The loan application, which the

2    defendant -- for which the defendant is ultimately the mortgage

3    broker, claimed that the borrower had a particular bank account

4    that was false.  The borrower didn't have that bank account but

5    claimed that the borrower had particular employment as the

6    owner of a company called Tri-State Management at a lucrative

7    salary.  That was false.  That was just a paper company.  The

8    borrower didn't have that title and didn't have any income, let

9    alone that lucrative income.  That loan was issued by the bank

10   that, thereafter, went into default.

11            The second property --

12            THE COURT:  When did it go into default?

13            MR. ALLEE:  So, your Honor, I can give you just -- I

14   believe the answer is 2008, but there's a lot of loans and

15   dates so I'd probably want to look at my notes to confirm that.

16   But I believe it's in 2008 that the loan is in default.

17            THE COURT:  Okay.

18            MR. ALLEE:  Also that question, your Honor, is

19   actually -- it's a broader question than it seems because -- or

20   it might be a broader question it seems because there's

21   default, which is just the first nonpayment.  But then there's

22   a series of events that happened after that that can be -- that

23   can cure the default or can make, you know, can be -- that

24   precede an ultimate foreclosure.

25            The next property was 5 Kosnitz.  That's the property

1   up in Orange County, your Honor.  The borrower there, that's

2   the defendant's wife, that's Rachel Rubin.  There are lies in

3   that application and then a series of applications having to do

4   with her employment and her income.  It was actually the same

5   company, Tri-State Management, that was used to pretend that

6   she was not judgment proof.  It was claimed that she was the

7   owner of that company, had a substantial income.  That was

8   totally false.

9         That loan was issued.  That loan went into default.

10  There was a short sale at the back end of that extinguishing

11  the debt at a substantial discount, and the defendant remains

12  living there at that home to this day.  He claims that he pays

13  rent there and that he pays it in cash, according to the reply

14  submission.

15        The next property, the 119-121 Hart Street, multiple

16  lies there.  Actually it's Yehuda Rubin who's the borrower

17  there.  He claimed $36,000 a month in income which was inflated

18  and false.  And he claimed that that would be his primary

19  residence, which was never the case.  That was never going to

20  be his primary residence.  That's, of course, meaningful to a

21  lender because you can get different terms, and there's a

22  different underwriting analysis.  It's a different risk when

23  it's a primary resident who's seeking a loan as opposed to an

24  investor.  That loan also went into default and the debt was

25  extinguished, was ultimately extinguished.

1    The last loan is 35 Vernon.  That's the more recent

2  conduct, 2013.  The borrower there and the purported landlord

3  for that building is the defendant's brother-in-law, Joel

4  Koppel, who's a co-defendant in this case who awaits

5  sentencing, submitted with that application in addition to just

6  the notion that Koppel was the real landlord, when the best

7  that could be said is that he was nominally the landlord.  And

8  there should be no mistake about this, were forgeries, were

9  forged documents.  They're actually on another property or

10  purported to be related to another property which is 115 Hart

11  Street, which is -- which is also relevant in this conspiracy.

12    And the forgeries were not merely that the rents were

13  inflated or aspirational, but the tenant -- they were just

14  tenant signatures that were not their signatures.  One of them

15  was an actual tenant and the other was not.  It was just a name

16  plucked from a totally other random place and then put in

17  there.  It was a surprise to those people when law enforcement

18  contacted them in connection with this case.

19    And just incidentally, not only is just the raw

20  conduct of a forgery very serious and certainly arguably more

21  serious than what happened on the prior loans, even though this

22  didn't result in a loss, there would be a higher guidelines

23  range for that crime were it aggravated identity theft, which

24  it is.  That's a mandatory two years.

25    But the guidelines -- Ms. Necheles is correct -- to

1   be lower because there's no default there, presumably because

2   rents are being paid.  Those crimes -- those aspects of this

3   crime took place over eight years from 2006 up to 2013.  It's

4   more than a million dollars of fraud over those eight years.

5         As I mentioned, the defendant and others defaulted on

6   the first three of those loans that caused substantial losses

7   to the bank.  As I also mentioned, the defendant and others

8   sought and obtained short sales from the bank to extinguish the

9   debts and in doing so blamed unfortunate financial

10   circumstances.

11         The defendant's criminal conduct, it cannot be said

12   was isolated.  It was not aberrational.  It was not the result

13   of desperation.  It was not triggered or aligned only to some

14   unique set of circumstances.  It was planned.  It was

15   purposeful.  It took place over a long period of time and took

16   a really lot of effort.

17         The defense's written submissions and exhibits, in

18   our view, do not tell a true story of the crime of the

19   defendant.  The government's take is that the defendant

20   acknowledges what he must but otherwise offers a series of

21   excuses for his conduct, including today, making much of the

22   financial crisis of 2008 as a factor at this sentencing.  The

23   financial crisis does absolutely nothing to excuse or even

24   explain the defendant's conduct.  The harm that ordinarily

25   results when someone lies to a bank to get a loan, is precisely

1    the harm that happened here, non-repayment of the loan.  That

2    is a very foreseeable harm for this crime and that's the harm

3    the defendant caused.  That is not caused by the financial

4    crisis.

5         Who was harmed by the financial crisis incidentally

6    is honest, unsophisticated homeowners who were prayed upon to

7    take out loans that they couldn't afford, including through the

8    types of phone call Ms. Necheles referred to.  They got loans

9    that were too big for them.  They incurred debts that were

10   crushing to them.  They ended up under water on their homes and

11   they were not so fortunate to have friends or business

12   associates come along and offer to pay in cash at a sufficient

13   fraction of the debt for the bank to forgive that loan.

14        The nature and circumstance of the offense of course,

15   Your Honor, have been disputed by the parties in the written

16   submission.  And, including today, there's some of the advocacy

17   that we don't agree with.  The accountant, of course it wasn't

18   an accountant who put Yehuda Rubin up to this.  Not only is

19   this factually false, it also makes no sense at all.  The

20   accountant -- there's nothing in it for the accountant.  Yehuda

21   Rubin is the one who had already represented employment by his

22   mother and his wife that was fictional, and it was after the

23   fact that the verifications come in from the accountant.  I

24   mentioned forgeries.  Our view of that conduct is that it's far

25   more serious.

1          As for the one other item of note, and Ms. Necheles

2     has mentioned it again, it's in the reply that she's surprised

3     the government would rely on a representation of Irving Rubin,

4     that's the defendant's father and co-defendant.

5          So firstly, she's right.  We wouldn't rely on a

6     representation of Irving Rubin as in a raw way.  But we've

7     examined bank records that -- of the bank accounts that ensued

8     in the following years after that loan was issued, connected to

9     the properties that are a part of that builder's bank

10    development.  And it is Yehuda Rubin who is the one who's

11    operating those bank accounts.  And so that's far afield from

12    the sentencing.

13         We're not trying to argue about that loan or what

14    happened on that.  We're just trying to respond to the

15    defense's submission to hopefully get the truth out.  But we

16    agree, just because Irving Rubin said Yehuda is the heir to the

17    business doesn't really mean a whole lot.  But when you look at

18    the bank records, it looks likes that's what happened.  Yehuda

19    Rubin is the one operating the bank accounts that were

20    connected to those loans by the ensuing years.

21         There are also a lot of unverified or unverifiable

22    representations in the defense's reply.  Even today we're in a

23    place in this case where we would want a lot of opportunity to

24    take a hard look at those before we would ever ask or agree

25    that the Court should rely on those.

1           THE COURT:  For example?

2           MR. ALLEE:  For example, the cash rent payments.  So

3    a letter came into the Court from Abraham Werzberger.  It is a

4    somewhat vague letter.  It would give anyone who looked at a

5    lot of loan applications in this case deja vu.  It claims that,

6    for some unspecified time period, Yehuda Rubin paid rent in

7    cash.  Maybe that's true; maybe it's not.  We looked at the

8    bank records and saw one check payment which was previously

9    cited to us as evidence of rental payments.

10          We would want things under oath.  We want documents.

11   We want a whole lot more information that could be verified

12   before we would join with the defense in suggesting that

13   representation could be relied upon.  The PSR is a place where

14   sometimes that can be fleshed out, but it's not in there.  So

15   that's our response to that.

16          The second aim of sentencing is the history and

17   characteristics of the defendant, to impose a sentence that

18   accounts for that.  The defendant is in Criminal History

19   Category II.  He has a prior conviction for grand larceny,

20   which was in Orange County, for which he served no prison time.

21   The crime in this case, the incident crime, both predated and

22   postdated that as Ms. Necheles mentioned.  Some of that

23   within -- some of the crime here goes back to '06.  And then it

24   extends -- or the last of it was in '13, whereas that prior

25   conviction dates to 2010, I believe.

1           The defendant, in terms of history and

2    characteristics is, of course, a father and he's, of course, a

3    husband.  And in the letter submitted on his behalf, it's clear

4    that he's done good deeds.  He's done them for his family.

5    He's done them for his friends.  And he now runs a successful

6    business, which he's begun or which has taken off during the

7    pendency of this case which employs approximately 30 employees.

8    The Court, of course, should consider this and can consider

9    that factor in imposing sentence.

10          There are a couple of things that we want to note

11   about that.  We, of course, don't take issue with all of it.

12   But it brings up a couple of points:

13          First, it's been claimed that the defendant can't be

14   sentenced to a term of imprisonment because the loss of him

15   would be too great in these other contexts.  That's surely

16   meant sincerely by the people who expressed that concern.  The

17   defendant, however, is no more unique in that regard than other

18   defendants who have been sentenced by this Court.

19          In his business, he has a partner.  He has 30

20   employees who can fill the void.  More than most defendants, he

21   enjoys continuing support from family and friends who surely

22   will step up in his absence.  The defendant is better off in

23   this regard than many other defendants who have been here to be

24   sentenced, who face sentencing.  People who are solo

25   practitioners, people who are solo business owners, people who

1  are licensees who risk the loss of their entire livelihood, the

2  loss of their license, and single mothers and fathers without

3  enjoying the extensive family support and other support that

4  Yehuda Rubin has.

5      We also want to note that the person who is depicted

6  in the letters, and Yehuda Rubin is depicted in the letters

7  that are attached to this sentencing submission, is not the

8  same person who is depicted in the briefing itself.  It's been

9  argued that the defendant committed the crime because he was

10 young, because he failed to appreciate in some way the

11 wrongfulness of what he was doing.

12     But those who support the defendant, who wrote

13 letters, described him as having served as a life coach, as a

14 mentor, as a confidant and, generally, as someone with a strong

15 personal sense of goodness or of right and wrong.  It's very

16 hard to imagine that person, who's depicted in the letters,

17 committing the crime the defendant committed just because he

18 was in his 20s.

19     Even today, he's been described as someone smart and

20 competent, organized and very careful.  We know he started up

21 this business that he currently runs from scratch.  That's not

22 someone who was swayed into this crime through a youthful

23 indiscretion, the government submits.

24     There's also, as an aim of sentencing, the need to

25 reflect the seriousness of the offense, to promote respect for

1 the law and provide just punishment.  For some of the reasons

2 we've already laid out, we think that a guideline sentence

3 would meet those aims.

4         And if the question is:  Does it make sense to send

5 the defendant to jail, the answer is yes.  Yes, it does make

6 sense to send him to jail.  It's not a happy thought.  It's a

7 very somber thought, but that is just punishment.  It wouldn't

8 be the choice of anyone else in this room were it a raw choice,

9 but it is the consequence of the defendant's choices.  That is

10 the need to promote respect for the law.  That is what just

11 punishment is.  It's not a happy thing to send someone to

12 prison.  It is a necessary thing to impose a sentence that's

13 commensurate with their offense.

14         Deterrence is also an issue, both general and

15 specific.  In terms of general deterrence, a sentence here will

16 send a message whatever the sentence is, your Honor.  The

17 message should be that this crime, lying to banks for years to

18 defraud them of more than a million dollars, does not pay.  The

19 message should not be that, in the worst case scenario, if you

20 do that and you get caught you go to a halfway house for a

21 year.  A person could look at that and actually rationally

22 engage in that crime.  That's how disproportionate a sentence

23 is being sought by the defense.

24         The last aim, or any last aim of sentencing, is the

25 need to avoid unwarranted sentencing disparities, your Honor.

 1   This, of course, is the second sentencing in this case, the

 2   second of 12 sentencings that will be before your Honor.

 3            The first defendant to be sentenced was Pinchus

 4   Glauber.  He was sentenced to two years probation.  He was the

 5   appraiser.  A couple of things about that, your Honor:

 6            The first is that Yehuda Rubin is the most culpable

 7   defendant in the case.  There are other defendants who did bad

 8   things who will face serious sentences.  And maybe there's some

 9   things sort of arguable at the margins, but this is the highest

10   guidelines range in a plea agreement in this case, your Honor.

11   And I expect you'll hear ten time after this sentencing that

12   the person before you is not as culpable as Yehuda Rubin.

13            The government's position we anticipate, and we've

14   gotten most of the PSRs, and we can pretty firmly tell the

15   Court is that we firmly believe the guideline sentence for

16   every defendant in this case would be an appropriate sentence

17   and would be necessary to achieve the aims of sentencing.

18            This defendant, Yehuda Rubin, was a core member of

19   the conspiracy.  He participated in multiple fraudulent loans

20   over a course of several years and he did so for the benefit of

21   himself and his family and others.

22            Lastly, your Honor, just on the other types of

23   penalties, there are a few other penalties in play here.

24            As to forfeiture, we have an agreement and consent

25   order of forfeiture, which I can hand up at the conclusion of

1    sentencing.  It's an agreed-upon figure of $1,219,000.

2          THE COURT:  Say it again, 1 million?

3          MR. ALLEE:  $1,219,000, which is a number agreed upon

4    by both sides.

5          As to restitution, we don't have a position to

6    advocate to Your Honor.  We're not sure whether the victim

7    seeks restitution, number one.

8          Number two, as has been pointed out to us by the

9    defense, there's some -- it is somewhat true that restitution

10    is double counting when the gains and the losses are the same.

11    And so the presence of forfeiture, they matter there.

12          We would ask for additional time that can be up to 90

13    days for us to fully vet that with the victim, whether they

14    seek restitution and what amount and whether that amount is

15    fair and justified.  So we don't have a position on restitution

16    yet.

17          A fine here would be appropriate, your Honor, for

18    reasons we've articulated in our brief, a fine within the

19    guidelines range.

20          And as to community service, we saw the submission

21    that came in, the final submission from the defense from the

22    third party.  And our view is simply community service is fine

23    but not to replace the other aspects of sentencing.  We saw

24    nothing persuasive in that submission that would run contrary

25    to the rest of our advocacy.  Community service could be an

1    additional penalty, but not to replace the others.

2            Unless your Honor has questions, we'll otherwise rest

3    on our submission.

4            THE COURT:  Did you have an answer to the question

5    about the potential familial connection?

6            MR. ALLEE:  So there's just a lot of facts in this

7    case.  My understanding is that they are related but I just

8    caution that, your Honor.  I'm not entirely certain of that.

9    Of course we think the defense should be able to readily answer

10   that.  I can answer that with little time.  I can look into it

11   further.  But I can only tell you now I think they are related.

12           THE COURT:  Okay, thank you very much.

13           MS. NECHELES:  Just a couple of things.  I want to

14   start with the short sale on -- just couple of facts that I

15   think the government does not have right with respect to the

16   short sale on Mr. Rubin's home and the letter from

17   Mr. Werzberger, who was the landlord, saying he received cash.

18           THE COURT:  Yes.

19           MS. NECHELES:  Mr. Werzberger has been interviewed by

20   the FBI, I think, on more than one occasion and at least this

21   is what he tells me.  He says I've told the FBI repeatedly I

22   received rent on this property.  And he says in his letter that

23   he receives rent in cash.  The government had it wrong that

24   money went back to this Mr. Werzberger.  It is clearly a

25   different Mr. Werzberger who lives in Brooklyn.  It's right on

1   the bank account statement where it says where the money is

2   wired to and where that other Mr. Werzberger lived.  In

3   addition, Mr. Werzberger says he puts this money -- or he pays

4   taxes on this money.  I don't know why he would lie about that.

5           Your Honor, when the government says they would not

6   rely on this letter and it's not in the PSR, we're only

7   responding to an allegation the government made.  This is not

8   the crime charged.  We were saying, no, it's not another crime

9   that Mr. Rubin committed.  Of course it's not in the PSR.  It's

10  not a crime in this case.  The government made this allegation

11  and now they say we haven't disproved it sufficiently.  That

12  really is not the standard.

13          The second issue is the first loan and the

14  accountant.  The first loan that is charged in this case is 418

15  Lafayette.  418 Lafayette, Mr. Rubin didn't put this loan

16  together.  He didn't make those statements on it.  He's never

17  said he made a statement.  I'm surprised to hear the government

18  say he made a misstatement.  It wasn't a loan for him.  It was

19  a loan for his parents.  His parents had gotten loans in the

20  past.  He did not put in -- we pled guilty to it because he did

21  submit this mortgage application knowing it was false.  But

22  he's not the one who went to the accountant.  He's not the one

23  who asked for this letter to be written.  This accountant was

24  an accountant for his father and other people for many, many

25  years.

1      The Builders Bank bank account statements that the

2  government speaks about, many years later Mr. Rubin took over

3  those.  Many years after this loan, the loan proceeds were all

4  gone, has nothing to do with this loan.  It was many years

5  later.  It's sort of miching and mashing everything together

6  that are totally separate.  It has nothing do with this loan.

7  The money here went to other places.

8      My understanding is that Morris Lowy was a -- and I

9  don't know whether it's related.  It could be, but I also know

10  that name from many places.  Morris Lowy was a hard money

11  lender who had lent money to the father and then also later

12  lent money to Mr. Rubin as well.

13      Whether the business -- whether his business will

14  fall apart, the government argues here that someone else can

15  step up.  There are 30 employees.  Your Honor, people have

16  different strengths.  In my law firm, if I were to walk away,

17  there's not many other people who are bringing in business.

18  Different people bring in business and you do it at different

19  stages in your life.  There is nobody else who is bringing in

20  business at this business at this point in time.  And if new

21  business doesn't come in, the business will shut down.  And

22  you've heard Ms. Futrell talk about that.  I don't think she

23  was lying when she said that.  Mr. Rubin is the person who is

24  bringing in business here.

25      Now with respect to deterrence, the government says

1  that a sentence of community service here would send a message

2  to the community that is no big deal.  You can commit a crime

3  and no big deal.  I do not believe that there is anybody who

4  thinks that what happened to the Rubin family is not a big

5  deal.

6          Numerous people in this family were arrested.

7  Together they've spent millions of dollars on legal fees.  They

8  will spend millions of dollars more on forfeiture and

9  restitution.  Their children saw their parents being arrested

10  and guns pointed at their parents.  They are -- they are now

11  going to go to a halfway house.  This is not an easy thing.

12  Their whole lives have been uprooted.

13          Your Honor, this is -- I am not saying it's anybody's

14  fault but their own.  But this is certainly punishment to them

15  and a punishment that people in the community have seen.  I had

16  many people in the community -- I have met with many people who

17  have -- women who have expressed to me, I don't want to be on

18  documents signed by my husband.  I don't want to happen in my

19  life what happened in the Rubins family.

20          People know about this case very well.  It was -- it

21  sent a big shock wave through the community.  There is a lot of

22  deterrence from what happened here.  It was a big deal to

23  arrest his mother, his father, his aunts and uncles, his wife.

24  All of these people were taken out of the house, even though we

25  had asked -- we had called repeatedly and asked to be able to

1    surrender so they wouldn't be arrested in front of their

2    children.  The government said no.

3              That is a -- as is their right -- that was, your

4    Honor, I submit, a big deterrence.  I cannot imagine anybody

5    saying this is not a big deal what happened to this family.

6    Thank you.

7              THE COURT:  Thank you very much, Ms. Necheles.

8              Mr. Rubin, is there anything you'd like to say before

9    the Court imposes a sentence?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  Just make sure you speak near a

12   microphone.

13             THE DEFENDANT:  Your Honor, I'm not a very good

14   speaker but I wanted to say a few words today.  I had three

15   years to think about my conduct and why I'm standing here

16   today.  I thought about --

17             (Reporter interruption.)

18             THE COURT:  If you could just slow down a little bit.

19   I know that you're nervous but take your time.

20             THE DEFENDANT:  I've thought a lot about falsifying

21   applications that I submitted to the banks.  I know it was

22   wrong and at the time I justified my conduct.

23             I believed my lies didn't matter and I can make

24   everything work was wrong and arrogant.  I caused banks to lose

25   hundreds of thousands of dollars.  I can't blame anyone except

1  myself.  I know that this was my fault and I know it's my

2  responsibility to pay it back.  I hurt a lot of people with my

3  conduct.  I've hurt my wife, who was arrested because of me.

4  I've hurt my children on that morning when all these FBI agents

5  came into our home and saw me and my wife arrested, handcuffed

6  and taken away.  I hurt all of my employees because my company

7  is now in danger to close for what I did wrong.

8          I particularly wanted to apologize to my wife and

9  kids.  My wife had a terrible childhood and she trusted me to

10 keep her safe and I betrayed her trust and she's suffering more

11 because of that.

12         The last three years, I've spent a lot of time

13 speaking with my attorneys, my new accountant who helped me

14 file my tax returns, my wife, my business partner, the advice

15 from Olive, and my early Ramadan thinking about what I did

16 wrong.  I would not cheat my religion, my religious life.  I've

17 given a lot of thought.  I understand now that to live up to my

18 religious obligations and moral obligations to my family and my

19 community I also need to be a good citizen.

20         I want to be able to hold my head high and to be able

21 to sleep at night knowing that I will never, again, be charged

22 in a criminal case.  I want to teach my children to live in a

23 way that will not lead them into trouble.  And I need to be

24 that, by example.

25         My arrest in this case was a big awakening.  I was

1    29 years old when I was arrested.  Most everything I was

2    charged with happened almost ten years before when I was 20 or

3    22.

4            And I also stupidly submitted false leases in 2013.

5    I realized when I was arrested that I need to clean up my life

6    and to be meticulous in the future.  It's not okay to lie just

7    because I tell myself it's not an important lie.

8            This is the way I have run my new business,

9    meticulous honesty.  I'm proud of the business that I've built

10    with my partner.  I'm particularly proud that I built it

11    honestly.  I understand that my conduct deserves a punishment

12    but I ask your Honor for the sake of my wife and children and

13    my employees that you should be as lenient as possible.

14            THE COURT:  Okay.  Thank you very much, Mr. Rubin.

15            All right.  The Court's task is to determine what

16    sentence is sufficient but no more than necessary to achieve

17    the goals of the sentencing laws as they apply to Mr. Rubin and

18    to his case.

19            To do that, I have considered all of the facts set

20    forth in 18, U.S.C., Section 3553(a).  In doing that, I have

21    carefully considered the written submissions by the parties.

22    It's been quite a hearty set of submissions, the most recent of

23    which was made yesterday.  But I've read them all, including

24    the exhibits.  I've also carefully considered what everybody

25    has had to say here today including our guest speaker and also

1    Mr. Rubin in addition, of course, to what counsel has said.

2             Now in terms of the 3553(a) factors, we're told by

3    the higher courts that the starting point is the guideline

4    calculation.  And that calculation is set forth without

5    objection in the presentence report at paragraphs 56 through 70

6    of the presentence report.  The base offense level for

7    violation of Section 371 is 2X1.1, and pursuant to 2X1.1(a),

8    you're supposed to consult the guideline provision that

9    addresses the substantive offense.  And here it's making false

10   statements to lenders and that is covered by Section 2B1.1.

11            Because the statutory maximum term for imprisonment

12   here is five years, the base offense level is six, and that's

13   pursuant to Section 2B1.1(a)(2).  Because the loss amount was

14   more than 550,000 but less than 1.5 million, there's a 14-level

15   increase pursuant to Section 2B1.1(b)(1)(H).

16            That results in an adjusted offense level of 20, but

17   three points come off because of Mr. Rubin's timely acceptance

18   of responsibility as reflected in his guilty plea.  And that's

19   pursuant to Sections 3E1.1A and B.

20            Mr. Rubin finds himself in Criminal History Category

21   II.  That's because there's one point assessed from the

22   July 2011 judgment of three years conditional discharge and two

23   more points are assessed because Mr. Rubin committed the

24   incident offense while serving that sentence.  And that's

25   pursuant to Section 4A1.1.  So the two points added to the one

1  yield three criminal history points and that's why Mr. Rubin is

2  in Criminal History Category II.

3          At a total offense level of 17 and a Criminal History

4  Category of II, the guideline range is 27 to 33 months

5  imprisonment.  And the fine range is 5- to $50,000.  So that's

6  the math.

7          And I agree with you, Ms. Necheles, I think that the

8  starting point should really be the history and characteristics

9  of the person being sentenced but at least I've done the math

10  so that's where I want to start.  And I accept completely the

11  premise that the sentence of anybody is not to just focus on

12  the criminal conduct.  That's what Congress says, but common

13  sense tells us that too.  And of course we should look at the

14  complete picture which, of course, includes looking at the

15  entirety of the person being sentenced.

16          And much has been said.  You know, Ms. Necheles

17  talked a lot about Mr. Rubin's relationship with his wife

18  Rachel and the circumstances that led to their marriage and how

19  Mr. Rubin has stood by his wife as she has had to deal with

20  many of her own challenges.

21          And then Ms. Necheles highlights what is clear from

22  the letters when she said there are many people who have called

23  upon Mr. Rubin or otherwise have benefited from his

24  volunteerism in offering different levels of support or comfort

25  or assistance.  And whether it's caring for a four-year old or

1    whether it's providing assistance to, you know, a shocked

2    husband who's wife has been given a very difficult diagnosis

3    and helping that person navigate medical care to the anonymous

4    donations which are now no longer anonymous, all of these

5    letters speak to an individual who has given to others.  And it

6    is always the case, and I've always taken the view that it

7    should be the case, that those are things that should be

8    considered, because all things being equal the person who gives

9    of his or her time, who donates, who contributes to the

10   community in whatever way it is, should be treated differently

11   than the person who doesn't do those things.

12         I also think that implicit in this is -- and it's

13   obvious here with the turnout here in the courtroom which, of

14   course, never makes its way onto a transcript, is that

15   Mr. Rubin enjoys the support of his community.  And that's

16   important in any case because anybody who's facing a sentence

17   faces challenges going forward regardless of what the sentence

18   is.  Whether it's probation, whether it's a halfway house,

19   whether it's jail, dealing with a sentence is not an easy

20   thing.  It's nothing that people are trained for.  It's nothing

21   that is -- that comes lightly.  And so having the support of

22   one's family, of one's friends and one's work colleagues is

23   important for the obvious benefit of the person being

24   sentenced.  But also, in terms of the system, it's important

25   because it helps in terms of looking at the risk going forward.

1            To me, the most depressing and even difficult

2     sentences are where the person being sentenced has no one in

3     the back of the courtroom.  And this is not really a case where

4     I think recidivism is as much of a risk maybe as somebody with

5     a Criminal History VI and that's a recipe for disaster, when

6     someone has demonstrated a problem repeatedly breaking the law

7     and there's no one in the back of the courtroom.  Then again,

8     all things being equal, that's a factor that probably does not

9     help the person being sentenced.

10            Now, one of the sort of fault lines in this

11     sentencing litigation, and there are many, which is what

12     happens when you get excellent lawyers and give them time to

13     write submissions, is the -- Ms. Rubin's age when he committed

14     the offense conduct.  And then there's the literature that

15     counsel for Mr. Rubin cite in their submission.

16            And of course it's true that on average, people in

17     their late teens, early 20s don't exercise the judgment that

18     people who are older in life exercise.  Just as it's the case

19     of people who are in their 50s and beyond are less likely to

20     repeat.  I mean, there's plenty of literature.  I'm sure you

21     have it in your boilerplate ready to go, and I would too if I

22     were you, Ms. Necheles.  And that's all true and makes sense

23     and the literature backs that up and so it is.

24            But these are generalizations.  And just as there are

25     people who commit crimes afters the age of 55, I think

1  Mr. Allee's point was a fair one, which is that what the

2  letters say about Mr. Rubin is someone who is older than his

3  years and was at the time.  Getting married at age 19 ages

4  someone a lot quicker then someone who is not married at 19,

5  because you have to take on responsibilities.  You take on

6  commitments that most 19-year olds, especially ones that aren't

7  married, don't take on.  It's contributing to the relationship

8  which is hard work.  It is providing for one's family.  It

9  is -- it involves a maturity that even if the person didn't

10  have it at 19, they get it in a hurry.

11         But beyond that, the letters do speak to Mr. Rubin as

12  someone who is -- I think Mr. Allee said, a life coach.  And

13  people call on him to be a mentor, to be a problem solver, to

14  help navigate something as complex as medical care for someone

15  with a very difficult brain tumor diagnosis, and taking care of

16  a four-year old.  The person who entrusts somebody else to take

17  care of their four-year old doesn't think that the literature

18  applies to that caregiver.

19         And, indeed, Ms. Necheles says several times about

20  how smart Mr. Rubin is and how he is organized and he is

21  competent and that is the secret behind Big Apple's success.

22  And so I think in terms of -- it's hard to square the

23  generalization with what the record says about Mr. Rubin, that

24  he was far more savvy, far more mature, far more intelligent

25  and competent and organized than your average 21-year old or

1 | your average 22-year old. So I don't think that that's a

2 | factor that has as much significance in this case. Of course

3 | it can in other cases, but I don't think it's as significant in

4 | this case maybe as in other cases.

5 | Plus, the conduct doesn't stop when Mr. Rubin's in

6 | his early 20s. And it may be that, of the four properties

7 | we're talking about, the one that's in play in 2013 is the

8 | least serious of the four, but it doesn't mean it's not

9 | serious. And also I think it speaks to -- not recidivism, but

10 | it speaks to whatever one was supposed to learn in one's early

11 | 20s about committing fraud. Mr. Rubin didn't learn it. And

12 | maybe, as I said, it wasn't as serious but it was a first

13 | cousin of the things that he was doing earlier on in his life.

14 | Moreover, I think that that's a factor that might

15 | play more significantly in a case that involves a momentary

16 | lapse of judgment. You know, there's plenty of people,

17 | Ms. Necheles, that you've represented who -- they're given a

18 | brief moment to make a choice. You know, if it's a gun, if

19 | it's a lie for me in this one instance. And maybe the average

20 | 20-year old doesn't have the maturity or the brain development

21 | to make the right decision. This was -- I don't think there

22 | really can be much dispute about this -- this was -- this was a

23 | fraudulent scheme that required planning and work and that

24 | actually required some level of competence and organization.

25 | And it's not something that was done in a momentary lapse of

1    judgment by a kid.

2           If those were the facts, then this may be different.

3    But here this was a scheme and sadly a scheme that involved

4    Mr. Rubin's wife.  I mean, she gets arrested because of this.

5    And other family members are brought into the scheme that

6    involved everything from lying about jobs, lying about income,

7    lying about residence, to forgery.

8           And I hate to be so blunt, especially in a crowd of

9    admirable supporters, but this is just thievery, plain and

10   simple, and committed by someone who unfortunately used his

11   talents to commit this fraud.

12          And I think Big Apple kind of cuts both ways because

13   Big Apple proves that there was no need for this.  This wasn't

14   an act of desperation.  This wasn't someone who felt like it

15   was checkmate in life and this was his only play.  Not at all.

16   Big Apple proves that Big Apple could have happened years ago.

17   And it's not an excuse that the market was tough.  The market

18   was tough on all kinds of people.  And Ms. Necheles made the

19   point that when the banks are calling up back in the last

20   decade, borrow some more, borrow some more, she says I wouldn't

21   have done it.  And most people, the vast majority of people,

22   certainly wouldn't accept the offer as an invitation to commit

23   fraud.  And I don't buy the argument that this was the system's

24   fault.

25          The burglar who gets into the unlocked house doesn't

1    get to blame the owners of the house.  And nobody here is going

2    to cry for banks, I get that.  But ultimately, the victims are

3    the others who would borrow from the banks because guess who

4    those costs get passed on to?  So this isn't about sympathy for

5    the banks.  Yeah, the banks did lots of stupid things too.  But

6    that doesn't in any way, in my view -- not only does it not

7    excuse the conduct -- Ms. Necheles doesn't offer it for that

8    reason -- but I just don't think it's a substantial mitigating

9    factor given the facts and circumstances of this case.

10          The other thing we didn't talk about much here today,

11   but is in the papers, is this isn't Mr. Rubin's only offense

12   conduct.  And the check case, whatever it is, it's certainly

13   not the crime of the century.  And I'm even willing to accept

14   the facts that are most favorable to Mr. Rubin.  But I think

15   the Criminal History Category II is appropriate, given those

16   facts.  And it's troubling because it's another example of

17   Mr. Rubin committing fraud.

18          Now Mr. Rubin says well, I -- when I made these lies,

19   I didn't think they were going to hurt.  Then why make them?

20   The reason for the lie is to fool somebody.  That's the point

21   of the lie.  And you would know more want to lie to your wife,

22   thinking she's not going to mind if I lie than you would want

23   to lie to anybody in the financial transaction.  The lessen is

24   Big Apple is run by the books and is complying with every

25   ethical and legal requirement; that it is -- that it's proof

1    that lying is bad.  And it's always bad and there's no

2    rationalization for it even accepting that that was the

3    rationalization.

4         So, you know, every sentence is so hard and every

5    sentence is so tragic because every issue has at least two

6    sides to the story.  You know, people who like to pontificate

7    on sentencing never have to go through this.  And there are a

8    lot of good people in the back of the courtroom who are hurt by

9    having to even be here.  They wish -- they wish that none of

10   this had happened and we could just start over.  I don't think

11   there's anybody who disagrees with that.

12        But in terms of looking at Mr. Rubin's personal

13   history and characteristics is complicated to be sure.  In

14   looking at the seriousness of the offense conduct, I've talked

15   about that.  This was very serious conduct.  This was stealing

16   over a million dollars.  That's the bottom line.  And I don't

17   need to get into the weeds about, you know, the short sale and

18   Ms. Necheles -- the points that were made by her and

19   Ms. Cassidy in the reply, which were compelling about some of

20   the other circumstances, and whether or not the rent was paid

21   in cash.  Okay, I'll assume that it was and is being paid in

22   cash.  But it's still serious conduct.

23        In terms of another piece of the personal history and

24   characteristics of the Rubin, there's Big Apple.  And you know

25   a lot of people obviously have benefited, customers and

1  employees alike have benefited and I think this is a

2  significant factor.  And I think a couple of things can be said

3  about this.

4       There is a business partner.  And it may very well be

5  Mr. Rubin is the one who generates most of the business.  And I

6  don't pretend to be an expert on any business, let alone the

7  kind of business that Big Apple does.  But it sounds like there

8  are a lot of very talented people who are working at this

9  business.  I'm assuming Mr. Lowy is not nothing.  There are

10 actually -- there are two people who are running this business.

11 And this was a business that was started and it's been

12 developed while Mr. Rubin had this case hanging over his head.

13 He always knew that there was a possibility this day was

14 coming.  And I don't think it's fair to say that, you know, the

15 sentence is what's going to be a big issue for the business.

16 No, it's Mr. Rubin's conduct.

17      Mr. Lowy chose to go into business with somebody who

18 presumably he knew.  And there may be some possibility that he

19 knows that Mr. Lowy was getting some of the money from some of

20 these fraudulent loans.  I don't know.  I will assume not,

21 they're not going to him.  But I am going to assume that

22 Mr. Lowy knew or had some reason to know that Mr. Rubin was

23 facing these charges.  After all, I'm told the whole community

24 knows about what the Rubin family is going through.  And good

25 for Mr. Lowy for saying this was in his financial interest to

1  do, this business with Mr. Rubin.

2         But the flip side of it is -- and I don't think

3  Ms. Necheles would argue it this way -- but just because

4  someone is in business with somebody else, that's not an

5  immunity card.  That's a factor certainly under 3553(a).  But

6  it doesn't erase the fraud.  It doesn't change the past.  It's

7  a factor.  It's certainly a mitigating factor and I've

8  considered it.

9         A couple of other things.  Deterrence is an issue.

10  And I agree with what Ms. Necheles says.  The notion that the

11  only form of deterrence is jail is not true.  And I don't think

12  Mr. Allee was arguing that, although I can understand why

13  Mr. Necheles said what she said.  And Justice Stevens talks

14  about this, that probation itself is a very severe punishment.

15         And here the Rubin family has had to endure

16  everything from the arrest in front of their children to the

17  stigma of being in the community having to face these charges,

18  to having to no doubt deal with the financial and resource

19  challenges of defending one's self against these charges.  And

20  his own lawyers are asking for 12 months in a halfway house

21  plus supervised release.  So it's not as if this is nothing,

22  what it is that counsel for Mr. Rubin are asking for and is not

23  as if there isn't some term of fact.

24         The flip side of it is the government says Mr. Rubin

25  is the most culpable person in this case in terms of his

 1  involvement.  And however it is that guidelines had calculated

 2  which, of course, isn't the final answer as to who's the most

 3  culpable person in the case, but at least I accept government's

 4  representation.  Mr. Rubin is facing the highest guideline

 5  range of anybody who is to be sentenced in this case.  And this

 6  speaks a little bit also to unwarranted disparity.

 7       And I do think that general deterrence is a factor

 8  here.  And to the extent that Ms. Necheles says, you know, the

 9  community is aware of what the Rubin family has gone through,

10  they're going to be very aware of the sentence.  And I do think

11  there is a difference between a sentence that does not involve

12  any jail time and a sentence that does involve jail time.  It's

13  a little harder to calculate the margin about how much -- how

14  long this sentence should be.  Is one year supervised release

15  enough or two?  There's a difference betweens zero and one and

16  it's a greater difference than maybe the difference between one

17  and two.  And if there was an exact science, then sentencing

18  would be easy.  It's not, so it's not.

19       But I've certainly considered both the notion of

20  deterrence and the need to avoid unwarranted disparity.  And

21  it's tricky in a case like this where the person the government

22  says is the most culpable is the second person of 12 to be

23  sentenced.  We don't get to pick the order of sentences.  And I

24  don't know how many adjournments I've granted to all the other

25  people in this case.  I almost always grant them.

1        So where I come out on all of this after considering

2   all of the 3553(a) factors that have been so ably argued by

3   both sides, is that it is the judgment of the Court that

4   Mr. Rubin be sentenced to the custody of the attorney general

5   for a period of 18 months to be followed by two years of

6   supervised release.  I'm going to impose a fine of $10,000.  I

7   think it's appropriate under the circumstances of this case.

8   The forfeiture is $1,219,000.  The special assessment is as it

9   must be $100.

10       The conditions of supervision are that Mr. Rubin is

11  not to commit another federal, state or local crime.  He's not

12  to unlawfully possess a controlled substance, a firearm or

13  destructive device.  And he is to cooperate in the collection

14  of DNA as directed by the probation office.

15       I don't think there's any need for any drug testing

16  condition because there's just no evidence in the record that

17  Mr. Rubin represents any kind of a risk for substance abuse.

18  The standard conditions of supervision, one to 13 are imposed.

19  Those will be explained later.

20       In terms of the added conditions, the two that

21  probation recommends make sense.  First, Mr. Rubin is to

22  provide the probation officer with access to any requested

23  financial information.  And also, Mr. Rubin is not to incur any

24  new credit charges or additional lines of credit without the

25  approval of the probation office.

1          In terms of the restitution, 90 days.  The government

2     has to make its case.  I'm going to encourage you the stay in

3     touch with counsel for Mr. Rubin, please.  And don't wait until

4     day 89.

5          In terms of the fine, to the extent Mr. Rubin is

6     engaged in a Bureau of Prisons, non UNICOR work program, he's

7     to pay $25 per quarter towards the criminal financial

8     penalties.  However, if he participates in the UNICOR program,

9     is a grade one through four, he is to pay 50 percent of his

10    monthly report earnings toward criminal financial penalties

11    consistent with BOP regulation 28 CFR Section 545.11.

12         The fine is to be paid -- probation department

13    recommendations seems steep to me.  They're saying $500 a

14    month.  I'm going to say it needs to be paid -- it's going to

15    be 10 percent of gross monthly income.

16         Are there any open counts, Mr. Allee?

17         MR. ALLEE:  Yes, your Honor.  We ask that the Court

18    dismiss the open counts.

19         THE COURT:  All right.  That's granted.

20         Mr. Rubin, to the extent you haven't waived, you have

21    a right to appeal this sentence if you file a notice of appeal

22    within 14 days of when the judgment is entered.

23         I recognize this is a higher sentence than the

24    probation department recommended.  It's a higher sentence than

25    Mr. Rubin's counsel advocated for, and it's a sentence lower

 1 than what the government wants.  In other words, this is a

 2 sentence that makes nobody happy.

 3          In my view, some reduction was appropriate, given

 4 Mr. Rubin's good deeds and given his work at Big Apple.  But to

 5 me, the severity of the criminal conduct in terms of the amount

 6 of money, in terms of the amount of planning, in terms of the

 7 brazenness of the scheme and the fact that it lasted over a

 8 period of time, in my view were aggravating factors that made

 9 the sentence that I've imposed appropriate under the

10 circumstances.

11          Anything you want in a judgment, Ms. Necheles?

12          MS. NECHELES:  Your Honor, I would just ask if you --

13 if he could surrender on March 1 and if you could recommend

14 Otisville.

15          THE COURT:  I'll certainly recommend Otisville.  I

16 know you know this but just to say this for the benefit of your

17 client and his family, all I can do is make a recommendation.

18 But I will recommend Otisville.  I think that makes sense under

19 the circumstances.

20          The surrender date is March 1 that you're asking for?

21          MS. NECHELES:  Yes.

22          THE COURT:  And the reason for that is?

23          MS. NECHELES:  It's right after some holidays and it

24 will allow him to try to get some order in his business.

25          THE COURT:  Is it right before other holidays?

1           MS. NECHELES:  It's before Passover.  Passover is not

2   until April.  And so Passover is like -- ends in like the first

3   week of April, I think.

4           THE COURT:  April 7 or --

5           MS. NECHELES:  I believe that's --

6           THE COURT:  Right.  Mr. Allee?

7           MR. ALLEE:  We have no position on that either, your

8   Honor.

9           THE COURT:  Well, I mean I'm trying to understand are

10  the particularly important holidays in February or January?

11          MS. NECHELES:  There's Purim.

12          THE COURT:  When is Purim?

13          MS. NECHELES:  I think the end of February I think

14  this year.  Your Honor, I think that's about 90 days and I

15  think that is generally what --

16          THE COURT:  Okay.  All right.

17          So we'll say March 1, that Mr. Rubin is to appear at

18  the designated facility by 12 noon.  And if for some reason the

19  facility is not designated, he needs to report to the marshal's

20  office here by noon on March 1, which is Thursday, March 1,

21  2018.

22          Anything else, Ms. Necheles?

23          MS. NECHELES:  No, your Honor.

24          THE COURT:  Anything else, Mr. Allee?

25          MR. ALLEE:  No, your Honor.

1              THE COURT:  All right.  We're adjourned.  Thank you

2    everybody.

3

4              *(Proceeding concluded)*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25